# 25-1687

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA S.A.U.,
*Plaintiffs-Appellees*,

v.

ARGENTINE REPUBLIC,
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court for the
Southern District of New York, No. 15-cv-2739

———————————

**OPPOSITION TO MOTION FOR STAY PENDING APPEAL**

———————————

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

July 17, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees state the following:

Plaintiffs-Appellees Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together "Petersen") are nongovernmental corporate entities. Petersen Energía Inversora, S.A.U. is a Spanish corporation wholly owned by Petersen Energía Inversora Holdings, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation. Petersen Energía, S.A.U. is a Spanish corporation wholly owned by Petersen Inversiones Spain, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation. No public corporation owns 10% or more of the stock of either Petersen Energía Inversora, S.A.U. or Petersen Energía, S.A.U.

Plaintiffs-Appellees Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together "Eton Park," and together with Petersen, "Plaintiffs") are non-governmental entities that have no parent corporations. No public corporation owns 10% or more of the stock of either Eton Park Capital Management, L.P. or Eton Park Fund, L.P. Eton Park Master Fund, Ltd. is in liquidation; Burford Capital Limited, a public corporation, indirectly acts as its liquidator and owns more than 10% of its stock.

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES......................................................................... iii

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................... 3

ARGUMENT ...................................................................................... 7

I.   Argentina Is Not Likely To Succeed On The Merits ...................................... 8

   A.   The District Court Had Authority to Order Argentina to Bring
        the Shares Into the United States........................................... 8

   B.   The District Court Correctly Held That the Shares Are Subject
        to Execution Under the FSIA ................................................11

   C.   The District Court Correctly Held That International Comity
        Does Not Bar Its Order....................................................... 14

II.  As The District Court Held, The Other Stay Factors Counsel
     Strongly Against Granting Relief And Rewarding Argentina's
     Conduct ................................................................................. 16

   A.   Argentina Has Not Shown Irreparable Injury .................................. 16

   B.   Plaintiffs Would Be Harmed by a Stay ....................................... 18

   C.   The Public Interest Weighs Against a Stay ................................... 19

CONCLUSION .................................................................................... 22

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
     LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014)................................................................ 9, 10, 12

*Argentine Republic v. Petersen Energía Inversora S.A.U.*,
139 S.Ct. 2741 (2019)................................................................... 4

*Austria v. Altmann*,
541 U.S. 677 (2004)........................................................................9

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ........................................................13

*De Csepel v. Hungary*,
27 F.4th 736 (D.C. Cir. 2022) .....................................................15

*Export-Import Bank v. Grenada*,
768 F.3d 75 (2d Cir. 2014) ..........................................................13

*Hirschfeld v. Bd. of Elections*,
984 F.2d 35 (2d Cir. 1993) ...........................................................16

*Koehler v. Bank of Berm. Ltd.*,
911 N.E.2d 825 (N.Y. 2009) .................................................... 8, 12

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
676 F.3d 83 (2d Cir. 2012) ...........................................................17

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................. *passim*

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
895 F.3d 194 (2d Cir. 2018) ...........................................................4

*Peterson v. Islamic Republic of Iran*,
876 F.3d 63 (2d Cir. 2017) ............................................... 8, 9, 10, 12

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) ................................................. 15, 19

*Samantar v. Yousuf,*
    560 U.S. 305 (2010).........................................................................................10

*Sullivan v. Troser Mgmt., Inc.,*
    816 N.Y.S.2d 395 (App. Div. 2006)...................................................................18

**Statutes and Rules**

28 U.S.C. §1610(a) ...........................................................................................11, 13

28 U.S.C. §1610(a)(2).......................................................................................... 13

CPLR §5519(a)(4)....................................................................................................18

Fed. R. Civ. P. 69(a) ..............................................................................................18

