# 25-1687

## In the United States Court of Appeals for the Second Circuit

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA S.A.U.,
*Plaintiffs-Appellees*,

v.

ARGENTINE REPUBLIC,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:15-cv-02739) (Hon. Loretta A. Preska)

### PAGE-PROOF OPENING BRIEF FOR DEFENDANT-APPELLANT THE ARGENTINE REPUBLIC

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio J. Galvis
Adam R. Brebner
Pedro José Izquierdo
Arturo Carlos Schultz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

## CORPORATE DISCLOSURE STATEMENT

The Argentine Republic is a governmental party not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT ........................................ i

INTRODUCTION ....................................................................... 1

JURISDICTIONAL STATEMENT ................................................ 5

STATEMENT OF THE ISSUES ................................................... 6

STATEMENT OF THE CASE ...................................................... 6

    A.    Factual Background ........................................................ 7

        1.    The Republic's Expropriation of the YPF Shares ..................... 7

        2.    Plaintiffs' Claims and the Underlying Judgment ...................... 9

        3.    The Republic's YPF Shares ........................... 11

    B.    The Turnover Order ...................................................... 12

SUMMARY OF ARGUMENT ..................................................... 16

STANDARD OF REVIEW .......................................................... 20

ARGUMENT ............................................................................ 20

I.    LONGSTANDING FEDERAL COMMON LAW FORBIDS THE EXECUTION ON FOREIGN-SOVEREIGN PROPERTY LOCATED OUTSIDE THE UNITED STATES ...................... 21

    A.    Before the FSIA's Enactment, Foreign-Sovereign Property Was Absolutely Immune from Execution ................................... 22

    B.    The FSIA Did Not Abrogate the Federal-Common-Law Rule that Foreign-Sovereign Property Abroad Is Absolutely Immune from Execution ......................................................... 24

    C.    The Supreme Court's Decision in *NML* Does Not Support the Turnover Order ........................................................ 30

**II.**     **THE C.P.L.R. DOES NOT AUTHORIZE THE FORCED TRANSFER OF FOREIGN-SOVEREIGN PROPERTY LOCATED ABROAD** ...........................................................35

**III.**   **THE TURNOVER ORDER VIOLATES THE FSIA** ............................42

    A.    The YPF Shares Are Not "in the United States." ................43

    B.    The YPF Shares Are Not "Used for a Commercial Activity in the United States." ........................................................45

    C.    The YPF Shares Were Not "Used for the Commercial Activity Upon Which the Claim Is Based." .......................................50

**IV.**   **THE TURNOVER ORDER VIOLATES INTERNATIONAL COMITY AND THE ACT-OF-STATE DOCTRINE** ...........................52

    A.    The Turnover Order Directly Conflicts with Argentine Law ............52

    B.    The Turnover Order Violates the Act-of-State Doctrine ...................57

**CONCLUSION** ........................................................................................59

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re 650 Fifth Ave. & Related Props.*,
　2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014)....................................................49

*Af-Cap, Inc.* v. *Chevron Overseas (Congo) Ltd.*,
　475 F.3d 1080 (9th Cir. 2007) .........................................................................46

*Am. Int'l Grp., Inc.* v. *Bank of Am. Corp.*,
　712 F.3d 775 (2d Cir. 2013) .............................................................................20

*Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*,
　585 U.S. 33 (2018)...........................................................................................20

*In re Arb. Between Monegasque De Reassurances S.A.M.*,
　311 F.3d 488 (2d Cir. 2002) .............................................................................20

*Aurelius Cap. Partners, LP* v. *Republic of Argentina*,
　584 F.3d 120 (2d Cir. 2009) ....................................................................*passim*

*In re Austrian & German Holocaust Litig.*,
　250 F.3d 156 (2d Cir. 2001) .............................................................................55

*Autotech Techs. LP* v. *Integral Rsch. & Dev. Corp.*,
　499 F.3d 737 (7th Cir. 2007) .............................................................28, 29, 31

*Bainbridge Fund Ltd.* v. *Republic of Argentina*,
　690 F. Supp. 3d 411 (S.D.N.Y. 2023) .........................................................13, 40

*Beierwaltes* v. *l'Office Federale De La Culture De La
　Confederation Suisse*,
　999 F.3d 808 (2d Cir. 2021) .............................................................................43

*Bolivarian Republic of Venezuela* v. *Helmerich &
　Payne Int'l Drilling Co.*,
　581 U.S. 170 (2017).........................................................................................39

*Braka* v. *Bancomer, S.N.C.*,
　762 F.2d 222 (2d Cir. 1985) .......................................................................58, 59

*Celestin* v. *Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ...................................................20, 57, 58

*Clearstream Banking S.A.* v. *Peterson*,
140 S. Ct. 813 (2020) ...................................................................31

*Conn. Bank of Com.* v. *Republic of Congo*,
309 F.3d 240 (5th Cir. 2002) ...........................................28, 31, 44, 46

*Credit Suisse* v. *U.S. Dist. Ct. for the Cent. Dist. of Cal.*,
130 F.3d 1342 (9th Cir. 1997) ...............................................58, 59

*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ...................................................49

*De Csepel* v. *Republic of Hungary*,
27 F.4th 736 (D.C. Cir. 2022) ...................................................57

*De Letelier* v. *Republic of Chile*,
748 F.2d 790 (2d Cir. 1984) ...........................................25, 28, 29

*EM Ltd.* v. *Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012) ...................................................30

*Exp.-Imp. Bank Republic of China* v. *Grenada*,
768 F.3d 75 (2d Cir. 2014) ...........................................42, 45, 46

*Ezrasons, Inc.* v. *Rudd*,
— N.E.3d —, 2025 WL 1436000 (N.Y. May 20, 2025) ....................37

*F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*,
542 U.S. 155 (2004) ...................................................37, 42

*Fed. Republic of Germany* v. *Philipp*,
592 U.S. 169 (2021) ...................................................39

*In re Feit & Drexler, Inc.*,
760 F.2d 406 (2d Cir. 1985) ...................................................41

*First Nat'l City Bank* v. *Banco Para El Comercio
Exterior de Cuba*,
462 U.S. 611 (1983) ...................................................48

*Flatow* v. *Islamic Republic of Iran*,
  76 F. Supp. 2d 16 (D.D.C. 1999) ....................................................49

*Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) .......................................................49

*In re Gaming Lottery Sec. Litig.*,
  2001 WL 123807 (S.D.N.Y. Feb. 13, 2001) .................................41

*Gucci Am., Inc.* v. *Weixing Li*,
  768 F.3d 122 (2d Cir. 2014) ..........................................................53

*Hartford Fire Ins. Co.* v. *California*,
  509 U.S. 764 (1993).........................................................36, 37, 42

*Ings* v. *Ferguson*,
  282 F.2d 149 (2d Cir. 1960) ..........................................................52

*Koehler* v. *Bank of Bermuda Ltd.*,
  911 N.E.2d 825 (N.Y. 2009)...............................................32, 41, 42

*Levin* v. *Bank of N.Y.*,
  2022 WL 523901 (S.D.N.Y. Feb. 21, 2022) .............................31, 35

*Liu* v. *U.S. Congress*,
  834 Fed. Appx. 600 (2d Cir. 2020)................................................55

*In re Maxwell Commc'n Corp.*,
  93 F.3d 1036 (2d Cir. 1996) ..........................................................41

*Miller* v. *Doniger*,
  814 N.Y.S.2d 141 (N.Y. App. Div., 1st Dep't, 2006) .....................41

*Minerva Surgical, Inc.* v. *Hologic, Inc.*,
  594 U.S. 559 (2021).......................................................................26

*Morrison* v. *Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010).......................................................................26

*Motorola Credit Corp.* v. *Standard Chartered Bank*,
  21 N.E.3d 223 (N.Y. 2014)............................................................42

*Motorola Credit Corp.* v. *Uzan*,
  388 F.3d 39 (2d Cir. 2004) ..................................................................52, 54, 56

*Motorola Credit Corp.* v. *Uzan*,
  739 F. Supp. 2d 636 (S.D.N.Y. 2010) ................................................41

*Murray* v. *Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804) ................................................................27, 28

*N.Y. & Cuba Mail S.S. Co.* v. *Republic of Korea*,
  132 F. Supp. 684 (S.D.N.Y. 1955) ......................................................22, 23

*Pangea Cap. Mgmt., LLC* v. *Lakian*,
  906 F.3d 1 (2d Cir. 2018) ....................................................................20

*Permanent Mission of India* v. *City of New York*,
  551 U.S. 193 (2007)............................................................................22

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
  2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) ..........................5, 10, 47

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
  895 F.3d 194 (2d Cir. 2018) ..........................................................5, 10

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
  2020 WL 3034824 (S.D.N.Y. June 5, 2020) .......................................10

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
  2023 WL 2746022 (S.D.N.Y. Mar. 31, 2023)............................10, 51

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
  2023 WL 5827596 (S.D.N.Y. Sept. 8, 2023) .....................................51

*Peterson* v. *Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ................................................30, 31, 44

*Peterson* v. *Islamic Republic of Iran*,
  876 F.3d 63 (2d Cir. 2017) ...............................................................*passim*

*Peterson* v. *Islamic Republic of Iran*,
  963 F.3d 192 (2d Cir. 2020) ..............................................................31

*Reebok Int'l Ltd.* v. *McLaughlin*,
49 F.3d 1387 (9th Cir. 1995) ...................................................52, 53, 54

*Republic of Argentina* v. *NML Cap., Ltd.*,
573 U.S. 134 (2014)............................................................................*passim*

*Republic of Mexico* v. *Hoffman*,
324 U.S. 30 (1945) .........................................................................22

*Republic of Philippines* v. *Pimentel*,
553 U.S. 851 (2008)..........................................................................23

*Republic of Philippines* v. *Westinghouse Elec. Corp.*,
43 F.3d 65 (3d Cir. 1994) .............................................................55

*Richmark Corp.* v. *Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) ......................................................31

*Rubin* v. *Islamic Republic of Iran*,
830 F.3d 470 (7th Cir. 2016) .....................................................*passim*

*Samantar* v. *Yousuf*,
560 U.S. 305 (2010)..........................................................22, 24, 27

*Schooner Exch.* v. *McFaddon*,
11 U.S. (7 Cranch) 116 (1812) ....................................................22

*Simon* v. *Republic of Hungary*,
911 F.3d 1172 (D.C. Cir. 2018) ...................................................57

*Starbare II Partners L.P.* v. *Sloan*,
629 N.Y.S.2d 23 (N.Y. App. Div., 1st Dep't, 1995) ........................41

*Stephens* v. *Nat'l Distillers & Chem. Corp.*,
69 F.3d 1226 (2d Cir. 1995) .........................................................25

*Trump* v. *CASA, Inc.*,
606 U.S. 831 (2025)..........................................................................40

*Turkiye Halk Bankasi A.S.* v. *United States*,
598 U.S. 264 (2023)..........................................................27, 33, 34

*United States* v. *Texas*,
507 U.S. 529 (1993)............................................................26

*United States* v. *Wells Fargo Bank*,
485 U.S. 351 (1988)............................................................25

*Verlinden B.V.* v. *Central Bank of Nigeria*,
461 U.S. 480 (1983)............................................................22