## INTRODUCTION

Well over a decade ago, Defendant-Appellee Argentine Republic ("Argentina") breached its clear contractual obligations by refusing to make a tender offer to Plaintiffs for their shares in the energy company YPF S.A. ("YPF"), causing Plaintiffs billions of dollars in damages. After years of delaying the resulting litigation—including an unsuccessful trip to this Court, which rejected any claim to sovereign immunity—Argentina was finally held accountable for its breach when the district court entered judgment against it after a bench trial. The court was fully conscious that it was entering a sizable money judgment against a foreign nation with appellate rights, and thus offered to stay the judgment pending appeal if Argentina would agree to expedite its appeal and post minimal security to protect Plaintiffs' interests. Argentina not only rejected that offer, but declined to seek a stay from this Court, rendering the judgment subject to collection just like any other unstayed money judgment. And rather than expediting its appellate efforts to have that unstayed judgment reversed, Argentina opted to take full advantage of an elongated briefing schedule while pursuing a strategy of delay and obstruction of any attempt at collection.

Given Argentina's tactical choices, the parties' appeals from the district court's judgment have now been pending for twenty-one months, and awaiting an oral argument date for nearly eleven months. Meanwhile, Argentina has made no

attempt whatsoever to satisfy the unstayed judgment. Instead, Argentina has consistently resisted all efforts to enforce the judgment, in this country and abroad, even though that judgment remains fully valid and enforceable pending appeal.

That misguided strategy has now come home to roost. Nearly two years after declining to either satisfy the district court's stay conditions or ask this Court for relief, Argentina now runs into court seeking emergency relief from an order that allows the one thing that inevitably follows from an unstayed money judgment: namely, Plaintiffs' efforts to collect their due. The district court thoroughly justified its turnover order allowing for partial satisfaction of the unstayed judgment in a 33-page opinion. Having exhaustively rejected Argentina's position on the merits, the district court then focused on the equities in denying Argentina's request to stay that order. The court explained that any injury was entirely self-inflicted—a result of Argentina's "own actions in delaying and attempting to circumvent its obligations under the judgment"—and the remaining equities tilted strongly against Argentina. D.Ct.Dkt.753 ("Stay.Op.") at 3. As the court summarized, Argentina "abused the Court's accommodations and thus will not be given additional ones." Stay.Op.4.

This Court should reach the same result. The district court, which has overseen this litigation for ten years and is intimately familiar with Argentina's arguments and its tactics, carefully considered and correctly rejected them. Instead of confronting the district court's analysis, Argentina largely ignores it. And even if

Argentina could show any likelihood of success on appeal, the district court correctly concluded that all the other factors warrant denying a stay, given Argentina's dilatory and obstructionist tactics. To the extent Argentina believes it may be harmed if the turnover order takes effect before its appeals are decided, the answer is simply to expedite argument and decision in the appeals from the underlying judgment (which could moot the turnover-order appeal if Argentina prevails), and to expedite the turnover-order appeal for prompt decision if the merits appeal upholds the judgment (expedition Argentina has already agreed not to oppose, *see* Mot.3, 21). At a bare minimum, Argentina should not be permitted to continue obstructing Plaintiffs' lawful efforts to enforce their unstayed judgment with an unsecured stay of the turnover order, which would be a nonstarter under New York law. The stay motion should be denied.

## BACKGROUND

1. This case arises from Argentina's clear breach of its contractual obligations under YPF's Bylaws, and YPF's breach of its own obligation to enforce those Bylaws. In the 1990s, Argentina sought to privatize YPF. To assure investors that it would not renationalize YPF without affording them a compensated exit, Argentina amended YPF's Bylaws to require anyone (including Argentina) who obtained a specified stake in YPF to make a tender offer at a price set by predetermined formulae. Those provisions convinced investors, and YPF's initial

3

public offering raised billions, including $1.1 billion from NYSE-listed shares. *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 199-200 (2d Cir. 2018).

For nearly twenty years, those provisions worked as intended. But in 2012, Argentina seized control of a majority of YPF's shares without honoring the Bylaws' tender-offer requirement, and declared it would not be "stupid" enough to "comply" with the Bylaws. YPF then breached its own obligations by failing to impose the consequences the Bylaws required. *See id.* at 202-03.