*In re Vitamin C Antitrust Litig.*,
837 F.3d 175 (2d Cir. 2016) ................................................20

*In re Vitamin C Antitrust Litig.*,
8 F.4th 136 (2d Cir. 2021) ...................................................56

*W.S. Kirkpatrick & Co., Inc.* v. *Env't Tectonics Corp., Int'l*,
493 U.S. 400 (1990).......................................................58, 59

*Walters* v. *Indus. & Com. Bank of China, Ltd.*,
651 F.3d 280 (2d Cir. 2011) ..........................20, 23, 30, 46

*Weilamann* v. *Chase Manhattan Bank*,
192 N.Y.S.2d 469 (N.Y. Sup. Ct. 1959)............................37

**U.S. Statutes**

28 U.S.C. § 1291 ...................................................................5

28 U.S.C. § 1330 ...................................................................5

28 U.S.C. § 1605...........................................................5, 46, 47

28 U.S.C. § 1609 ..........................................................*passim*

28 U.S.C. § 1610 ..........................................................*passim*

28 U.S.C. § 1611 .................................................................24

N.Y. C.P.L.R. § 5201 ..........................................................40

N.Y. C.P.L.R. § 5225 ...................................................*passim*

N.Y. Civil Practice Act § 796 ............................................36

**Argentine Statutes**

Permanent Supplemental Budget Law, Law No. 11,672 .........................................54

YPF Expropriation Law, Law No. 26,741 ........................................................*passim*

**Other Authorities**

1935 N.Y. Laws 1274 ..........................................................................................36

1962 N.Y. Laws 1447 ..........................................................................................36

H.R. Rep. 94-1487 (1976)...........................................................................23, 24, 28, 29

Joseph W. Dellapenna, *Suing Foreign Governments and Their Corporations* (2d ed. 2003) .................................................................23

Restatement (Fourth) of Foreign Relations Law § 432 ...........................................38

Restatement (Third) of Foreign Relations Law § 403 .......................................38, 39

Restatement (Third) of Foreign Relations Law § 441 ...........................................52

## INTRODUCTION

No other U.S. court has ever entered an order like this one. The district court has ordered a foreign sovereign to violate its own laws and to transfer its property located within its own borders to the United States, so that the property can be executed on in satisfaction of a U.S. judgment. Such an encroachment on foreign sovereignty violates U.S. common law, U.S. statutory law, New York law, customary international law, and the most basic notions of international comity. Unless reversed, this order will create a topsy-turvy world in which U.S.-located property of foreign sovereigns enjoys the carefully delineated protections of the Foreign Sovereign Immunities Act (FSIA), while their foreign-located property has no immunity. In short, this would be a legal mess and a diplomatic disaster.

This case originates in the district court's entry of a combined $16.1 billion judgment in two unprecedented actions against the Argentine Republic, which never should have been heard in a U.S. court. That judgment, which is directly contrary to governing Argentine law, is the subject of separate appeals currently scheduled for oral argument on October 29, 2025.[1] While those appeals were pending, the district court ordered the Republic to transfer sovereign property located in

---

[1] *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, Nos. 23-7370, 23-7463, 23-7614; *Eton Park Cap. Mgmt., L.P.* v. *Argentine Republic*, Nos. 23-7376, 23-7471, 23-7667.

Argentina—the Republic's 51% share interest in Argentina's largest energy company, YPF S.A. (the YPF Shares)—to a non-party New York bank for turnover to plaintiffs (the Turnover Order). The district court's Turnover Order is unlawful several times over.

*First*, the district court incorrectly concluded—over the U.S. Government's strong objection—that there is no foreign sovereign immunity for sovereign property located outside the United States. That is both wrong and backward. For over 200 years, this country has recognized that foreign sovereigns are entitled to immunity from execution on their sovereign property. When Congress enacted the FSIA in 1976, it created narrow exceptions for certain foreign-sovereign property *located in the United States*. The FSIA's text and legislative history make clear that the statute did not silently abrogate the longstanding common-law rule that foreign-sovereign property located abroad (especially in the sovereign's own territory) is immune from execution in U.S. courts. It makes no sense that Congress would have laid down protective rules for U.S.-located sovereign property, while creating a free-for-all on foreign-located sovereign property.

Since the FSIA's enactment, the U.S. Government has repeatedly taken the position that foreign-sovereign property located outside the United States remains immune from execution in U.S. courts—a position it reiterated in its statement of interest below and in support of a stay in this Court. Federal courts uniformly agree,

2

except for a single outlier decision that the Supreme Court vacated (albeit on other grounds). Notably, the Supreme Court has since made clear that the FSIA did not displace all preexisting common-law immunities. The district court and plaintiffs overread a few lines in a Supreme Court decision that did not present this question.

*Second*, the district court misinterpreted New York's turnover statute, C.P.L.R. § 5225, as authorizing the turnover of foreign-sovereign property located abroad. Neither the statute's text nor its history supports that extraordinary result. The statute is silent on its application to foreign-located sovereign property. And New York has a straightforward interpretive canon for addressing such silence: statutes must be read consistently with the common law unless clearly abrogated. Section 5225 is an ordinary turnover statute making no mention of foreign sovereigns; it does not clearly express New York's intent to override longstanding sovereign-immunity principles and customary international law.

*Third*, the FSIA independently bars the district court's order. The court held that execution on the YPF Shares is permissible under FSIA Section 1610(a)(2), which authorizes execution on foreign-sovereign property (1) "in the United States," (2) "used for a commercial activity in the United States," *and* (3) "used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). None of Section 1610(a)(2)'s three requirements is met here.

To start, the Republic's YPF Shares are not "in the United States." Like all other YPF shares, they are held in book-entry form in Argentina. A U.S. district court cannot demand that those shares be brought here (in derogation of Argentine law) to jerry-rig its way into the FSIA's text. Nor does the Republic "use[]" its shares "for a commercial activity in the United States." The Republic has only ever used its YPF Shares in Argentina by voting them at shareholder meetings held in Buenos Aires. And any U.S. activity of YPF itself—a separate legal entity only partially owned by the Republic—cannot be attributed to the Republic. Last, the YPF Shares were not "used for the commercial activity upon which the claim [was] based." Plaintiffs' claim rests on the alleged breach of YPF's bylaws by the Republic's expropriation of the YPF Shares, not on any later "use" of those shares.

*Fourth*, the Turnover Order violates foundational principles of international comity. Those comity principles forbid a U.S. court from ordering any person—let alone the foreign sovereign itself—to take action in another country's territory in violation of that country's laws. The act-of-state doctrine likewise prohibits U.S. courts from invalidating official acts of foreign sovereigns in their own territory. That is exactly what the district court's order requires. Since 2012, Argentine law has barred the transfer of the YPF Shares without approval by a two-thirds vote of the Argentine Congress. The district court's suggestion that the Argentine executive

can simply demand that the Argentine Congress change its law does not save its extraordinary order from violating international comity and the act-of-state doctrine.

Under each of these doctrinal frameworks—federal common law, New York law, the FSIA, international comity, and the act-of-state doctrine—the district court's Turnover Order is unprecedented and wrong. As the U.S. Government has made clear below and in this Court, the order, if affirmed, would be deeply injurious to the United States' interests, including creating the risk of reciprocal treatment of the United States and its U.S.-held property and damaging its relations with an important ally. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court asserted subject-matter jurisdiction over these cases under 28 U.S.C. § 1330(a), after concluding that the FSIA's commercial-activity exception applied. *Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2016 WL 4735367, at *7 (S.D.N.Y. Sept. 9, 2016); *see* 28 U.S.C. § 1605(a)(2). This Court affirmed that holding in a prior interlocutory appeal. *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 895 F.3d 194, 209 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019). This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's June 30, 2025 Turnover Order. The Republic timely filed its notices of appeal on July 10, 2025. J.A. __(Dkt.749).

5

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in holding that, contrary to longstanding federal common law, foreign-sovereign property held outside the United States enjoys no sovereign immunity from execution in U.S. courts.

2.     Whether the district court erred in construing N.Y. C.P.L.R. § 5225 to authorize the forced transfer of foreign-sovereign property held outside the United States.

3.     Whether the district court erred in holding that the Republic's shares in Argentine energy company YPF S.A. fall within the FSIA exception for a foreign sovereign's property that is (i) "in the United States," (ii) "used for a commercial activity in the United States," *and* (iii) "used for the commercial activity upon which the claim is based."  28 U.S.C. § 1610(a)(2).

4.     Whether the district court erred in rejecting foundational principles of international comity and the act-of-state doctrine in ordering the Republic to take action in Argentina that would violate Argentine law.

## STATEMENT OF THE CASE

This appeal relates to a combined $16.1 billion judgment against the Republic, which is separately on appeal before this Court.  While that appeal was pending, the district court (Preska, J.) ordered the Republic to turn over its YPF Shares in partial satisfaction of this non-final judgment.  S.A. 1-33.  The court simultaneously entered

a nearly identical order in a separate action against the Republic. *See Bainbridge Fund Ltd.* v. *The Republic of Argentina*, No. 16-cv-8605 (S.D.N.Y.), Dkt. 189. On August 15, 2025, after the district court refused to grant a stay, this Court stayed both turnover orders pending appeal. Dkt. 50.

## A. Factual Background

The facts and proceedings leading to the underlying judgment are detailed in the Republic's opening brief in *Petersen Energía, S.A.U.* v. *Argentine Republic*, No. 23-7370 (2d Cir. filed Sept. 6, 2024) (Dkt. 228). The key facts relevant to the Turnover Order and this appeal are below.

### 1. The Republic's Expropriation of the YPF Shares

YPF is Argentina's largest energy company, employing over 25,000 people. J.A. __(Dkt.591-3.at.10, 89).[2] The Republic established YPF in 1922 as a state-owned energy company to ensure an adequate domestic energy supply. J.A. __(Dkt.393¶2). YPF was privatized in 1993, and by the end of 2001, Spanish oil company Repsol S.A. held over 99% of YPF's capital stock. J.A. __(Dkt.393¶¶3, 21). In transactions in 2008 and 2011 in Spain and Argentina, the Petersen Group, a privately held Argentine conglomerate owned by the Argentine Eskenazi family, acquired a 25% stake in YPF through the Petersen plaintiffs, which are special-

---

[2] District court materials cited in the joint appendix are from the docket in *Petersen Energía, S.A.U.* v. *Argentine Republic*, 15-cv-02739 (S.D.N.Y.).

purpose companies formed in Spain.  J.A. __(Dkt.393¶¶22-24, 27, 39, 41).  The Eton

Park plaintiffs, now defunct hedge funds, acquired approximately 3% of YPF by

2012.  J.A. __(Dkt.393¶¶43-46).

Controlled by Repsol and the Petersen Group, YPF went into serious decline,

in part because Repsol and Petersen agreed to distribute 90% of YPF's profits as

dividends.  J.A. __(Dkt.393¶¶32, 53-54).  Its oil and gas reserves were depleted,

production dropped sharply, and YPF took on enormous debt.  J.A. __(Dkt.393¶¶50,

56-58).  On April 16, 2012, the executive branch of the Republic issued a decree

"intervening" in YPF (a procedure similar to government receivership), and

introduced a bill to Argentina's Congress to start the expropriation process.