Plaintiffs sued Argentina and YPF for their breaches. The district court rejected Argentina's and YPF's claims of sovereign immunity, this Court affirmed, *id.* at 205-11, and the Supreme Court denied certiorari, 139 S.Ct. 2741 (2019). The district court granted summary judgment against Argentina on liability, but granted summary judgment for YPF. D.Ct.Dkt.437. The case against Argentina proceeded to a three-day trial, and the court entered judgment in September 2023, awarding Plaintiffs $16.1 billion in damages. D.Ct.Dkt.493. The parties' appeals from that judgment are pending in this Court.

2. Argentina originally sought a stay of the judgment from the district court pending appeal. The district court granted a stay on two conditions: that Argentina "promptly … seek expedited review of its appeal" to this Court, and provide "minimal security" by pledging its YPF shares and certain receivables by December

5, 2023. D.Ct.Dkt.527 at 10. Rather than comply with those conditions, Argentina asked for a month to "evaluate" them, D.Ct.Dkt.528 at 1; the district court granted that request and then some, giving Argentina until January 10, 2024 to pledge the required security and until January 30, 2024 to seek an expedited appeal. D.Ct.Dkt.529. After taking full advantage of that extension, Argentina chose not to comply with the district court's conditions for a stay after all. The district court accordingly declined to stay its judgment further. D.Ct.Dkt.538; *see* Stay.Op.2-3. Argentina did not seek a stay from this Court, and the judgment accordingly became effective and subject to execution and collection.

Despite initially seeking a stay, Argentina has taken full advantage of this Court's generous briefing deadlines (and additional extensions), extending the appellate briefing to last nearly a year. Briefing was finally completed in August 2024, and the appeals have been awaiting oral argument for nearly eleven months. Meanwhile, Argentina has used the fact that the judgment has not yet been affirmed to oppose recognition and enforcement in jurisdictions around the world, effectively availing itself of the stay the district court denied and Argentina declined to pursue in this Court.

Despite Argentina's ongoing obstruction, Plaintiffs have continued their lawful efforts to execute on the unstayed judgment. In April 2024, Plaintiffs moved for an order requiring Argentina to (i) transfer its YPF shares to a global custody

account at Bank of New York Mellon ("BNYM"), and (ii) instruct BNYM to transfer the ownership interests in those shares to Plaintiffs' designees in partial satisfaction of the judgment. D.Ct.Dkt.555. The district court received extensive briefing on the motion, including a statement from the United States.

On June 30, 2025, the district court granted Plaintiffs' motion. As the court explained in a thorough 33-page opinion, because Argentina's YPF shares are "used for a commercial activity in the United States" (in directing YPF's commercial activity in this country) and were "used for the commercial activity upon which" Plaintiffs' claims are based (in effectuating Argentina's breach of its tender-offer obligation), those shares are not entitled to execution immunity under the Foreign Sovereign Immunities Act ("FSIA") if they are in the United States. D.Ct.Dkt.742 ("Op.") at 16-23. And because the district court has personal jurisdiction over Argentina, the court explained, it has authority under federal law and New York law to order Argentina to bring the shares into New York to pay Plaintiffs. Op.25-27. Finally, "[t]he United States has a strong interest in enforcing its judgments" that "outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to execution under the FSIA," particularly when Argentina has "refuse[d] to make any effort to honor the Court's unstayed judgment." Op.28-32.

On July 14, the district court denied Argentina's motion to stay the turnover order. Having already explained why Argentina's merits arguments were unavailing,

the district court focused on the equities and held that even assuming Argentina could show a likelihood of success on appeal, the remaining factors warranted denying a stay. As the court observed, any purported injury to Argentina "directly flows from the Republic's own actions in delaying and attempting to circumvent its obligations under the judgment," and such "self-inflicted harms are not considered irreparable." Stay.Op.3. Conversely, "an unsecured stay would plainly endanger Plaintiffs' rights," and "the public interest considerations weigh against a stay" because Plaintiffs "are entitled to satisfy their unstayed judgment." Stay.Op.3-4.