J.A. __(Dkt.393¶¶59-60).  The next month, after vigorous debate, the Argentine

Congress enacted the YPF Expropriation Law, Law No. 26,741, which went into

effect on May 7, 2012.  J.A. __(Dkt.393¶66).

To promote the "national public interest" in "[a]chieving [hydrocarbon] self-

sufficiency," the YPF Expropriation Law "declared [of] public interest and subject

to expropriation" 51% of the equity of YPF, "represented by an identical stake of

Class D shares held by Repsol."  YPF Expropriation Law Arts. 1, 7 (S.A. 46, 48).

That 51% stake is the "YPF Shares" at issue here.  That law further provided that

51% of the YPF Shares would belong to the National Government and 49% would

subsequently be distributed among Argentina's oil-producing provinces.  *Id.* Art. 8

(S.A. 48). Except for this transfer to the provinces, that law prohibits "any future transfer of the shares" "without the permission of the National Congress by a two-thirds vote of its members." *Id.* Art. 10 (S.A. 48-49).

After enactment of the YPF Expropriation Law, Repsol and various YPF minority shareholders brought claims asserting that the Republic had violated YPF's bylaws by assuming control over the YPF Shares without making a tender offer. J.A. __(Dkt.393¶¶76-78). Those claims were ultimately resolved as part of the expropriation, through a settlement agreement in which the Republic paid Repsol $5 billion for its shares and Repsol agreed to secure the discontinuance of all claims brought by third parties related to the expropriation. J.A. __(Dkt.393¶¶92-95). Petersen and Eton Park elected not to participate or assert any claims against the Republic at that time. J.A. __(Dkt.393¶¶80-82).

### 2. Plaintiffs' Claims and the Underlying Judgment

In March 2015, litigation funder Burford Capital acquired the right to pursue Petersen's claims for €15 million. J.A. __(Dkt.393¶100). In April 2015, Petersen sued the Republic and YPF in the Southern District of New York. J.A. __(Dkt.1). Petersen brought what it styled as a claim for "breach of contract," alleging principally that the Republic had breached YPF's bylaws by "acqui[ring] . . . a controlling stake in YPF" without making a tender offer to other shareholders.

J.A. __(Dkt.1¶¶50-54).   Eton Park, also funded by Burford, filed a copycat complaint in 2016.  J.A. __(Dkt.393¶102).

The Republic moved to dismiss Petersen's complaint on sovereign-immunity grounds.  *See Petersen*, 2016 WL 4735367, at *4.  The district court denied the Republic's motion, and this Court affirmed.  *See id.* at *16, *aff'd*, 895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019).

On remand, the Republic renewed its motion to dismiss on *forum non conveniens* grounds, which the district court denied.  *Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2020 WL 3034824, at *14 (S.D.N.Y. June 5, 2020).  After discovery, without holding oral argument, the district court granted summary judgment to plaintiffs on their claims against the Republic, which were governed by Argentine law.  *Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2023 WL 2746022, at *4, 20 (S.D.N.Y. Mar. 31, 2023).  In doing so, the court repeatedly misconstrued Argentine law, including by (i) recognizing the first-ever breach-of-contract action for damages based on corporate bylaws; (ii) disregarding YPF's bylaws' exclusive penalty provision; and (iii) overriding Argentina's comprehensive system for third-party claims arising from an expropriation.  The court later acknowledged that it had decided "issues of first impression and questions of Argentine law," J.A. __(Dkt.527.at.6), and the upcoming appeal, which is scheduled

for oral argument on October 29, 2025, will require this Court to effectively act as an Argentine appellate court.

After a short bench trial on damages, the court awarded the Petersen plaintiffs approximately $14.4 billion in damages and prejudgment interest, and the Eton Park plaintiffs approximately $1.7 billion.  J.A. __(Dkt.498).

### 3.    The Republic's YPF Shares

Pursuant to YPF's bylaws, all YPF shares are held in Argentina in book-entry form at Caja de Valores S.A. (CdV), a privately owned Argentine securities depositary that serves as registrar and custodian for all YPF shares.  J.A. __(Dkt.363-1§7(a)); J.A. __(Dkt.579¶¶33-36).   When YPF book-entry shares trade on the Buenos Aires Stock Exchange or are otherwise "transferred," no physical transfer occurs:  CdV notes the transfer in the registry, and at all times retains custody of the shares.  J.A. __(Dkt.579¶¶37-38).

The Republic has exercised its rights as a YPF shareholder by voting the YPF Shares at shareholder meetings, which take place in Buenos Aires, where YPF is domiciled.  S.A. 19; J.A. __(Dkt.579¶¶11-14); J.A. __(Dkt.579¶¶15-18).  At these shareholder meetings, all shareholders—including the Republic—vote to elect the Board  and  to  approve  any  initiatives  requiring  shareholder  approval. J.A. __(Dkt.579¶¶11-12).

Except for the Republic's 51% interest, the remainder of YPF's Class D shares continue to trade publicly. J.A. __(Dkt.591-3.at.90). YPF is thus 49% owned by diverse public shareholders in Argentina, the United States, and around the world. YPF operates as an independent publicly traded company managed by its CEO and officers under the direction of a board of directors. J.A. __(Dkt.591-3.at.18); *see* J.A. __(Dkt.363-1§§11-19). It primarily conducts business in Argentina, where the majority of its assets—operations for crude oil and natural gas exploration and exploitation, refining, storage, manufacturing, and transportation—are located. J.A. __(Dkt.591-3.at.19, 54). The primary source of YPF's revenues is the sale of gasoline, diesel, and natural gas in Argentina. J.A. __(Dkt.591-3.at.19).

### B. The Turnover Order

This appeal involves plaintiffs' efforts to collect on the district court's extraordinary $16.1 billion judgment. In April 2024, plaintiffs filed a motion seeking an injunction and order requiring the Republic to "transfer [the YPF Shares] to a global custody account at Bank of New York Mellon ('BNYM') in New York," and then to "instruct BNYM to initiate a transfer of [the Republic]'s ownership interests in [the YPF Shares] to Plaintiffs or their designees." J.A. __(Dkt.555.at.1). A global custody account is a commercial product set up for specific clients. J.A. __(Dkt.559-15.at.3). BNYM is not a party in this case and has no such account for the Republic. But plaintiffs pressed the district court that BNYM has other

relationships with the Republic and should be forced to create a global custody account for the Republic in New York, to allow it to "indirectly hold[]" the YPF Shares that "exist in book-entry form" in Argentina. J.A. __(Dkt.556.at.19).

The Republic opposed plaintiffs' motion because federal common law, the FSIA, New York law, principles of international comity, and the act-of-state doctrine all prohibit reaching into a foreign nation to grab its sovereign property for turnover in the United States. On November 6, 2024, the U.S. Government filed a statement of interest in support of the Republic's opposition, "reiterat[ing] its long-standing position that foreign sovereign property located abroad is not subject to execution in U.S. courts." J.A. __(Dkt.679.at.1). It also explained that turnover would violate principles of prescriptive comity, and that New York law did not require that outcome. J.A. __(Dkt.679.at.5-8). Finally, the U.S. Government made clear that applying New York's turnover statute as plaintiffs requested would nullify the FSIA's requirement that executable property be "in the United States" before judicial intervention. J.A. __(Dkt.679.at.8-9).

On June 30, 2025, without oral argument, the district court granted plaintiffs' turnover motion. S.A. 33. The court relied heavily on its earlier decision in *Bainbridge Fund Ltd.* v. *Republic of Argentina*, 690 F. Supp. 3d 411 (S.D.N.Y. 2023), in which it found that, under N.Y. C.P.L.R. § 5225, it could order a foreign sovereign to bring assets held outside the United States to New York. S.A. 13 (citing

13

*Bainbridge*, 690 F. Supp. 3d at 421-422). The court's reasoning proceeded in three steps.

*First*, the district court held that, once it ordered the YPF Shares to be brought to New York from Argentina, they would fall into the exception to sovereign immunity enumerated in FSIA Section 1610(a)(2). S.A. 16-23. Even though the Republic conducts its shareholder activities exclusively in Argentina, the court determined that the Republic "used" the YPF Shares for "commercial activity in the United States" by "direct[ing]" YPF's separate alleged U.S. commercial activities. S.A. 20. The court also concluded that the YPF Shares were "used for the commercial activity upon which the claim is based," reasoning that the Republic somehow subsequently used the YPF Shares to "effectuate the breach of the tender offer obligation." S.A. 21-23. The court separately concluded that the YPF Shares would qualify as property "in the United States" once ordered to be brought here. Specifically, by ordering the Republic to "transfer" the YPF Shares to a "global custody account" with BNYM in New York, via BNYM's sub-custodian in Argentina, the court found that there would be a "security entitlement[]" with a New York situs. S.A. 26-27.

*Second*, the district court held that N.Y. C.P.L.R. § 5225 authorized it to order delivery of the YPF Shares into the United States. S.A. 23-26. The court reasoned that Section 5225 allows it to order "any person" to "deliver any documents

necessary to effect payment"—which included ordering a foreign sovereign to bring assets held within its own borders into New York.  S.A. 12, 26 n.19.

*Third*, the district court held that international comity posed no obstacle.  S.A. 28-32.  The court recognized that Argentine law "forbids any transfer of the Shares without permission of the National Congress by two-thirds vote" and prohibits any payment of non-final judgments.  S.A. 29.  But the court still found no "true" or "unavoidable" conflict between U.S. and Argentine law, positing that the Republic could simply (i) "receive the permission of the [Argentine] National Congress by two-thirds vote," (ii) "change the law," or (iii) "satisfy the judgment through a separate agreement with Plaintiffs."  S.A. 29-30.  And even if a true conflict did exist, the court found that the United States' interest in enforcing the judgment "counsel[ed] in favor" of turnover.  S.A. 30.

The district court declined to stay its Turnover Order pending appeal, but this Court granted a stay.  Dkt. 50.  The U.S. Government filed an amicus brief in this Court in support of a stay, reaffirming its consistent position that the FSIA "did not abrogate execution immunity of foreign state property located abroad."  Dkt. 40 at 3.  The U.S. Government also emphasized the Turnover Order's "significant ramifications for the United States' foreign relations" and the risk of "reciprocal treatment of the United States and its property in the courts of other nations."  *Id.* at 2.

## SUMMARY OF ARGUMENT

I.     The district court's Turnover Order violates longstanding federal common law barring the execution on foreign-sovereign property located outside of the United States.  For centuries, all sovereign property was treated as absolutely immune from attachment or execution.  In enacting the FSIA, Congress partially peeled back that immunity and, for the first time, allowed for the execution on certain sovereign property located only "in the United States."  But nothing in the FSIA's text permits execution on foreign-sovereign property outside of the United States. For that separate category, Congress left the common-law rule intact.