## ARGUMENT

The district court correctly denied a stay pending appeal, and this Court should as well. A stay pending appeal "is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted). A court considering a stay request must determine "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426. None of those factors favors a stay here.

## I.     Argentina Is Not Likely To Succeed On The Merits.

Argentina comes nowhere near a "strong showing" it is "likely to succeed on the merits." *Id.*  The district court carefully considered Argentina's arguments, and correctly rejected each one.  Argentina has no good reason to think the result should be different on appeal.

### A.     The District Court Had Authority to Order Argentina to Bring the Shares Into the United States.

Argentina begins by asserting that federal common law "bars execution on foreign-sovereign property outside the United States." Mot.8 (capitalization altered). That argument stumbles at the threshold, because the district court did not order execution on property outside the United States.   Instead, the court ordered Argentina—"a judgment debtor over which it has personal jurisdiction"—to bring the shares *into* the United States to permit execution *inside* the United States.  Op.25. Argentina does not dispute that courts generally have the power to order judgment debtors to bring property into the jurisdiction to satisfy the judgment.  *See, e.g.*, *Koehler v. Bank of Berm. Ltd.*, 911 N.E.2d 825, 831 (N.Y. 2009) ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property[.]"); *see also Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 92 (2d Cir. 2017) (courts may "recall to New York extraterritorial assets owned by a foreign sovereign"), *vacated on other grounds sub nom. Clearstream Banking S.A. v. Peterson*, 140 S.Ct. 813 (2020).   There is no different rule for foreign-sovereign

defendants; instead, the only difference in the foreign-sovereign context is that the FSIA governs jurisdiction over the defendant (not disputed here) and over the assets (satisfied here, *see infra* pp.11-14).

Argentina's reliance on pre-FSIA federal common law as a basis for execution immunity goes nowhere. The Supreme Court has doubted that pre-FSIA federal common law recognized the immunity Argentina asserts. *See Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 144 (2014) (identifying "no case holding that, before the [FSIA], a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts"). But "even if Argentina were right about the scope of the common-law execution-immunity rule, then it would be obvious that the terms of [FSIA] execution immunity are narrower," since the statute "immunizes only foreign-state property '*in the United States*,'" not "extraterritorial assets." *Id.*; *see Peterson*, 876 F.3d at 90 ("The FSIA does not by its terms provide execution immunity to a foreign sovereign's extraterritorial assets.").

Argentina cannot use pre-FSIA common law to expand the FSIA. As the Supreme Court has explained, the FSIA establishes a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *NML*, 573 U.S. at 141. "The key word there—which goes a long way toward deciding this case—is *comprehensive*." *Id.*; *see Austria v. Altmann*, 541 U.S. 677, 699 (2004) (FSIA "established a *comprehensive* framework for resolving any claim

9

of sovereign immunity" (emphasis added)). The FSIA deliberately "abated the bedlam" that had previously governed claims of foreign sovereign immunity, "replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime" with clear statutory rules. *NML*, 573 U.S. at 141. "After the enactment of the FSIA, the Act—and not the pre-existing common law— indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010). "Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *NML*, 573 U.S. at 141-42.

That forecloses Argentina's argument. As the district court recognized, nothing in the FSIA "prevent[s] the Court from ordering [Argentina], a judgment debtor over which it has personal jurisdiction, to bring the Shares from outside of New York into New York to pay Plaintiffs." Op.25; *see NML*, 573 U.S. at 144; *Peterson*, 876 F.3d at 90. The district court did not "reject[]" any "longstanding consensus" about the scope of a court's power to order assets to be brought within the court's territorial jurisdiction, Mot.10; there is no such consensus, and the court dutifully followed clear Supreme Court precedent in rejecting a purported immunity for foreign sovereigns found nowhere in the FSIA, *see NML*, 573 U.S. at 141-42, 144. Argentina has no likelihood of reversing that holding on appeal.