Since the FSIA's enactment, courts around the country have uniformly agreed that foreign-sovereign property outside of the United States remains immune from execution, in keeping with the U.S. Government's longstanding position.  The district court's contrary interpretation is at odds with the FSIA's text and legislative history, basic rules of statutory construction, international law, and common sense. In rejecting the application of federal common law, the district court relied on an outlier decision of a panel of this Court that the Supreme Court later vacated, that this Court declined to re-adopt on remand, that was contrary to other decisions of this Court, and that cannot be reconciled with subsequent Supreme Court decisions. This Court should make clear that the FSIA did not abrogate longstanding common law execution immunity for foreign-sovereign property located abroad.

16

II.     The district court also wrongly interpreted New York's turnover statute, C.P.L.R. § 5225, to permit the court to order a foreign sovereign to retrieve and to transfer its property from the sovereign's own territory to the United States.  That interpretation conflicts with both the common law against which Section 5225 was enacted and longstanding principles of prescriptive comity limiting the reach of federal and state statutes.  Both common law and comity principles require that Section 5225 be given a more limited reach unless the C.P.L.R. expressly says otherwise—which it does not.

The district court's expansive reading of Section 5225 rested on New York decisions applying Section 5225 extraterritorially to non-sovereign property.  But extraterritoriality and prescriptive comity are distinct concepts.  The question here is not whether Section 5225 allows for turnover of property outside New York in general, but rather whether it allows for turnover of foreign-sovereign property located outside the United States, including in the foreign sovereign's own country.  Nothing in Section 5225 supports the latter construction.

III.    The district court further erred in holding that the YPF Shares qualify for an exception to immunity under FSIA Section 1610(a)(2).  That section requires that property subject to execution be (1) "in the United States," (2) "used for a commercial activity in the United States," *and* (3) "used for the commercial activity upon which the claim is based."  28 U.S.C. § 1610(a)(2).

17

A.  *First*, the YPF Shares are not and cannot be "in the United States." 28 U.S.C. § 1610(a).  All YPF shares, including the Republic's, are book-entry shares maintained only in Argentina.  To get around that, the district court used New York law to first order that the shares be transferred here—but this "two-step" would nullify the relevant FSIA exception, which requires that the property be "in the United States," not that it be ordered here.  In any event, even under the district court's novel financial arrangement, the YPF Shares would remain in book-entry form in Argentina.

B.  *Second*, the YPF Shares are not "used for a commercial activity in the United States."  28 U.S.C. § 1610(a).  The Republic used its YPF Shares to vote at YPF shareholder meetings, which under Argentine law take place only in Argentina.  All the activity for which the Republic has used the YPF Shares—whether voting or any other shareholder action—has occurred exclusively in Argentina.  The district court found otherwise by erroneously attributing YPF's purported commercial activity in the United States to the Republic.

C.  *Third*, the YPF Shares were not "used for the commercial activity upon which the claim is based."  28 U.S.C. § 1610(a)(2).  Plaintiffs' underlying claim against the Republic is that it allegedly breached YPF's bylaws by acquiring the YPF Shares without conducting a tender offer *for plaintiffs' shares*.  The Republic did not "use" the YPF Shares to commit that alleged breach.

18

IV.    *Finally*, the Turnover Order should be reversed under principles of international comity and the act-of-state doctrine because it would require the Republic to violate its own laws.

A.    The Turnover Order violates established principles of international comity.  It is black-letter law that a U.S. court may not direct a party, much less a sovereign, to violate the laws of another country *in that country*.  Here, Argentine law that long predates this litigation requires the approval of a supermajority of Congress to transfer the YPF Shares.  The district court deemed this clear conflict with Argentine law irrelevant because "[t]he Republic has several choices it can legally pursue"—to receive permission from the Argentine Congress, change the law, or settle with plaintiffs.  S.A. 30.  But the "choice" to avoid illegal action in Argentina by changing Argentine law (or settling the case) is no choice at all.

B.    The Turnover Order also violates the act-of-state doctrine, which prohibits U.S. courts from invalidating the official act of a foreign sovereign.  This Court has construed the act-of-state doctrine to bar orders effectively nullifying a foreign law.  The Turnover Order requires the Republic to ignore or to change its own laws, effectively rendering those acts invalid, including the Republic's lawful expropriation of the YPF Shares.

19

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*. *See Am. Int'l Grp., Inc.* v. *Bank of Am. Corp.*, 712 F.3d 775, 778 (2d Cir. 2013). Such questions of law include (i) "determinations that a foreign state or its property is or is not protected by immunity," *see Walters* v. *Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 286 (2d Cir. 2011); (ii) "the district court's interpretation of a state statute," *Pangea Cap. Mgmt., LLC* v. *Lakian*, 906 F.3d 1, 5 (2d Cir. 2018); (iii) determinations of foreign law, *see Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018); and (iv) application of the act-of-state doctrine, *see Celestin* v. *Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022).

This Court reviews international-comity decisions for abuse of discretion. *In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 183 (2d Cir. 2016), *vacated on other grounds*, *Animal Sci.*, 585 U.S. 33. A court abuses its discretion when its decision rests on an "error of law" or "cannot be located within the range of permissible decisions." *In re Arb. Between Monegasque De Reassurances S.A.M.*, 311 F.3d 488, 498 (2d Cir. 2002).

## ARGUMENT

The district court's unprecedented Turnover Order is wrong in four ways. It (1) violates longstanding federal common law barring execution on a foreign sovereign's extraterritorial assets, (2) misconstrues New York's turnover statute,

(3) dramatically expands the scope of the FSIA's commercial-activity exception, and (4) violates international comity and the act-of-state doctrine by impermissibly directing a foreign sovereign to change its own laws to comply with a U.S. court's order. This Court should reverse on any one of those independent grounds.

## I. LONGSTANDING FEDERAL COMMON LAW FORBIDS THE EXECUTION ON FOREIGN-SOVEREIGN PROPERTY LOCATED OUTSIDE THE UNITED STATES.

Federal common law bars the application of New York's turnover statute to the extraterritorial assets of a foreign sovereign. For 200 years, foreign-sovereign property was absolutely immune from execution. The FSIA partially lowered immunity only for certain sovereign property in the United States, but left such immunity untouched for sovereign property abroad. The district court's misreading of the FSIA rests entirely on an outlier, now-vacated ruling by the panel in *Peterson* v. *Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), *judgment vacated sub nom.*, *Clearstream Banking S.A.* v. *Peterson*, 140 S. Ct. 813 (2020), which itself rested on a misunderstanding of a Supreme Court case on a different subject. With the benefit of subsequent Supreme Court decisions underscoring *Peterson*'s flaws, this Court should reaffirm the consensus view of other courts across the country, including other panels of this Court, that the pre-FSIA common law continues to forbid the execution on foreign-sovereign property located abroad.

## A. Before the FSIA's Enactment, Foreign-Sovereign Property Was Absolutely Immune from Execution.

"The doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976." *Samantar* v. *Yousuf*, 560 U.S. 305, 311 (2010). That "accepted rule of substantive law" included not just sovereign immunity from suit but also sovereign immunity from execution, because "[t]he judicial seizure of the property of a friendly state" could be regarded as "an affront to its dignity" and could "affect [the United States'] relations with" the foreign sovereign. *Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 35-36 (1945).

For most of the Nation's history, the Executive Branch adhered to the "absolute" theory of sovereign immunity, under which foreign states could not be sued without their consent, and foreign-sovereign property was never subject to judicial seizure. *See, e.g.*, *Permanent Mission of India* v. *City of New York*, 551 U.S. 193, 199 (2007); *Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); *Schooner Exch.* v. *McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812). In 1952, the Executive Branch adopted the "restrictive" theory of foreign sovereign immunity, granting foreign sovereigns immunity *from suit* only for their sovereign or public acts, and not for their private or commercial acts. *Permanent Mission of India*, 551 U.S. at 199; *see Verlinden*, 461 U.S. at 487. But immunity *from execution* remained absolute. *See, e.g.*, *N.Y. & Cuba Mail S.S. Co.* v. *Republic of Korea*, 132 F. Supp. 684, 685-686 (S.D.N.Y. 1955) (following the State Department's "direct

22

and unequivocal position" that the shift to the restrictive theory of sovereign immunity did not affect execution immunity); Joseph W. Dellapenna, *Suing Foreign Governments and Their Corporations* 743 (2d ed. 2003) ("Absolute immunity from execution persisted after the United States adopted the restrictive theory of immunity from suit."). This distinction between jurisdictional and execution immunity reflects "a critical diplomatic reality": "[s]eizing a foreign state's property is a serious affront to its sovereignty—much more so than taking jurisdiction in a lawsuit"—and "carries potentially far-reaching implications for American property abroad." *Rubin* v. *Islamic Republic of Iran*, 830 F.3d 470, 480 (7th Cir. 2016), *aff'd*, 583 U.S. 202 (2018); *see Republic of Philippines* v. *Pimentel*, 553 U.S. 851, 866 (2008) (recognizing the "specific affront that could result" to a state from seizing its property "by the decree of a foreign court").

Accordingly, before the FSIA, "property of foreign states was absolutely immune from execution"—whether within or outside the United States—as a matter of federal common law. *Walters*, 651 F.3d at 289 (quoting *De Letelier* v. *Republic of Chile*, 748 F.2d 790, 799 (2d Cir. 1984)); *N.Y. & Cuba Mail*, 132 F. Supp. at 686 (principle that "property of a foreign government is immune from attachment" "is so well established . . . its applicability here could hardly be open to doubt"). Indeed, in enacting the FSIA, Congress explicitly recognized that the "current practice" and "traditional view in the United States concerning execution

has been that the property of foreign states is absolutely immune from execution." H.R. Rep. 94-1487, at 26-27 (1976).

## B. The FSIA Did Not Abrogate the Federal-Common-Law Rule that Foreign-Sovereign Property Abroad Is Absolutely Immune from Execution.

In 1976, Congress enacted the FSIA, which broadly did two things. *First*, it "codif[ied] the restrictive theory of sovereign immunity" as to jurisdictional immunity. *Samantar*, 560 U.S. at 313. *Second*, as relevant here, it "partially lower[ed] the barrier of immunity from execution." H.R. Rep. 94-1487, at 27. On execution, the FSIA now provides that "property *in the United States* of a foreign state shall be immune from attachment arrest and execution" subject to certain exceptions enumerated in Section 1610 (and partially clawed back in Section 1611). 28 U.S.C. § 1609 (emphasis added); *see* 28 U.S.C. §§ 1610, 1611. The FSIA says nothing about foreign-sovereign property outside the United States.

In allowing for limited execution against foreign-sovereign property *in the United States*, Congress did not silently abrogate the longstanding rule prohibiting execution against foreign-sovereign property *outside the United States*. The district court's belief that Congress's silence effected such a monumental shift is directly at odds with the FSIA's text and legislative history, basic rules of statutory construction, the international-law backdrop against which the FSIA was enacted, and common sense.