### B. The District Court Correctly Held That the Shares Are Subject to Execution Under the FSIA.

The district court also correctly concluded that the shares are subject to execution under the FSIA. Under the FSIA, property of a foreign state "shall not be immune from … execution" if it is (1) "in the United States," (2) "used for a commercial activity in the United States," and (3) "is or was used for the commercial activity upon which the claim is based." 28 U.S.C. §1610(a). As the district court explained, each of those requirements is or will be met here. Op.16-23, 25-27.

*First*, Argentina contends its YPF shares "cannot be 'in the United States'" because they "are book-entry shares maintained only in Argentina." Mot.13. But many of the YPF shares were traded in the United States as NYSE-listed ADRs at the time of Argentina's breach, *see* Op.4, and nothing prevents the district court from restoring that situation. As the district court described, once Argentina complies with the turnover order, its "ownership interest in the Shares will qualify as security entitlements" that "will have a New York situs, because the global account will be held at the New York office of BNYM" even if the shares themselves remain in the register in Argentina. Op.26-27. Argentina does not even try to dispute that analysis, let alone show it can overcome that analysis on appeal.

Alternatively, Argentina asserts that allowing the district court to order it to bring property into the United States would turn §1610(a)(2)'s "prerequisite that foreign sovereign property be located in the United States" into "a nullity." Mot.13.

11

But the Supreme Court has already explained that §1610(a)(2) poses no limit on execution on property outside the United States. *NML*, 573 U.S. at 144; *see Peterson*, 876 F.3d at 90; *supra* pp.9-10. By its terms, §1610(a)(2) simply does not apply to out-of-state property. It does not prohibit a court from using other authority—which the court indisputably had here, *see Koehler*, 911 N.E.2d at 831— to require a defendant to bring out-of-state property into the state.

*Second*, Argentina claims its YPF shares are not "used for a commercial activity in the United States." Mot.14-15. But Argentina "does not dispute that YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors … all constitute 'commercial activity in the United States.'" Op.17. And as the district court explained, Argentina plainly uses its YPF shares for that commercial activity, as "[s]ince April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share ownership and generated value for the company through use of the United States' markets." Op.19. "Accordingly, the Republic's use of its controlling shares to direct YPF's commercial activity in the United States is sufficient to establish that the shares are 'used for a commercial activity in the United States.'" Op.20.

Argentina asserts its shares were only "used" in shareholder meetings in Argentina. Mot.14. But §1610(a) does not ask whether the property was *itself* used

"in the United States"; it asks whether the property was used for "*commercial activity* in the United States." 28 U.S.C. §1610(a) (emphasis added). What matters is not where the shares were used, but where the commercial activity happened. *See Export-Import Bank v. Grenada*, 768 F.3d 75, 91 (2d Cir. 2014) (asking whether funds were "used by [Grenada] for *commercial activity that takes place in the United States*" (emphasis altered)).

Argentina calls it "extraordinary" to conclude that "'a foreign sovereign's use of its controlling shares to direct a company's commercial activity in the United States satisfies' the FSIA's commercial-activity-in-the-United-States requirement." Mot.14. But that is precisely what the statutory text requires. When property is used to direct commercial activity in the United States, it is "used for commercial activity in the United States." 28 U.S.C. §1610(a); *see, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 151-52 (3d Cir. 2019). That is why, despite its efforts to distinguish the cases supporting the district court's conclusion, Argentina cannot cite any case for its contrary view.