1.     To begin, the text of the FSIA clearly specifies its scope.  The FSIA governs only execution immunity for "property *in the United States* of a foreign state."  28 U.S.C. § 1609 (emphases added).  The exceptions in Section 1610 likewise apply to the "property *in the United States* of a foreign state" or "property *in the United States* of an agency or instrumentality of a foreign state."  28 U.S.C. § 1610(a), (b) (emphasis added).  As to sovereign property in the United States, "[t]he FSIA starts with a baseline rule of execution immunity; the exceptions are few and narrowly drawn."  *Rubin*, 830 F.3d at 480 (citation omitted); *see De Letelier*, 748 F.2d at 799 ("Congress planned to and did lift execution immunity 'in part,'" but not "wholly").  Thus, in *Stephens* v. *National Distillers & Chemical Corp.*, this Court recognized that the FSIA "did not alter" the "accepted" federal-common-law rule that "the property of foreign sovereigns was absolutely immune from attachment," "other than to create the exceptions contained in §§ 1610–1611."  69 F.3d 1226, 1234 (2d Cir. 1995).

That the FSIA created a detailed regime for property in the United States— but does not mention property outside the United States—confirms that Congress left in place the existing common-law immunity for sovereigns' non-U.S. property.  After all, under traditional statutory-interpretation principles, "the expression of one is the exclusion of others."  *United States* v. *Wells Fargo Bank*, 485 U.S. 351, 357 (1988).  And a reading that limits the FSIA's reach to foreign-sovereign property

inside the United States is also consistent with the "longstanding principle of American law" that federal statutes are presumed to "apply only within the territorial jurisdiction of the United States." *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (citation omitted).

Equally important here is the rule of statutory interpretation that Congress does not abrogate the common law without saying so. Congress "legislates against a background of common-law adjudicatory principles, and it expects those principles to apply except when a statutory purpose to the contrary is evident." *Minerva Surgical, Inc.* v. *Hologic, Inc.*, 594 U.S. 559, 572 (2021) (internal quotations and citation omitted). Thus, "to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States* v. *Texas*, 507 U.S. 529, 534 (1993) (citation omitted).

Here, Congress enacted the FSIA against a background of longstanding common law that foreign-sovereign property, both inside and outside the United States, was absolutely immune from execution. Congress specified that in certain circumstances, foreign-sovereign property inside the United States would no longer be immune. But it did not "speak" at all, much less "directly," to foreign-sovereign property located abroad. It bears repeating that the FSIA nowhere mentions execution on such property. Common-law immunity thus continues to govern for foreign-sovereign property outside the United States.

Nor can the FSIA be understood to implicitly displace the governing common-law principles, by occupying the entire field of potential foreign-sovereign immunities. The Supreme Court has explicitly rejected that exact proposition. In a case involving the immunity of foreign officials, the Court made clear that "[e]ven if a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324. The Court recently reiterated *Samantar*'s holding in the context of common-law criminal immunities, stressing again that "a suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law.'" *Turkiye Halk Bankasi A.S.* v. *United States*, 598 U.S. 264, 280 (2023) (quoting 560 U.S. at 324). In *Turkiye*, the Supreme Court held that there was no immunity under the FSIA, but nevertheless remanded for this Court to "fully consider the various arguments regarding common-law immunity." *Id.* at 280. That decision makes abundantly clear that common-law immunity survived the FSIA's enactment in areas—like this one involving foreign-sovereign property located abroad—that the FSIA does not expressly cover.

2. It is particularly implausible that the FSIA silently eliminated execution immunity beyond U.S. borders because Congress enacted this statute against a background of longstanding international law disfavoring execution against foreign-sovereign property. Courts must avoid construing federal statutes "to violate the law of nations if any other possible construction remains." *Murray* v. *Schooner*

27

*Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). That is particularly true for the FSIA, as the 1976 Congress "took into account the international community's view of sovereign immunity." *De Letelier*, 748 F.2d at 798. Congress repeatedly turned to international law in shaping the FSIA, even submitting draft bills "for comment to many authorities and practitioners in the international law field." H.R. Rep. 94-1487, at 9; *see* 28 U.S.C. § 1609 (recognizing that the FSIA attachment and execution provisions are "[s]ubject to existing international agreements").

The wholesale—and silent—elimination of execution immunity for foreign-sovereign property abroad would have been a shocking departure from international law. "[A]t the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." *Conn. Bank of Com.* v. *Republic of Congo*, 309 F.3d 240, 255-256 (5th Cir. 2002). Both "the 1945 charter of the United Nations and the 1972 enactment of the European Convention [on State Immunity] . . . left the availability of execution totally up to the debtor state." *De Letelier*, 748 F.2d at 799. Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property." *Conn. Bank*, 309 F.3d at 252. If Congress *had* intended to upturn international law, it would have said so outright. *See Autotech Techs. LP* v. *Integral Rsch. & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("We would need some hint

28

from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction.").

3.    The FSIA's legislative history further confirms Congress's intent to leave common-law immunity in place for foreign-sovereign property located abroad. Noting the status quo of "absolute immunity from execution," Congress emphasized that it chose to only "partially lower[] the barrier of immunity from execution." H.R. Rep. 94-1487, at 8, 27. It stuck to the general hierarchy of the restrictive theory of sovereign immunity, under which immunity from execution was stronger than immunity from suit. Congress thus recognized that its partial lowering of execution immunity for foreign-sovereign property in the United States would remedy only "*in part*" "the present predicament of a plaintiff who has obtained a judgment against a foreign state." *Id.* at 8 (emphasis added); *see De Letelier*, 748 F.2d at 798 ("The Act's history . . . strongly support[s] the conclusion that under the circumstances at issue in this case Congress did in fact create a right without a remedy."). Congress could have wholly remedied that "predicament" by wiping out execution immunity, but it chose not to do so.

4.    Finally, construing the FSIA to leave in place the common-law immunity for foreign-sovereign property abroad is necessary to avoid absurd results. If Congress had silently eliminated execution immunity, except as outlined in Section 1609 for U.S.-located property, then the immunity regime would be upside-

down: foreign-sovereign property in the United States would often be immune from execution, subject to the FSIA's narrow statutory exceptions, but property in the foreign sovereign's own territory would have no immunity. As the U.S. Government explained below, "it would not be logical to conclude that Congress, in enacting the FSIA, meticulously delineated the circumstances under which execution on foreign-state-owned assets in the United States would be allowed, but, through its silence, abandoned all such limits for assets located abroad." J.A. __(Dkt.679.at.4).

## C. The Supreme Court's Decision in *NML* Does Not Support the Turnover Order.

For many years, this Court repeatedly and correctly held that the FSIA did not disturb the common-law rule against execution on foreign-sovereign property abroad. For example, in *EM Ltd.* v. *Republic of Argentina*, this Court held that "a district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries," 695 F.3d 201, 208 (2d Cir. 2012), and in *Walters* that China's assets "*outside* of the United States" are "categorically immune from execution under the FSIA," 651 F.3d at 297. *See also Aurelius Cap. Partners, LP* v. *Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("property that is subject to attachment and execution must be 'property in the United States of a foreign state'").

Since the FSIA's enactment, other federal appellate courts have uniformly held that same view. *See Peterson* v. *Islamic Republic of Iran*, 627 F.3d 1117, 1130

30

(9th Cir. 2010) (property not "in the United States" is "immune from execution"); *Autotech*, 499 F.3d at 750 ("The FSIA did not purport to authorize execution against a foreign sovereign's property . . . wherever . . . located around the world."); *Conn. Bank*, 309 F.3d at 247 ("courts in the U.S. may execute only against property that meets the[] two statutory criteria," including that it be "'in the United States'"); *Richmark Corp.* v. *Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) (FSIA "does not empower United States courts to levy on assets located outside the United States"); *see also Levin* v. *Bank of N.Y.*, 2022 WL 523901, at *3 (S.D.N.Y. Feb. 21, 2022) ("courts in this circuit and elsewhere have uniformly held or confirmed that a foreign state's property located abroad is immune under the FSIA").

In 2017, a panel of this Court broke from its previous decisions and those of other federal appellate courts in *Peterson* v. *Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017). But *Peterson* is no longer good law. After an intervening statutory amendment, the Supreme Court vacated the panel decision and remanded. *Clearstream Banking S.A.* v. *Peterson*, 140 S. Ct. 813 (2020). On remand, this Court chose not to "reinstate [its] analysis" that foreign-sovereign property abroad lacked execution immunity. *Peterson* v. *Islamic Republic of Iran*, 963 F.3d 192, 196 (2d Cir. 2020). Nevertheless, the district court here relied almost exclusively on *Peterson* to hold that the FSIA—contrary to its text and legislative history—silently displaced *all* common-law protections for foreign-sovereign property abroad. This

Court should now reaffirm its adherence, as stated in multiple of its pre-*Peterson* decisions, to the consistent view of other federal appellate courts that foreign-sovereign property located abroad remains immune from execution.

1.     For starters, *Peterson* is distinguishable in key ways.  There, plaintiffs sued several banks, seeking turnover of assets held in Luxembourg to satisfy a judgment against Iran.  876 F.3d at 69, 84, 86.  The *Peterson* panel held that *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134 (2014), and *Koehler* v. *Bank of Bermuda Ltd.*, 911 N.E.2d 825 (N.Y. 2009), "when combined . . . authorize a court sitting in New York with personal jurisdiction over a non-sovereign third party to recall to New York extraterritorial assets owned by a foreign sovereign."  876 F.3d at 92.  By its own terms, the *Peterson* order was directed to a "non-sovereign third party" (a Luxembourg financial institution) and sought the transfer of sovereign assets held in a third-party country.  The order did not purport to direct a foreign sovereign itself to bring assets held in its own country to the United States.  So even if *Peterson* were still good law, it still would not justify turnover here, where the district court ordered a sovereign to transfer property from its own territory to the United States.

2.     More fundamentally, *Peterson* rested on the panel's misinterpretation of *NML*.  The *Peterson* panel wrongly concluded that the Supreme Court in *NML* had "abrogated decades of pre-existing sovereign immunity common law" and

"vitiated" the reigning consensus that foreign-sovereign property outside the United States is immune from execution. *Id.* at 69, 93. The *Peterson* panel thus relied on *NML* to subvert decades of unanimity, including decisions of this Court.

*NML* addressed only the "single, narrow question" of whether the FSIA implied a separate "discovery-in-aid-of-execution immunity" for a foreign sovereign's extraterritorial assets—not any request to actually *execute* on such assets. *NML*, 573 U.S. at 140, 144; *see id.* at 136. On that narrow question, the Supreme Court held that the FSIA does not "limit[] the scope of discovery available to a judgment creditor in a federal postjudgment execution proceeding against a foreign sovereign." *Id.* at 136. The Supreme Court did not quietly wipe away centuries of execution law in deciding a different legal question.

The *Peterson* panel erroneously relied on two portions of the Supreme Court's analysis—neither of which decides the question here. *First*, the panel quoted *NML*'s general statements that the FSIA is "comprehensive," and that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text." 876 F.3d at 89 (quoting *NML*, 573 U.S. at 141-142). But the Supreme Court's later decision in *Turkiye* confirms that the FSIA did not abrogate all common-law immunity. In *Turkiye*, after finding that there was no immunity under the FSIA, the Supreme Court remanded the case for this Court to "fully consider the various arguments regarding common-law immunity." 598 U.S. at 280-281. As it reminded

this Court, "a suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law.'" *Id.* at 280 (quoting *Samantar*, 560 U.S. at 324). That later holding eliminates any notion that the FSIA supplanted all common-law immunity, including immunity from execution for foreign-sovereign property located abroad.