*Third*, Argentina asserts its shares were never used "for the commercial activity upon which the claim is based." 28 U.S.C. §1610(a)(2). But as the district court explained, Argentina "used its control of [the YPF] shares to effectuate the breach of the tender offer obligation because that control ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today." Op.21. And

13

"following the enactment of the YPF Expropriation Laws, the Republic continued to use [the YPF] shares to breach its obligations—using the shares to vote at shareholder meetings, appoint a new Board, run the company, and evade the tender offer requirement." Op.22. In short, "by controlling [those] shares, the Republic stranded minority shareholders in a government-run enterprise—the precise outcome against which the bylaws were designed to protect and therefore the crux of the Republic's breach." Op.23.

Argentina again never responds to the district court's analysis. Instead, it accuses the court of "inconsistent rulings," pointing to the statement in its liability decision that the expropriated shares "were not the source of the tender offer obligation." D.Ct.Dkt.437 at 53. But there is no inconsistency whatsoever in saying that the expropriated shares "were not the source of the tender offer obligation," which arises from the Bylaws, *id.*, and also that the shares were used "to effectuate the breach of the tender offer obligation," by doing what the Bylaws prohibited, Op.21. Argentina's distortion of the district court's decisions and its failure to grapple with the district court's reasoning confirm that Argentina is not likely to succeed on appeal.

## C. The District Court Correctly Held That International Comity Does Not Bar Its Order.

Last and least, Argentina asserts that the turnover order violates principles of international comity. Mot.16-18. The district court correctly rejected that argument

14

too.  Op.28-32.  There is no "unavoidable conflict" between the turnover order and Argentine law, as Argentina "has several choices it can legally pursue" to comply with both, Op.30—including obtaining permission from the Argentine Congress, which would not "require the Argentine Congress to change [any] law," Mot.17.

In any event, "comity considerations counsel in favor of granting" the turnover order *even assuming* a "true conflict."  Op.30.  "The United States has a strong interest in enforcing its judgments, and that interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to execution under the FSIA."  Op.30-31; *see Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1478 (9th Cir. 1992) (recognizing the United States' "strong interest in enforcing its judgments").  A foreign government "cannot simply override the exceptions to the FSIA by invoking its own law to shield its assets from execution in the United States."  Op.31.  Otherwise, "every foreign state could render itself judgment-proof in United States courts just by passing a law requiring its own approval for any transfer of its property." Op.31; *see De Csepel v. Hungary*, 27 F.4th 736, 753 (D.C. Cir. 2022) (rejecting comity-based argument that would afford immunity beyond the FSIA).

More to the point, "[w]hile the Republic demands that this Court extend comity, it simultaneously refuses to make any effort to honor the Court's unstayed judgment." Op.32.  Instead, "[a]t each turn," Argentina has "dodge[d] its obligations

15

on the final judgment." D.Ct.Dkt.538 at 5. Argentina's ongoing delay and obstruction should disqualify it from invoking comity to avoid enforcement. After all, "[c]omity is not a one-way street." Op.32.

Argentina asserts a conflict between the turnover order and Argentine law, but does not even mention the court's alternative holding that comity favors the turnover order regardless. Mot.16-18. Nor does Argentina say anything about its own refusal to honor the judgment and its protracted obstruction and delay. *See* Op.32. That silence again confirms Argentina's failure to make any "strong showing that [it] is likely to succeed on the merits." *Nken*, 556 U.S. at 426.

## II. As The District Court Held, The Other Stay Factors Counsel Strongly Against Granting Relief And Rewarding Argentina's Conduct.

### A. Argentina Has Not Shown Irreparable Injury.

Even if Argentina could show any likelihood of success on appeal, the district court correctly concluded that the remaining factors warrant denying a stay. As to irreparable injury, "any supposed harm" to Argentina "directly flows from the Republic's own actions in delaying and attempting to circumvent its obligations under the judgment," which "is unstayed solely because of the Republic." Stay.Op.2-3. Any such harm is accordingly "self-inflicted" and "caused in large part by [Argentina's] own delay," *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39-40 (2d Cir. 1993), and Argentina's claim of irreparable injury "ring[s] hollow in light of [its]

16

plainly dilatory tactics," *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 102 (2d Cir. 2012).[1]