*Second*, the *Peterson* panel pointed to *NML*'s brief comments about execution immunity abroad. 876 F.3d at 90; *see NML*, 573 U.S. at 144. But execution immunity was not fully briefed and was unnecessary to the Supreme Court's holding. The Court observed only that the parties had "cite[d] no case holding that, before the [FSIA], a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts." *NML*, 573 U.S. at 144. Without the benefit of such briefing, the Court simply assumed that U.S. courts "generally lack authority in the first place to execute against property in other countries," so the immunity question would not "ever have arisen." *Id.* As explained above, however, the uniform line of pre-FSIA cases held that foreign-sovereign property was absolutely immune from execution. *See supra* pp. 22-24. And as New York law illustrates, U.S. courts have used *in personam* jurisdiction to act on property in other countries—just not property of foreign sovereigns. *See infra* pp. 40-42. Indeed, the Supreme Court does not view *NML* as having conclusively resolved the execution question: it has since called for the views of the Solicitor General on the propriety

34

of the "attachment of and execution against property of a foreign sovereign located outside the United States." J.A. __(Dkt.679-1.at.1). In response, the U.S. Government took the position—as it does here—that *NML* "did not hold that [foreign-held foreign-sovereign] assets are subject to execution in U.S. courts." J.A. __(Dkt.679-1.at.13).

3.     After *NML*, other courts have correctly continued to hold that foreign-sovereign property located abroad is immune from execution. For instance, in *Rubin*, the Seventh Circuit held that property located in Iran was not subject to execution, because to be "even potentially subject to attachment and execution," property must be "within the territorial jurisdiction of the district court." 830 F.3d at 475. The court even quoted *NML*'s observation that U.S. "courts generally lack authority in the first place to execute against property in other countries." *Id.* (quoting 573 U.S. at 144). At least one district court in this Circuit, citing the same quote from *NML*, reached the same conclusion as *Rubin*, holding that a bank account was "immune from execution under the [FSIA] because it is located outside of the United States." *Levin*, 2022 WL 523901, at *2. This Court should do the same.

## II.     THE C.P.L.R. DOES NOT AUTHORIZE THE FORCED TRANSFER OF FOREIGN-SOVEREIGN PROPERTY LOCATED ABROAD.

For the reasons above, federal common law would preempt New York's turnover statute if that statute purported to authorize the seizure of the extraterritorial assets of a foreign sovereign. But the district court erred in reading New York's

statute that way.  New York's C.P.L.R. § 5225 says nothing about its application to foreign-sovereign property abroad.[3]  Although New York courts have construed Section 5225 to apply extraterritorially, none has applied it to foreign-sovereign property abroad.  Separate statutory-construction principles—including a preference to avoid conflicts with established common-law rules and with principles of international comity—preclude reading Section 5225 to reach such property.

A.    The district court erred in construing Section 5225 to overturn the longstanding common law barring the execution on foreign-sovereign property abroad in place when it was enacted.  Section 5225 derives from the Civil Practice Act § 796, which was passed in 1935, 1935 N.Y. Laws 1274; Section 5225 was passed in substantially its current form in 1962, 1962 N.Y. Laws 1447.  Both Section 5225 and its predecessor were thus enacted before the FSIA, at a time when foreign-sovereign property was absolutely immune from execution.  *See supra* pp. 22-24.  Indeed, just three years before the C.P.L.R.'s enactment in 1962, a New York court declined to order attachment of Soviet property, holding that it was "clear that this

---

[3]    The statute provides:  "Upon motion of the judgment creditor, upon notice to the judgment debtor, where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff." N.Y. C.P.L.R. § 5225(a).

court may not assume jurisdiction over a foreign country or its property in any manner antagonistic to the policies of the United States," and that it "must honor and give full effect to the position taken in that connection by the Department of State of the United States" that the property was immune from execution. *Weilamann* v. *Chase Manhattan Bank*, 192 N.Y.S.2d 469, 472 (N.Y. Sup. Ct. 1959).

New York construes its laws not to abrogate common-law immunity principles without a "clear and specific" statement to that effect. *Ezrasons, Inc.* v. *Rudd*, — N.E.3d —, 2025 WL 1436000, at *4 (N.Y. May 20, 2025). Here, Section 5225 includes no statement at all about its application to foreign-sovereign property. Because that silence preserves the then-longstanding common law that New York courts had recognized, the district court erred in construing Section 5225 to reach foreign-sovereign property located abroad.

B.     Principles of prescriptive comity likewise bar the district court's far-reaching construction of Section 5225. Prescriptive comity is a "rule of statutory construction" that "cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws." *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 164-165 (2004). Under prescriptive comity, "a nation [or state] having some 'basis' for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction 'with respect to a person or activity having connections with another state when the

exercise of such jurisdiction is unreasonable.'" *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 818 (1993) (quoting Restatement (Third) of Foreign Relations Law § 403(1)). Whether jurisdiction is "unreasonable" under the Restatement turns on, among other factors, "the extent to which the regulation is consistent with the traditions of the international system" and "the existence of justified expectations that might be protected or hurt by the regulation." Restatement (Third) of Foreign Relations Law § 403(2)(d), (f).

The district court's construction of Section 5225 to reach foreign-sovereign property abroad is still further unreasonable because it puts New York law in conflict with customary international law prohibiting the execution on sovereign property in the territory of another state. *See* Restatement (Third) of Foreign Relations Law § 403(2)(f)*; see also* Restatement (Fourth) of Foreign Relations Law § 432(b) ("Under customary international law . . . a state may not exercise jurisdiction to enforce in the territory of another state without the consent of the other state."). As the U.S. Government has confirmed, "the United States recognizes that this principle reflects a widely accepted rule of customary international law." J.A. __(Dkt.679.at.7) (citing European Convention on State Immunity, art. 23, ETS No. 74; Report of the Sixth Committee to the General Assembly, United Nations Convention on the Jurisdictional Immunities of States and Their Property, art. 19(c),

U.N. Doc. A/59/508 (Nov. 30, 2004), https://treaties.un.org/doc/source/docs/A_59_508-E.pdf).

The district court's interpretation of Section 5225 to reach foreign-located sovereign property also is unreasonable because, as the U.S. Government has explained, it "put[s] U.S. property at risk, given the potential for reciprocal adverse treatment of the United States in foreign courts." J.A. __(Dkt.679.at.8); *see* J.A. __(Dkt.679-2.at.26) (same); *see also Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 183 (2017) (noting that grant of sovereign immunity "dovetails with our own interest in receiving similar treatment") (citation omitted). State statutes, no less than federal ones, must be interpreted "to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Fed. Republic of Germany* v. *Philipp*, 592 U.S. 169, 184 (2021) (citation omitted).

Finally, the district court's misreading of Section 5225 unreasonably upsets "justified expectations." Restatement (Third) of Foreign Relations Law § 403(2)(d). The court created its own mechanism for turnover by ordering the Republic to open a new global custody account with non-party BNYM, through which a new securities entitlement in the YPF Shares would be created. That creates a host of problems under New York law. *First*, C.P.L.R. § 5225(c) does not authorize courts

to order a non-party like BNYM to enter into a new commercial relationship. *See Trump* v. *CASA, Inc.*, 606 U.S. 831, 833 (2025) (noting that courts have "consistently rebuffed requests for relief that extended beyond the parties"). *Second*, under C.P.L.R § 5201(b), a money judgment can be enforced only against "property which could be assigned or transferred," and the YPF Shares cannot be transferred under Argentine law absent a two-thirds vote of the Argentine Congress. *See supra* pp. 8-9. *Third*, because the YPF Shares themselves must remain in Argentina, the Turnover Order would require the creation of an equally novel "securit[ies] entitlement[]" in New York, S.A. 27, rather than the transfer of any existing property in the Republic's "possession or custody" under C.P.L.R. § 5225(a). These unworkable and unauthorized procedures, which also fail to consider regulatory and bylaws requirements for control acquisitions, are the inevitable consequences of misconstruing New York's law to cover foreign-sovereign property located abroad.

C.  The district court did not meaningfully consider how its interpretation of Section 5225 conflicts with New York statutory-interpretation principles respecting common law and prescriptive comity. Instead, the court rested on its prior decision in *Bainbridge*, which presumed that because Section 5225 can sometimes be applied outside New York, it also applies to sovereign property overseas. 690 F. Supp. 3d at 415-416 (citing *Koehler*, 911 N.E.2d at 825); *see* S.A. 29 n.21. But the court cited no New York precedent involving a foreign sovereign—and thus no

precedent raising the common-law and prescriptive-comity reasons to limit the reach of Section 5225 when it comes to the extraterritorial property of a foreign sovereign.

In *Koehler*, the New York Court of Appeals held that "a New York court with personal jurisdiction over a defendant"—there, a bank—"may order him to turn over out-of-state property" of a judgment debtor.  911 N.E.2d at 831.  It reached that conclusion because "CPLR article 52 contains no express territorial limitation." *Id.* at 829.  But *Koehler* said nothing about whether Section 5225 can be applied to foreign-sovereign property located abroad.[4]  The New York Court of Appeals took Section 5225's silence to authorize it to reach *private* property abroad—but silence requires the opposite conclusion before extending the statute to a foreign sovereign in violation of the common law and international comity.  As this Court has explained, "international comity is a separate notion from the presumption against extraterritoriality," and may act as its own "canon of construction" to "shorten the reach of a statute."  *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996) (internal quotations omitted).  "[E]ven where the presumption against

---

[4]  Tellingly, none of the other cases relied on by the district court involved foreign sovereigns or implicated principles of sovereign immunity. S.A. 12-13; *see Motorola Credit Corp.* v. *Uzan*, 739 F. Supp. 2d 636, 637 (S.D.N.Y. 2010) (individuals); *In re Gaming Lottery Sec. Litig.*, 2001 WL 123807, at *1 (S.D.N.Y. Feb. 13, 2001) (company); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 414 (2d Cir. 1985) (companies); *Miller* v. *Doniger*, 814 N.Y.S.2d 141 (N.Y. App. Div., 1st Dep't, 2006) (individual); *Starbare II Partners L.P.* v. *Sloan*, 629 N.Y.S.2d 23 (N.Y. App. Div., 1st Dep't, 1995) (individual).

extraterritoriality does not apply, statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins.*, 509 U.S. at 815 (Scalia, J., dissenting); *see Empagran*, 542 U.S. at 164 (citing dissent in *Hartford Fire* with approval). Indeed, the New York Court of Appeals has clarified that *Koehler* did not override the separate requirement to consider international comity. *See Motorola Credit Corp.* v. *Standard Chartered Bank*, 21 N.E.3d 223, 229 (N.Y. 2014) (holding *Koehler* did not abrogate New York's common-law "separate entity rule," which "promotes international comity").

In short, whether Section 5225 can apply extraterritorially does not determine whether it applies to foreign sovereigns abroad, and other canons applied by New York courts make clear that it does not.