Regardless, Argentina has not shown a meaningful risk of irreparable harm. It claims it will be harmed by losing majority control and the "undoing" of its "sovereign choice to expropriate 51% of [YPF]" if the shares are transferred to "unknown third-parties." Mot.18-19. But the normal route for avoiding the possibility that collection efforts could be hard to reverse is to seek a stay of the underlying judgment. Having forsworn that obvious remedy, Argentina is poorly positioned to complain that any collection efforts may be difficult to reverse. That said, Plaintiffs have never sought to deny Argentina its right to appeal by executing the unstayed judgment in an irreversible manner, and have no objection to accepting alternative collateral and/or agreeing to terms that would further ameliorate any harm to Argentina. *See infra* p.22. That eliminates any risk that it will be "impossible to put the genie back in the bottle" if the turnover order goes into effect. *Contra* Mot.18.

---

[1] Argentina claims it "could not satisfy" the district court's initial conditions for staying the judgment, Mot.14, but does not explain why—and makes no attempt to explain why it never proposed alternative conditions, sought a stay from this Court, or expedited its appeal.

### B. Plaintiffs Would Be Harmed by a Stay.

Argentina is equally wrong to assert that Plaintiffs would suffer "no appreciable harm" from a stay. *Contra* Mot.20. Instead, as the district court recognized, "an unsecured stay would plainly endanger Plaintiffs' rights." Stay.Op.3. Like all parties, Plaintiffs are "generally entitled to the prompt execution of [final] orders." *Nken*, 556 U.S. at 427. Argentina's efforts to derail that prompt execution clearly harm Plaintiffs. And Argentina seeks to compound that harm by requesting a stay without offering any "bond or other terms that secure [Plaintiffs'] rights," as required by Federal Rule of Civil Procedure 62(d), or placing its shares "in the custody of an officer designated by the court" or providing an "undertaking in a sum fixed by the court," as required by CPLR §5519(a)(4). *See* Fed. R. Civ. P. 69(a) ("procedure on execution" must "accord with the procedure of the state where the court is located").[2]

None of Argentina's counterarguments is persuasive. It claims Plaintiffs face no harm from a stay that "does nothing more than maintain the status quo," but Plaintiffs *are* harmed by the status quo—they hold an unstayed judgment that Argentina is refusing to pay while also refusing to provide any guarantee that it will be paid if Argentina's appeal proves unsuccessful. *Contra* Mot.20-21. Argentina

---

[2] Notably, Argentina does not dispute that New York law would require a bond. *See* CPLR §5519(a)(4); *Sullivan v. Troser Mgmt., Inc.*, 816 N.Y.S.2d 395 (App.Div. 2006).

claims Plaintiffs face no harm because Argentina "is not going anywhere and cannot sell its YPF Shares absent action by the Argentine Congress." Mot.20 (emphasis omitted). But as the district court understood, the risk that the Argentine Congress might act to further obstruct collection of the judgment is anything but speculative; in fact, a new bill was submitted just two weeks ago identifying the district court judge by name and purporting to prohibit satisfaction of the turnover order. Stay.Op.3-4; *see* D.Ct.Dkt.746-1. After causing Plaintiffs billions of dollars in damages and refusing to compensate Plaintiffs for well over a decade, Argentina is in no position to assert that an unsecured stay will not cause Plaintiffs any further harm.

### C. The Public Interest Weighs Against a Stay.

The district court likewise correctly concluded that "the public interest considerations weigh against a stay." Stay.Op.4. Like the parties, "the public" is "generally entitled to the prompt execution" of final judgments, *Nken*, 556 U.S. at 427, and has a "strong interest" in their enforcement, Op.30; *see Richmark*, 959 F.2d at 1478. That interest is especially strong here, where investors are relying on the courts to enforce contractual obligations and protect the integrity of the U.S. securities markets, and where the litigation has been pending for more than a decade and the district court entered its unstayed judgment nearly two years ago. *See* D.Ct.Dkt.161 at 36 (noting the Solicitor General has recognized in this very case the

"strong interest of the United States in ensuring that 'foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations'").  Time and again, Argentina "has abused the [district court's] accommodations." Stay.Op.4.  It should "not be given additional ones." Stay.Op.4.