## III.   THE TURNOVER ORDER VIOLATES THE FSIA.

Even if federal common law does not bar—and New York law affirmatively authorizes—the district court's order requiring the Republic to bring property from Argentina to the United States, the FSIA independently requires reversal. The FSIA was "designed to maintain broad immunity from attachment of a sovereign's property." *Exp.-Imp. Bank of the Republic of China* v. *Grenada*, 768 F.3d 75, 90 (2d Cir. 2014). Under FSIA Section 1609, a foreign sovereign's U.S. property "is immune from attachment or execution unless the property fits within one of the

42

limited exceptions enumerated in" Section 1610. *Aurelius Cap. Partners*, 584 F.3d at 129-130. Section 1610 permits execution only if a foreign state's property is (1) "in the United States," (2) "used for a commercial activity in the United States," *and* (3) "used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). Plaintiffs have "the burden of demonstrating" that all three of those criteria are met. *Beierwaltes* v. *L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 816 (2d Cir. 2021). They failed to carry that burden on even one.

### A. The YPF Shares Are Not "in the United States."

Section 1610(a)'s first and most fundamental criterion is that property be "in the United States." But the YPF Shares are not, were not at the time of the Turnover Order, and cannot be in the United States. As the district court acknowledged, those book-entry shares are maintained only in Argentina with CdV. S.A. 6, 27. The court wrongly concluded that it could circumvent this statutory requirement with a "two-step": first, it could order the Republic "to bring the [YPF] Shares from outside of New York into New York" under C.P.L.R. § 5225. S.A. 23-27. Then, *voilà*, the property would be "in the United States" and thus could satisfy the first prong of FSIA Section 1610(a).

The judicial creation of such a "two-step" cannot end-run Section 1610(a)'s "in the United States" requirement. If a U.S. court must first *order the property to*

*be brought* here, that property cannot be deemed "[t]he property in the United States of a foreign state" subject to attachment or execution. Every non-vacated decision of a court of appeals addressing this issue has treated the presence of foreign-sovereign property in the United States—before the involvement of a federal court—as the core Section 1610(a) requirement. *See Rubin*, 830 F.3d at 475 (for foreign-sovereign property to be "even potentially subject to attachment and execution," one "basic criteri[on]" is that property "must be within the territorial jurisdiction of the district court"); *Peterson*, 627 F.3d at 1131-1132 (property not "in the United States" is "immune from execution"); *Aurelius Cap. Partners*, 584 F.3d at 130 ("property that is subject to attachment and execution must be 'property in the United States of a foreign state'"); *Conn. Bank*, 309 F.3d at 247 ("courts in the U.S. may execute only against property that meets the[] two statutory criteria," including that it be "'in the United States'"). And as the U.S. Government explained below, the district court's "two-step" would "render[] the FSIA's clear statutory prerequisite that foreign sovereign property be located in the United States a nullity." J.A. __(Dkt.679.at.8).

There is more. The Turnover Order would not actually succeed here because the YPF Shares *cannot* be brought into the United States. The district court ordered the Republic under Section 5225 to "transfer its Class D shares of YPF to a global custody account at BNYM in New York." S.A. 33. But as the court also acknowledged, that "means that CdV would identify BNYM's sub-custodian as the

beneficial owner, but the Shares *would remain in the register maintained by CdV in Argentina*." S.A. 27 (emphasis added). Thus, even if the YPF Shares were "transferred" to a BNYM global custody account, they still would not be in the United States. For that reason too, this Court should reject the district court's effort to rewrite FSIA Section 1610(a).

### B. The YPF Shares Are Not "Used for a Commercial Activity in the United States."

Beyond not being in the United States, the YPF Shares do not satisfy the second prong of FSIA Section 1610(a) because they are not "used for a commercial activity in the United States." The Republic uses its YPF Shares for activities like voting or other shareholder action, all of which occur exclusively in Argentina. Even if *YPF* arguably conducts some commercial activities in the United States, the FSIA does not attribute the activities of a separate corporation to a voting shareholder like the Republic.

1.  The text of Section 1610(a) is clear: to be subject to attachment or execution, the "property . . . of a foreign state" must be "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). This requires that "*the sovereign* actively *utilize* that property in service of that commercial activity" in the United States. *Exp.-Imp. Bank*, 768 F.3d at 90 (emphasis added); *see Rubin*, 830 F.3d at 480 ("A foreign state may lose its execution immunity only by *its own* commercial use of its property *in the United States*.") (emphasis added).

That text is even clearer in context. Critically, the "commercial activity" exception to execution immunity in Section 1610(a) is narrower than the "commercial activity" exception to jurisdictional immunity in Section 1605(a)(2). The FSIA authorizes jurisdiction over a foreign sovereign based upon, among other things, "an act *outside* the territory of the United States *in connection with* a commercial activity of the foreign state elsewhere [if] that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (emphases added). By contrast, under Section 1610(a)'s more limited exception, it is not enough if a foreign sovereign's property is merely used "*in connection* with a commercial activity or *in relation* to a commercial activity." *Exp.-Imp. Bank*, 768 F.3d at 89 (adopting Ninth Circuit's approach from *Conn. Bank*, 309 F.3d 240, and *Af-Cap, Inc.* v. *Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007)). "If Congress had intended to allow execution on property that had a 'relationship with' or was 'integral to' a commercial transaction in the United States, we would expect it to say as much." *Conn. Bank*, 309 F.3d at 255. Instead, "Congress used the more specific phrase 'used for a commercial activity.'" *Id.*; *see Walters*, 651 F.3d at 289 (noting that "the asymmetry between jurisdiction and execution immunity in the FSIA reflects a deliberate congressional choice").

2.     Plaintiffs cannot meet their burden of showing that the Republic used its YPF Shares for any commercial activity *in the United States*. As the district court

46

found, the Republic only "used" its YPF Shares to vote at shareholders' meetings in Argentina, including "to elect the Board and to approve initiatives generally proposed by the Board." S.A. 19-20. Indeed, under Argentine law, all YPF shareholder meetings must—and do—take place in Buenos Aires. J.A. __(Dkt.579¶¶15-18). In other words, the Republic has used the shares for activities only in Argentina. Plaintiffs' own evidence confirms the same. *See, e.g.*, J.A. __(Dkt.557¶29) (Republic purportedly "exercised control over YPF's capital raising" by "voting at YPF's annual shareholder meetings" in Argentina); J.A. __(Dkt.559-7.at.1) (April 2023 shareholder meeting took place in Buenos Aires); J.A. __(Dkt.557-11.at.1) (same). Indeed, at the motion-to-dismiss stage, the district court observed in holding that it had jurisdiction under Section 1605(a)(2) that when "Argentina exercised shareholder rights associated with its [YPF] shares, including voting," this activity "*took place in Argentina*." *Petersen*, 2016 WL 4735367, at *5 (emphasis added).

3.    The district court wrongly held that *YPF's* asserted commercial activities in the United States were a "sufficient" jurisdictional hook because of the Republic's purported "use of its controlling shares to direct" those activities. *See* S.A. 20; *see also* S.A. 17 (citing "YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors under

SEC Rule 144A"). But under both Argentine and U.S. law, any commercial activity of YPF cannot be attributed to a shareholder, including a majority shareholder like the Republic. Under Argentine law, "a corporation such as YPF is a legal entity in its own right and distinct from its shareholders, including its controlling shareholder." J.A. __(Dkt.579¶¶19-28). And as the Supreme Court recognized in *First National City Bank* v. *Banco Para El Comercio Exterior de Cuba*, "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." 462 U.S. 611, 627 (1983).

This Court addressed a similar question in *Aurelius Capital Partners, LP* v. *Republic of Argentina*. There, the Court held that Argentine social security funds managed by private corporations were immune under Section 1610(a) because the property "*in the hands of the Republic* must have been 'used for a commercial activity,'" and was not. 584 F.3d at 131. This Court reasoned that the "commercial activities of the private corporations who managed these assets" in the United States—like any commercial activities YPF may conduct here—"are irrelevant." *Id.*

The Turnover Order ignores this Court's ruling in *Aurelius* and erroneously treats YPF's alleged U.S. activities as the relevant ones. It thus creates a sweeping new rule: "a foreign sovereign's use of its controlling shares to direct a company's commercial activity in the United States satisfies" Section 1610(a)'s commercial-activity-in-the-United-States requirement, regardless of where the sovereign's

48

shareholder activities occur. S.A. 18. That is not the law. Attributing the commercial activities of a company to its sovereign shareholder, without any piercing of the corporate veil, "would expose foreign states to far greater liability than was originally contemplated under the [FSIA]." *Flatow* v. *Islamic Republic of Iran*, 76 F. Supp. 2d 16, 23 (D.D.C. 1999).

In support of its extraordinary rule, the district court cited three inapposite cases. *First*, in *Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, the Third Circuit concluded that Venezuela, through its alter ego PDVSA, voted PDVSA's shares in its wholly owned *U.S. subsidiary*, and that voting the shares of a U.S. company constituted "using" those shares for commercial activity in the United States. 932 F.3d 126, 151-152 (3d Cir. 2019). *Second*, in *In re 650 Fifth Avenue & Related Properties*, a district court held that Iran, through its alter egos, used shares in a New York entity in New York. 2014 WL 1284494, at *13, 17 (S.D.N.Y. Mar. 28, 2014), *vacated & remanded sub nom.*, *Kirschenbaum* v. *650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016). *Third*, in *Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, the court assessed jurisdictional immunity based on *Iran's* conduct—not the activities of the corporation it allegedly controlled—in "a corporate dispute between majority and minority shareholders." 905 F.2d 438, 450 (D.C. Cir. 1990). Each decision turned on U.S. commercial activities of the defendant or its alter ego. By contrast, the district court here ruled

that the mere voting of shares in a non-alter-ego, non-U.S. corporation *outside* of the United States constitutes "use[] for a commercial activity in the United States" if the corporation engages in activity here. Neither the FSIA's text nor caselaw supports that unprecedented expansion of Section 1610(a).

## C. The YPF Shares Were Not "Used for the Commercial Activity Upon Which the Claim Is Based."

The YPF Shares also have never been "used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). Plaintiffs' underlying claim against the Republic is that it allegedly breached YPF's bylaws by acquiring the YPF Shares without conducting a tender offer for plaintiffs' shares. The Republic did not "use" the YPF Shares to commit that supposed breach.

Both plaintiffs and the district court have repeatedly disavowed that plaintiffs' claims are in any way tied to the YPF Shares. In opposing the Republic's jurisdictional defenses to these lawsuits, plaintiffs maintained that "the shares from which [they] derive their claims" are not those "Argentina expropriated from Repsol"—*i.e.*, the YPF Shares subject to the Turnover Order—but rather the shares that plaintiffs formerly owned. J.A.__(Dkt.388.at.69); *see* J.A.__(Dkt.44.at.13) ("[e]xpropriation of Repsol's [s]hares [i]s [i]rrelevant"). And in the Republic's merits appeal pending before this Court, plaintiffs continue to argue that their claims "arise 'not from the expropriated shares but from the contractual obligations the Republic undertook'" in YPF's bylaws. *Petersen*, No. 23-7370, Dkt. 226 at 64. The

50

district court agreed, noting that "the tender offer obligation is not attached to the shares that the Republic acquired." *Petersen*, 2023 WL 2746022, at *15.[5]

In the Turnover Order, the district court reversed course, finding that "[a]lthough 'the tender obligation is not attached to the shares that the Republic acquired,'" the Republic "used" and "continue[s] to use" the YPF Shares "to effectuate the breach of the tender offer obligation because that control ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today." S.A. 21-22. That makes no sense. The Republic's purported breach was not making a tender offer in 2012 for the 49% of shares that the Republic did *not* expropriate. That purported breach did not involve any contemporaneous or subsequent "use" of the YPF Shares to "ensure[] that . . . the bylaws would never be enforced" or that the Republic's ownership of the expropriated shares would continue to "today." Under plaintiffs' theory—which the district court accepted, *see Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2023 WL 5827596, at *7 (S.D.N.Y. Sept. 8, 2023)—that purported breach occurred, and damages were owed, in 2012.