Argentina asserts that the public interest favors a stay because the dispute "affects Argentina's sovereignty and national governance," Mot.21, but cites no case suggesting that sovereigns are more entitled to a stay than other parties, especially when they have lost a prior appeal wherein they unsuccessfully invoked sovereign immunity.  Argentina also vaguely suggests that a change of control could "trigger irreversible events under YPF's debt instruments or its bylaws' tender-offer requirement," Mot.21, but provides no details whatsoever supporting that speculation.  And Argentina asserts that other third parties could "potentially be affected by changes in company policies or governance," Mot.20-21, but while "there are certainly other parties that are impacted" by the turnover order, Plaintiffs "are entitled to satisfy their unstayed judgment." Stay.Op.4.  Argentina cannot avoid paying that judgment just by asserting that its "hydrocarbon-producing Argentine Provinces" would prefer to have Argentina maintain control of YPF.  *Contra* Mot.21.

Finally, Argentina claims a stay would "serve[] judicial efficiency by maintaining the status quo while the underlying judgment is also on appeal."

Mot.22.  That assertion is a bit rich coming from a party that has elongated the proceedings on the merits appeal and strung out the briefing over nearly a year. Plaintiffs, by contrast, filed their appellate briefs on a 30-day turnaround.  Plaintiffs certainly do not intend to cool Argentina's newfound ardor for expedition, but the sensible approach is to expedite the underlying merits appeal, which would obviate the need to address the turnover order if Argentina prevails.  If, by contrast, Plaintiffs prevail, this Court could then hold argument and quickly resolve Argentina's appeal of the turnover order with the assurance that it would not be issuing an advisory opinion and with Argentina's understanding that by one means or another it will, in fact, have to satisfy the judgment.  All of that is a reason for expediting argument and decision in the appeals from the district court's judgment, which have now been awaiting an oral argument date for eleven months, rather than staying the turnover order.

\* \* \*

The district court correctly determined that after more than a decade of failing to compensate Plaintiffs for their injuries, and nearly two years of failing to pay the unstayed judgment, Argentina is not entitled to further delay collection by an unsecured stay of the turnover order.  This Court should reach the same result.  But the one result this Court should not countenance is giving Argentina a stay of the turnover without any condition that it provide alternative security to protect

Plaintiffs' legitimate interests. Any such order would be a nonstarter under New York law, which requires depositing the property with the court or otherwise providing security for any stay of a turnover order. *See supra* p.18 & n.2. It would also reward Argentina for declining to seek a stay of the underlying judgment and its years of delay and evasion.

Thus, to the extent this Court is not inclined to simply deny the stay, it should remand this matter to the district court to allow Argentina to propose alternative security and/or to set conditions to avoid any irreversible outcomes pending appeal. Plaintiffs have no interest in having the shares become unrecoverable in the (unlikely) event Argentina prevails on appeal, and no interest in running an oil company, and so would accept reasonable conditions to ensure the share transfer can be easily unwound if necessary. Plaintiffs do very much have an interest in ensuring that they can collect on the judgment, and so would also agree to alternative security. But staying the turnover order outright would be tantamount to granting Argentina an unconditional stay of the underlying judgment despite the conditions previously imposed on any such stay by the district court, which has been closely supervising this matter for more than a decade, and would leave Plaintiffs—with an unstayed, fully enforceable judgment—high and dry.

## CONCLUSION

The Court should deny the stay motion and expedite the appeals from the judgment and the turnover order.

Respectfully submitted,

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

July 17, 2025

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This response complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,188 words, excluding the parts of the response exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

July 17, 2025

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on July 17, 2025, an electronic copy of the foregoing response was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.


s/Paul D. Clement
Paul D. Clement