---

[5] The Republic, by contrast, has consistently maintained that plaintiffs' claims are based on a sovereign act of expropriation for which the Republic is immune from suit under the FSIA.

## IV. THE TURNOVER ORDER VIOLATES INTERNATIONAL COMITY AND THE ACT-OF-STATE DOCTRINE.

Finally, the Turnover Order must be reversed because it requires the Republic to take action in Argentina that violates Argentine law.  Argentine law specifically forbids transferring the YPF Shares "without the permission of the National Congress by a two-thirds vote of its members."  YPF Expropriation Law Art. 10 (S.A. 48-49).  Yet the Turnover Order requires just that:  that the Republic take action in Argentina to (somehow) transfer its YPF Shares to BNYM's sub-custodian, in direct violation of its own preexisting laws.  In ordering the Republic to take action in Argentina in violation of its own laws, the Turnover Order violates longstanding principles of international comity and the act-of-state doctrine.  And the district court's response—that the Republic should simply change its laws—is no response at all.

### A. The Turnover Order Directly Conflicts with Argentine Law.

1. It is "well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state.'"  *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)); *see Reebok Int'l Ltd.* v. *McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995) (same); *see also Ings* v. *Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) (recognizing "fundamental principle[] of international comity" that "our courts dedicated to the enforcement of our laws should not take such action as may

cause a violation of the laws of a friendly neighbor"). Comity principles like this one continue to apply after the FSIA's enactment. Even the *Peterson* panel, which wrongly held that federal common law did not bar execution against foreign-sovereign property outside the United States, *see supra* pp. 30-35, recognized that international comity is an independent "barrier" against a "'court order [that] will infringe on sovereign interests of a foreign state.'" 876 F.3d at 94 & n.23; *cf. NML*, 573 U.S. at 146 n.6 (in evaluating postjudgment discovery, recognizing that "'other sources of law,'" including "comity interests," "ordinarily will bear on the propriety of discovery requests").

This Court has held that "comity principles" require consideration of "legal obligations pursuant to foreign law before compelling" compliance with a U.S. court order. *Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 139 (2d Cir. 2014). For example, in *Reebok*, the plaintiff sought a contempt finding against a Luxembourg bank for releasing funds to the defendant, which the bank did under direction from a Luxembourg court but in violation of a U.S. court order. 49 F.3d at 1389. The U.S. court found that it had personal jurisdiction over the Luxembourg bank because it had knowingly "'aid[ed] and abet[ted] a party in violating that order.'" *Id.* at 1391 (quoting *Waffenschmidt* v. *MacKay*, 763 F.2d 711, 714 (5th Cir. 1985)). The Ninth Circuit reversed, holding that, although that principle "may be sound" in many circumstances, "the strength of the analysis begins to crumble when a district court

seeks to reach out across the Atlantic in an attempt to impose conflicting duties on another country's nationals within its own borders." *Id.* at 1392; *see id.* at 1393 ("Reebok cannot now turn to the United States district court to punish [the bank] for complying with its own country's statutory and judicial law within that country.").

As in *Reebok*, the Turnover Order requires the Republic to violate its own laws on its own soil. Since 2012, three years before this litigation began, Argentine law has barred the transfer of the YPF Shares to *anyone* without a super-majority vote of its Congress. The YPF Expropriation Law explicitly (1) designates 49% of the YPF Shares to the Argentine Provinces that are part of the Federal Organization of Hydrocarbon Producing States, and (2) forbids any other transfer of the expropriated YPF Shares "without the permission of the National Congress by a two-thirds vote of its members." YPF Expropriation Law Arts. 8, 10 (S.A. 48-49). As an independent bar to turnover, Article 170 of the Permanent Supplemental Budget Law, Law No. 11,672, provides that the Republic may make payments only on judgments that have become final, which the judgment here has not. J.A. __(Dkt.580¶¶27, 29-30); J.A. __(Dkt.526-2). In ordering the Republic to turn over its YPF Shares, the district court thus improperly "'require[d] [the Republic] to do an act in [Argentina] that is prohibited by the law of [Argentina].'" *Motorola*, 388 F.3d at 60 (quoting Restatement (Third) of Foreign Relations Law § 441).

2.    The district court erred in seeing "no unavoidable conflict between Argentine law and Plaintiffs' requested relief," because "[t]he Republic has several choices it can legally pursue."  S.A. 30.  The court then offered three purported "choices" that confirm, rather than obviate, the conflict between Argentine law and its order.

The district court's first two options were for the Republic to either "receive the permission of the National Congress by two-thirds vote" to transfer the shares, or "take action to change the law."  S.A. 30.  Both require changing Argentine law. But as this Court has held, U.S. courts have no power to require "the legislature of a foreign sovereign" to "enact or change a law."  *In re Austrian & German Holocaust Litig.*, 250 F.3d 156, 164-165 (2d Cir. 2001) (on mandamus, instructing court to omit language from order "seemingly requir[ing] the German legislature" to amend its laws).  To "so . . . trammel on the prerogatives of a legislature" is simply "beyond the authority" of the U.S. judiciary.  *Id.* at 164; *see Liu* v. *U.S. Congress*, 834 Fed. Appx. 600, 606 (2d Cir. 2020) (federal courts "lack the power to compel [even] the [U.S.] Congress to exercise its legislative powers").  That is because "each sovereign nation has the sole jurisdiction to prescribe and administer its own laws."  *Republic of Philippines* v. *Westinghouse Elec. Corp.*, 43 F.3d 65, 79 (3d Cir. 1994) (vacating injunction regulating sovereign's conduct within its borders).

The district court's third option is no better:  to "satisfy the judgment through a separate agreement with Plaintiffs"—*i.e.*, to settle the case or some part of it. S.A. 30.  An illegal order does not become legal simply because the parties may elect to settle out of court.

3.     In the alternative, the district court doubled down, holding that if "there is a true conflict between Plaintiffs' requested relief and Argentine laws, comity considerations counsel in favor of granting Plaintiffs' requested relief." S.A. 30.  In reaching that conclusion, the court purported to balance the respective interests of the United States and Argentina.  S.A. 30.  But that balancing test does not apply here.  U.S. courts conduct an international-comity balancing test before subjecting a party to conflicting legal obligations here and in their home country.  *See In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 144, 154 (2d Cir. 2021) (applying a "multi-factor balancing test" where "defendants faced a true conflict between U.S. antitrust law and the Chinese export regime's twin requirements of maintaining minimum prices and coordinating actual market price").  By contrast, it is a bright-line rule of international comity that no person may be "require[d] . . . to do an act *in another state* that is prohibited by the law of that state." *Motorola*, 388 F.3d at 60 (quoting Restatement (Third) of Foreign Relations Law § 441) (emphasis added).

Even under a more flexible balancing test, the district court erred by declining to extend comity to the Republic on the basis that the Republic had inappropriately

attempted to "shield its assets from execution in the United States." S.A. 31. The YPF Expropriation Law barring the transfer of the YPF Shares without a two-thirds vote of the Argentine Congress was passed in 2012—before plaintiffs brought their claims and more than a decade before the Turnover Order. Thus, Argentine law here is not a post-hoc "'legal impediment[] to the enforcement of a federal court's orders.'" S.A. 32 (quoting *Motorola*, 388 F.3d at 60). And the United States cannot have an overriding interest in pressing forward anyway, when the U.S. Government, under multiple administrations, has advocated against turnover here. J.A. __ (Dkt.679.at.1, 8).

Finally, the district court wrongly relied on *Simon* v. *Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. 2018), and *De Csepel* v. *Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022). Those decisions did not address a conflict between U.S. and foreign law, much less purport to direct a foreign sovereign to violate its own laws on its own soil. Rather, they held that, as a matter of U.S. law, "the FSIA does not require prudential exhaustion," meaning the exhaustion of remedies in a foreign court before suing in U.S. court. *De Csepel*, 27 F.4th at 753; *see Simon*, 911 F.3d at 1180-1181. That doctrine is irrelevant here.

### B.     The Turnover Order Violates the Act-of-State Doctrine.

In entering its Turnover Order, the district court ignored the act-of-state doctrine, which this Court has recognized is a binding "*principle of decision.*"

*Celestin.*, 30 F.4th at 138 (citation omitted). Under that doctrine, U.S. courts may not "declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc.* v. *Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). The act-of-state doctrine thus "compels federal and state courts to treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'" *Celestin*, 30 F.4th at 138 (quoting *Kirkpatrick*, 493 U.S. at 406).

This Court has construed the act-of-state doctrine to bar orders that would require a country to violate its own laws and thus have the practical effect of nullifying those foreign laws. For example, in *Braka* v. *Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985), this Court held that U.S. courts could not order Mexico to make payments in dollars or at a particular exchange rate when Mexican law required payment in pesos at its own rate of exchange. As the Court explained, requiring Mexico "to violate its own national law with respect to an obligation wholly controlled by [its own] law . . . would clearly be an impermissible 'inquiry into the legality, validity, and propriety of the acts and motivation of [a] foreign sovereign[] acting in [its] governmental role[] within [its] own boundaries,'" triggering the act-of-state doctrine. *Id.* Similarly, the Ninth Circuit has held that the act-of-state doctrine foreclosed U.S. courts from ordering a Swiss bank to transfer funds in "direct contravention" of Swiss law freezing the assets, because doing so would be tantamount to "'declar[ing] invalid the official act of a foreign sovereign.'"

*Credit Suisse* v. *U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 130 F.3d 1342, 1347 (9th Cir. 1997) (quoting *Kirkpatrick*, 493 U.S. at 405).

*Braka* and *Credit Suisse* are directly on point here. In ordering the Republic to transfer the YPF Shares to a BNYM sub-custodian in Argentina, the district court required Argentina to violate its own laws. *See supra* pp. 54-56. Even worse, the Turnover Order would operate to fully reverse a lawful expropriation that was implemented under governing Argentine law based on energy-security concerns. It thus requires the Republic to ignore (or change) its own laws, effectively rendering them "null and void." *Kirkpatrick*, 493 U.S. at 406. Indeed, the district court admitted just that by directing the Republic to simply "change the law." S.A. 30. That clearly violates the act-of-state doctrine.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*

Robert J. Giuffra, Jr.
Sergio J. Galvis
Adam R. Brebner
Pedro José Izquierdo
Arturo Carlos Schultz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Attorneys for the Argentine Republic*

September 25, 2025

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) and Local Rule 32.1(a) because it contains 13,927 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

September 25, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I filed the foregoing Brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

September 25, 2025