# 25-1687

## United States Court of Appeals

*for the*

### Second Circuit

PETERSEN ENERGIA INVERSORA, S.A.U.,
PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees,*

– v. –

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

YPF S.A.,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF FOR AMICUS CURIAE
PROVINCE OF CHUBUT
IN SUPPORT OF DEFENDANT-APPELLANT**

---

Ilene Pabian
Chazz Freeman
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
(305) 374-8500

Sean Sheely
HOLLAND & KNIGHT LLP
787 Seventh Avenue, 31st Floor
New York, New York 10019
(212) 513-3200

*Attorneys for Amicus Curiae*

 COUNSEL PRESS    (800) 4-APPEAL • (386132)

## CORPORATE DISCLOSURE STATEMENT

The Province of Chubut is a governmental entity not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1.

# <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................1

ARGUMENT ...........................................................................................3

I.    The Legislative Framework Governing the Expropriated Class D Shares and the Mischaracterization of Chubut's and the Other Provinces' Interests. ..........................................................................3

II.    The Turnover Order Nullifies a Ratified Federal Agreement Between the Republic and Chubut. ................................................................8

III.    The Turnover Order Violates Argentina's Legislative Safeguards Protecting the Statutory Interests of Chubut and the Other Provinces. ...........9

IV.    Preservation of Chubut's Rights and the Unlawful Implications of the Turnover Order. ..................................................................13

CONCLUSION ......................................................................................16

CERTIFICATE OF SERVICE .................................................................18

CERTIFICATE OF COMPLIANCE .........................................................19

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                   **Page**

*Bank of New York v. Nickel*,
   789 N.Y.S.2d 95 (N.Y. App. Div., 1st Dep't 2004) ......................................15

*Celestin v. Caribbean Air Mail, Inc.*,
   30 F.4th 133 (2d Cir. 2022) ..........................................................................12

*Edrington v Richman*,
   20 N.Y.S.2d 717 (N.Y. App. Div., 1st Dep't 1940) ....................................15

*First Nat'l City Bank v. Banco Nacional de Cuba*,
   406 U.S. 759 (1972) .........................................................................................9

*Hilton v. Guyot*,
   159 U.S. 113 (1895) .........................................................................................9

*Matter of Goodchild*,
   290 N.Y.S. 683 (N.Y. Sur. Ct. 1936) ...........................................................14

*Mitchell v. Hawley*,
   83 U.S. 544 (1872) .........................................................................................14

*Motorola Credit Corp. v. Uzan*,
   388 F.3d 39 (2d Cir. 2004) ...........................................................................12

*Obduskey v. McCarthy & Holthus LLP*,
   586 U.S. 466 (2019) .......................................................................................11

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
   466 F.3d 88 (2d Cir. 2006) .......................................................................8, 13

*RR Vill. Ass'n., Inc. v Denver Sewer Corp.*,
   826 F.2d 1197 (2d Cir. 1987) .......................................................................14

*Supreme Merch. Co. v. Chem. Bank*,
   70 N.Y.2d 344 (1987) ................................................................................6, 15

*Swezey v. Lynch*,
   926 N.Y.S.2d 415 (N.Y. App. Div., 1st Dep't 2011) ...................................15

*U.S. v. Thiam*,
 934 F.3d 89 (2d Cir. 2019) ...............................................................9

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*,
 493 U.S. 400 (1990)..........................................................................12

## OTHER AUTHORITIES

Certified translation of Argentine Ministry of Interior,
 *Cadenas de Valor Chubut*.................................................................2

CPLR § 5201 .......................................................................................6

*Province of Chubut (Argentina) Update to Credit Analysis*, Moody's
 Ratings (Aug. 30, 2024) ...................................................................2

*Snapshot: Chubut, Argentina's No. 2 Oil Jurisdiction*, Bnamericas
 (Dec. 14, 2021) ................................................................................1

## INTEREST OF *AMICUS CURIAE*

The Province of Chubut ("Chubut" or "Province") respectfully submits this *amicus curiae* brief in support of the Argentine Republic's ("Argentina" or "Republic") appeal from the district court's June 30, 2025 turnover order ("Turnover Order"), which compels the transfer of more than 200 million shares of stock to Appellees.[1]

Chubut is an autonomous province of Argentina that governs itself under its own Constitution. With a population of approximately 603,000, Chubut is a sparsely populated and largely rural province located in the southern Patagonian region. Chubut's economy depends heavily on natural resource extraction, particularly hydrocarbons. It is the second-largest oil-producing province in Argentina and ranks fifth in natural gas production. *Snapshot: Chubut, Argentina's No. 2 Oil Jurisdiction*, Bnamericas (Dec. 14, 2021), https://www.bnamericas.com/en/news/snapshot-chubut-argentinas-no-2-oil-jurisdiction. Chubut was the site of Argentina's first hydrocarbon discovery and is the birthplace of YPF S.A. ("YPF"), the country's largest energy company. Hydrocarbon royalties constitute a significant portion of the Province's revenue, accounting for 19% of Chubut's total revenue in 2023.

---

[1] All parties have consented to the filing of this brief. *Amicus curiae* states that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

*Province of Chubut (Argentina) Update to Credit Analysis*, Moody's Ratings (Aug. 30, 2024), https://economia.chubut.gov.ar/wp-content/uploads/2025/01/Informe-de-calificacion-2024-1.pdf. Nearly 14,000 jobs in Chubut are directly tied to oil and gas extraction. (ADD.17)[2] (certified translation of Argentine Ministry of Interior, *Cadenas de Valor Chubut*, https://www.argentina.gob.ar/sites/default/files/chubut_-_cadenas_de_valor.pdf (last visited Sept. 29, 2025)). The Province's economic structure is relatively undiversified, with oil and gas historically accounting for nearly one-half of its total exports. (ADD.17).

Chubut has a direct and substantial statutorily created interest in the YPF shares at issue in this appeal. That property interest is expressly conferred by Argentine legislation and formalized through a federal agreement ratified by Chubut's legislature. The Turnover Order threatens to extinguish Chubut's legal rights in those shares without adjudication or consent, undermining its sovereign interests and its ability to participate in the governance of Argentina's most important energy enterprise.

Chubut therefore has a compelling interest in the resolution of this appeal. A ruling upholding the Turnover Order may impair the Province's statutory ownership rights and directly affect the economic and social welfare of its citizens. For these

---

[2] We refer to materials in the Addendum attached hereto as (ADD.__).

reasons, the Province urges this Court to reverse the Turnover Order, recognizing not only the severe consequences for Chubut's economy and population but also the broader implications for international comity, sovereign immunity, and the rights of subnational entities under both American and Argentine law.

## ARGUMENT

I. **The Legislative Framework Governing the Expropriated Class D Shares and the Mischaracterization of Chubut's and the Other Provinces' Interests.**

In 2012, the Argentine National Congress enacted Law No. 26,741 ("Expropriation Law"), mandating the expropriation of 51% of YPF's Class D shares, representing 200.6 million shares ("Expropriated Class D Shares"). *See* (S.A.46–50).[3] This law directs that 51% of the Expropriated Class D Shares be retained by the Republic, while the remaining 49% are to be held by the Republic on behalf of, and ultimately transferred to, the hydrocarbon-producing provinces that comprise the *Organización Federal de Estados Productores de Hidrocarburos* ("OFEPHI" or "Federal Organization of Hydrocarbon Producing States" in English), including Chubut (collectively, the "Provinces").[4] (S.A.48).

---

[3] All citations to (S.A.___) refer to the Special Appendix filed by the Republic in Second Circuit Case No. 25-1689.

[4] While Chubut submits this *amicus curiae* brief solely on behalf of itself, the arguments contained herein apply to the other Provinces. Accordingly, we at times refer to the provincial interest collectively.

Crucially, the Expropriation Law leaves no discretion in this allocation. Article 8 mandates that 49% of the Expropriated Class D Shares "shall be distributed" ("*se distribuirá*") to the Provinces, thereby conferring a substantive statutory right and beneficial ownership. (S.A.48). Article 9 reinforces this framework by mandating the Republic to exercise political voting rights attached to those Shares only "until" ("*hasta tanto*") the transfer is complete. (S.A.48). Together, these provisions establish that the Republic holds the Provinces' beneficial interest in the Shares as a transitional custodian—not as an absolute owner. Among other protections, the Expropriation Law requires a two-thirds vote of the Argentine National Congress before any transfer of the shares to entities other than the Provinces. (S.A.48–49).

To implement the Expropriation Law's directive that 49% of the Expropriated Class D Shares be held by the Republic on behalf of the Provinces, the Republic and the Provinces executed the Federal Agreement for the Implementation of Law No. 26,741 on August 9, 2012 ("Federal Agreement"). *See* (ADD.1–11). The Federal Agreement formalized the share allocation and set delivery procedures. *See* (ADD.1–11).

On July 24, 2025, Chubut's legislature ratified the Federal Agreement through Law No. XVII Nº 163, creating binding legislative approval both to the share

allocation and conditions of transfer.[5] *See* (ADD.25–26). The Federal Agreement is thus a sovereign-to-sovereign commitment, grounded in national legislation and provincial ratification, to carry out the Expropriation Law's allocation scheme. Annex I to the Federal Agreement specifies each Province's allocation based on hydrocarbon production and reserves. *See* (ADD.9). Chubut's entitlement is 8.4% of the Provinces' 49% block, or about 8.26 million Class D shares. *See* (ADD.9).

During the district court proceedings, Appellees disregarded this statutory framework and mischaracterized the Provinces' interest as insubstantial. They asserted that Argentina possesses "sole and undivided ownership of all 200.6 million Class D shares" of YPF while minimizing the Provinces' interest by referring only to their negligible Class B shareholdings, which are irrelevant to the dispute. (DE 598 at 24).[6] Appellees' citation to a cherry-picked portion of Form 20-F included as part of YPF's 2023 Annual Report (*id.*), which reflects only the Republic's record ownership, disregards that the same form expressly refers to the Provinces' 49% interest in the Expropriated Class D Shares:

---

[5] The Federal Agreement was also ratified by several of the other Provinces: Rio Negro (Law 4817, dated December 20, 2012); Santa Cruz (Law 3296, dated November 8, 2012); Tierra del Fuego (Decree N° 1888, dated August 21, 2021, and Decree N° 2459, dated October 30, 2012); and Salta (Decree 3113/12, dated October 16, 2012).

[6] Unless otherwise indicated, all citations to the docket (DE ___) refer to the docket in *Petersen Energia Inversora, S.A.U. et al. v. Argentine Republic et al.,* No. 1:15-CV-02739-LAP (S.D.N.Y.).

> For the purpose of ensuring the fulfillment of its objectives, the Expropriation Law provided for the expropriation of 51% of the share capital of YPF S.A. represented by an identical stake of Class D shares owned, directly or indirectly, by Repsol YPF and its controlled or controlling entities. According to the Expropriation Law, the shares subject to expropriation, which have been declared of public interest and were subsequently transferred to the Republic of Argentina, will be assigned as follows: 51% to the Argentine Republic and 49% to the Argentine provinces that compose the National Organization of Hydrocarbon Producing States.

YPF Form 20-F for 2023, available at YPF - Form 20-F 2023.pdf.[7] Thus, Form 20-F confirms that Appellees' framing is misleading: roughly 98.3 million Class D shares—49% of the expropriated total—are statutorily allocated to the Provinces. The Republic's record ownership of those shares is temporary and subject to the Provinces' beneficial interest.

The district court adopted Appellees' mischaracterization, relegating its discussion of the Provinces' interest to a footnote in the Turnover Order:

> The provinces' contingent interest in the Republic's shares, which will ripen into an actual interest only if the Republic decides to transfer the Shares, is not itself subject to attachment and cannot prevent transfer of the Republic's interest. See, e.g., Matter of Supreme Merch. Co. v. Chem. Bank, 70 N.Y.2d 344, 350 (1987) (CPLR § 5201 "preclude[s] a levy against contingent obligations not certain to ripen into something real."). Additionally, YPF's Form 20-F for the year ended December 31, 2023 confirms that the "Argentine National State" owns 200.6 million Class D shares of YPF (51% of the total), while the "Argentine provincial

---

[7] All YPF Form 20-Fs produced after the execution of the Expropriation Law in 2012 acknowledge the Provinces' interest.

governments" own 7.624 Class B shares (which Plaintiffs do not seek to execute upon).

(DE 742 at 6 n.7).[8] By treating the Provinces' statutory entitlement as a mere "contingent" right and focusing on the irrelevant Class B shares, the district court failed to grapple with the Expropriation Law's mandatory allocation. It further erred by suggesting that the Republic could decide whether to transfer the Provinces' shares, when Argentine law requires that transfer.[9]

Critically, the scope of the Turnover Order is ambiguous. The Turnover Order does not make clear whether it orders Argentina to transfer only its record-holding interest, subject to the Provinces' statutory encumbrance, or whether it purports to convey unencumbered ownership, which would extinguish the Provinces' statutory rights outright. That ambiguity is pivotal to the legal concerns addressed in the following sections.

---

[8] In an earlier order granting Argentina's motion to stay execution pending appeal, the district court expressly recognized that 49% of the Expropriated Class D Shares were "earmarked" for the Provinces and could not be pledged by the Republic as collateral. (DE 527 at 8–10). There is, at a minimum, friction between this earlier ruling and the Turnover Order's treatment of the Provinces' interest.

[9] While the Expropriation Law does not prescribe a specific timetable for the Republic's transfer of the shares to the Provinces, the district court conflated this flexibility in timing with discretion over whether the transfer must occur at all and failed to reference the Federal Agreement.

## II. The Turnover Order Nullifies a Ratified Federal Agreement Between the Republic and Chubut.

As we have explained, the Republic and the Provinces executed the Federal Agreement, which the Chubut legislature ratified on July 24, 2025. *See* (ADD.1–11, 25–26). The Turnover Order, if left undisturbed, would nullify this sovereign arrangement. If the Turnover Order were construed to transfer Argentina's record ownership while leaving Chubut's equitable interest intact, the Republic would have no remaining interest to convey. This would effectively reduce Chubut's rights to potentially unenforceable claims against private plaintiffs. Alternatively, if the Turnover Order were read to extinguish Chubut's statutory interest entirely, the Expropriation Law, the Federal Agreement, and Chubut's ratification of that Agreement would become mere parchment. Under that reading, Argentina would not have any interest to convey, nor would Chubut have any interest to receive. The legislative mandate embodied in the Federal Agreement, ratified by provincial legislatures, would be swept aside by judicial action from a foreign court without hearing or consent—a profound violation of due process and the act of state doctrine.

Both readings are irreconcilable with international comity. U.S. courts are not empowered to disregard foreign sovereign law or nullify a ratified agreement between a sovereign and its constituent provinces. *See Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) ("International comity is 'the recognition which one nation allows within its territory to the

legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience.'" (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895))). Comity requires respect for such sovereign acts. *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765 (1972) ("The act of state doctrine, like the doctrine of immunity for foreign sovereigns, has its roots . . . in the notion of comity between independent sovereigns."); *U.S. v. Thiam*, 934 F.3d 89, 94 (2d Cir. 2019) ("Under the principles of international comity, United States courts ordinarily refuse to review acts of foreign governments . . . ." (internal quotation marks and citation omitted)). The Turnover Order reduces a carefully crafted intergovernmental accord to a legal afterthought, undermining the principles of comity and sovereign equality. Therefore, the Turnover Order must be reversed.

## III. The Turnover Order Violates Argentina's Legislative Safeguards Protecting the Statutory Interests of Chubut and the Other Provinces.

The Expropriation Law also contains a critical safeguard: any future transfer of the Expropriated Class D Shares requires approval by a two-thirds majority of the Argentine National Congress. Specifically, Article 10 of the Expropriation Law provides:

> For the purposes of the implementation hereof and the registration of ownership of the rights corresponding to the shares subject to expropriation, it must be recorded that the expropriation of such shares is for reasons of public utility and that their *future transfer is prohibited without authorization from the Honorable National Congress, passed by a two-thirds vote of its members*.

9

(S.A.48–49) (emphasis added).

This supermajority requirement is a structural protection, not a mere procedural formality, that applies to all of the Expropriated Class D Shares including the Republic's 51% interest as well as the Provinces' 49% interest therein. It is intended, at least in part, to prevent dissipation of the Provinces' interest and ensure that any transfer of the shares—except to the Provinces themselves, which requires only executive action—occurs only with overwhelming legislative approval.

Appellees sought to circumvent this safeguard through the opinion of their expert, Professor Alberto Bianchi, who asserted—without any citation or compelling analysis—that the supermajority requirement applies solely to "voluntary share transfers" by the Argentine Executive Branch and not to judicially compelled transfers. *See* (DE 588 at 5–9). That interpretation has no support in the law's text or Argentina's legal tradition. By reading into Article 10 an exception it does not contain, Professor Bianchi effectively erased the very safeguard the legislature created.

As the Republic explained below, this "Bianchi-created" exception is legally untenable. *See* (DE 597 at 3–4). Citing the Declaration of Argentina's expert Professor Alfonso Santiago—submitted in opposition to a parallel motion filed in *Bainbridge Fund Ltd. v. Argentina,* Case No. 16-cv-8605, DE 121 (S.D.N.Y. June 11, 2024) ("Santiago Decl.")—the Republic emphasized that Article 10

10

unequivocally prohibits "*any* future transfer" without supermajority approval, voluntary or compelled. *See* (DE 597 at 3–4) (quoting (S.A.49)) (emphasis in original). Argentine courts, like those in the United States, are bound to apply duly enacted laws unless unconstitutional. *See* Santiago Decl. ¶ 7; *see also Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 481 (2019) ("[W]e must enforce the statute that Congress enacted."). Because Article 10 is constitutional, an Argentine court would be obligated to apply it and prohibit any transfer of the Expropriated Class D Shares to private parties absent two-thirds congressional approval. *See* Santiago Decl. ¶¶ 7–10.

The district court acknowledged the existence of the supermajority requirement but declined to resolve its scope, stating: "The Court does not opine on whether this law applies (a) to voluntary transfers only or (b) to voluntary transfers and transfers made necessary by a court order." (DE 742 at 5 n.6). Yet by ordering the transfer of the Expropriated Class D Shares to Appellees, the court either incorrectly assumed an exception exists or compelled Argentina to violate the Expropriation Law—neither of which is permissible. Despite the critical role of this safeguard in protecting the Provinces' interest in the Expropriated Class D Shares, the court offered no analysis of the statutory text, legislative history, or expert testimony on Argentine law to justify this result.

This judicial compulsion violates both Argentina's domestic law and foundational principles of international law, including the act of state doctrine. That doctrine forbids U.S. courts from "declar[ing] invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). This Court has acknowledged that the act of state doctrine is a binding "*principle of decision.*" *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 138 (2d Cir. 2022) (quoting *W.S. Kirkpatrick & Co., Inc.*, 493 U.S. at 406) (emphasis in original). The Turnover Order writes the supermajority requirement out of the Expropriation Law and places the Provinces' interest at grave risk of dissipation without due process. That is precisely what the act of state doctrine forbids.

Moreover, it is a "fundamental principle of international comity" that one state cannot compel another to act in violation of its own law. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (internal quotation marks and citations omitted). By compelling Argentina to transfer shares in violation of the Expropriation Law's supermajority requirement and the Federal Agreement, the Turnover Order places the Republic in a legally untenable position: comply with a U.S. court order or violate its own domestic law. Such compulsion underscores the broader comity and sovereignty concerns that render the Turnover Order legally unsustainable. Indeed, such judicial interference contravenes the principle of

12

sovereign equality and disregards the very foundation of international comity. *See Royal & Sun All. Ins. Co. of Canada*, 466 F.3d at 92.

The Argentine National Congress included the supermajority requirement in the Expropriation Law to prevent precisely what the Turnover Order compels: the unilateral dissipation of provincial interests without legislative consent. The proper functioning of the Expropriation Law presupposes that foreign courts will respect the sovereign framework. Without supermajority approval, no lawful transfer of the Expropriated Class D Shares, whether voluntary or involuntary, can occur. For this reason as well, the Turnover Order must be vacated.

## IV. Preservation of Chubut's Rights and the Unlawful Implications of the Turnover Order.

While Chubut submits this *amicus* brief in support of the Republic's appeal, it expressly reserves and does not waive any rights to assert its own claims or defenses in future proceedings and to challenge any threat to its statutory rights and interest in the Expropriated Class D Shares.

As explained above, the Turnover Order is ambiguous regarding whether it compels the transfer of an encumbered or unencumbered interest in the Expropriated Class D Shares (both of which are unlawful). If the Turnover Order is affirmed and construed on remand to leave the Provinces' interest unaffected, the Provinces would be required to grapple with how to secure their mandatory statutory interest in the

13

earmarked shares when the Republic, whose legislative approval is a prerequisite to share transfer, has been divested of its record-holding interest in such shares.

If the Turnover Order is read to compel the transfer of an unencumbered ownership interest, thereby extinguishing the Provinces' interest, it would contravene bedrock principles of law and pose significant challenges to the Provinces' legal rights. First, such a construction would violate due process. Chubut and the other Provinces were neither parties to the underlying action nor given an opportunity to be heard, yet their statutory entitlement to 49% of the Expropriated Class D Shares would be extinguished in violation of their due process rights. *See RR Vill. Ass'n., Inc. v Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir. 1987) ("[D]ue process ordinarily requires some opportunity to be heard prior to the deprivation of property.").

Second, Argentina cannot convey more than it owns. Its record title to the 49% block of the Expropriated Class D Shares is subject to the Provinces' statutory beneficial interest, and any transfer must be qualified by that interest. It is axiomatic that a transferee cannot receive greater rights than the transferor possesses. *See Mitchell v. Hawley*, 83 U.S. 544, 550 (1872) ("No one in general can sell personal property and convey a valid title to it unless he is the owner or lawfully represents the owner. *Nemo dat quod non habet*"); *Matter of Goodchild*, 290 N.Y.S. 683, 689 (N.Y. Sur. Ct. 1936) ("[A]n individual may convey no better title to an item of

14

property than that which he himself possesses."). Moreover, "[i]t is beyond cavil that attachment will only lie against the property of the debtor, and that *the right to attach the property is only the same as the defendant's own interest in it*." *Bank of New York v. Nickel*, 789 N.Y.S.2d 95, 99 (N.Y. App. Div., 1st Dep't 2004) (internal quotation marks and citations omitted) (emphasis added). Any turnover must therefore be qualified by the Provinces' statutory interest, and Chubut's interest, like that of all of the Provinces, would remain intact.

Third, in the Turnover Order, the district court characterized the Provinces' interest in the Expropriated Class D Shares as "contingent," and thus not attachable. (DE 742 at 6 n.7). While the Court need not determine at this point the exact nature of the Provinces' interest in those Shares as a matter of New York or Argentine law, the Turnover Order cannot lawfully compel the transfer of the Provinces' interest regardless of whether that interest is deemed "contingent." Under the district court's own reasoning, a "contingent" interest is not subject to attachment and therefore cannot be turned over. *See* (DE 742 at 6 n.7) (citing *Supreme Merch. Co. v. Chem. Bank*, 70 N.Y.2d 344, 350 (1987)). Alternatively, if the statutory interest is deemed more than contingent, it would still not be subject to turnover because the Provinces are not judgment debtors. *See Swezey v. Lynch*, 926 N.Y.S.2d 415, 423 (N.Y. App. Div., 1st Dep't 2011) (explaining that a "judgment creditor is entitled to execute only against property that actually belongs to the judgment debtor"); *Edrington v.*

*Richman*, 20 N.Y.S.2d 717, 719 (N.Y. App. Div., 1st Dep't 1940) ("A creditor may resort only to such property as belongs to the debtor and may not reach property rightfully belonging to others though held by the debtor."). Whether contingent or not, the Provinces' interest cannot be turned over.

Accordingly, Chubut expressly reserves all rights to institute future proceedings to determine its rights in the Expropriated Class D Shares and defend its statutory interest therein. Nonetheless, Chubut submits this *amicus curiae* brief to support the Republic's appeal of the Turnover Order based on international comity, sovereign immunity, and legal protections embedded in Argentine law.

## CONCLUSION

For these reasons, *Amicus Curiae* Province of Chubut respectfully urges this Court to reverse the district court's Turnover Order requiring the Argentine Republic to transfer its Class D shareholdings in YPF to Appellees.

Dated: September 29, 2025      Respectfully submitted,

By: */s/ Sean Sheely*
        Sean Sheely
        **HOLLAND & KNIGHT LLP**
        787 Seventh Avenue, 31st Floor
        New York, New York 10019
        Tel: (212) 513-3200
        sean.sheely@hklaw.com

        Ilene Pabian
        Chazz Freeman

**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Tel: (305) 374-8500
ilene.pabian@hklaw.com
chazz.freeman@hklaw.com

*Counsel for Amicus Curiae Province of Chubut*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Sean Sheely*
Sean Sheely

*Counsel for Amicus Curiae Province of Chubut*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Second Circuit Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. P. 32(f), this document contains 3,663 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 29, 2025

*/s/ Sean Sheely*
Sean Sheely

*Counsel for Amicus Curiae Province of Chubut*

19

# ADDENDUM

i

## TABLE OF CONTENTS

**Page**

Acuerdo Federal para la Implementación de la Ley
    26.741 - Anexo Ley XVII N. 163 with
    Certification of Translation...................................  ADD-1

chubut_-_cadenas_de_valor (1) with Certification
    of Translation ..........................................  ADD-12

Ley XVII N. 163 y Decreto 920.2025 with
    Certification of Translation...................................  ADD-25

ADD-1

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] Government Bill No. 09325
[illegible seal]
[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *4*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *05*

**July 15, 2025**

## <u>FEDERAL AGREEMENT FOR THE IMPLEMENTATION OF LAW No. 26,741</u>

In the City of Buenos Aires, on the ninth day of August 2012, between the NATIONAL GOVERNMENT represented herein by Architect Julio Miguel DE VIDO (hereinafter "NATIONAL GOVERNMENT"), and the Provinces that are members of the FEDERAL ORGANIZATION OF HYDROCARBON-PRODUCING STATES (OFEPHI) (hereinafter "PROVINCES"), represented as follows: Mr. Martín BUZZI for the Province of Chubut, Mr. Jorge Oscar IBAÑEZ for the Province of Formosa, Mr. Eduardo Alfredo FELLNER for the Province of Jujuy, Mr. Oscar Mario JORGE for the Province of La Pampa, Mr. Francisco Humberto PEREZ for the Province of Mendoza, Mr. Jorge Augusto SAPAG for the Province of Neuquén, Mr. Alberto Edgardo WERETINLECK for the Province of Río Negro, Mr. Juan Manuel URTUBEY for the Province of Salta, Mr. Ariel IVOVICH for the Province of Santa Cruz, and Mr. Roberto Luis CROCIANELLI for the Province of Tierra del Fuego, Antarctica, and South Atlantic Islands.

For the purposes of arbitrating measures conducive to compliance with Law No. 26,741, and

**WHEREAS**

Law No. 26,741 declared the achievement of self-sufficiency in hydrocarbons, as well as the exploration, exploitation, industrialization, transportation, and commercialization of hydrocarbons, to be in the national public interest and a priority objective of the Argentine Republic, in order to guarantee economic development with social equity, job creation, increased competitiveness of the various economic sectors, and equitable and sustainable growth of the provinces and regions.

ADD-2

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *5*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *06*

The aforementioned law established that the National Executive Branch, in its capacity as the authority in charge of setting energy policy, shall arbitrate measures conducive to compliance with the purposes set forth therein, with the cooperation of the provincial states and public and private capital, both national and international.

The law established the following as principles of the hydrocarbon policy of the ARGENTINE REPUBLIC:

a.  The promotion of the use of hydrocarbons and their derivatives as a factor in the development and increased competitiveness of various economic sectors and of the provinces and regions.

b.  The conversion of hydrocarbon resources into proven reserves and their exploitation and the restitution of reserves.

c.  The integration of public and private, national and international capital in strategic alliances aimed at the exploration and exploitation of conventional and unconventional hydrocarbons.

d.  The maximization of investments and resources used to achieve self-sufficiency in hydrocarbons in the short, medium, and long term.

e.  The incorporation of new technologies and management methods that contribute to the improvement of hydrocarbon exploration and exploitation activities and the promotion of technological development in the ARGENTINE REPUBLIC for that purpose.

ADD-3

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *6*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *07*

f.    The promotion of industrialization and the commercialization of hydrocarbons with high added value.

g.    The protection of consumer interests related to the price, quality, and availability of hydrocarbon derivatives.

h.    The obtaining of exportable hydrocarbon balances to improve the balance of payments, ensuring the rational exploitation of resources and the sustainability of their exploitation for the benefit of future generations.

Pursuant to Article 7 of said law, fifty-one percent (51%) of the assets of YPF Sociedad Anónima represented by Class D shares of said company, belonging to Repsol YPF S.A., its controlling entities, or subsidiaries, directly or indirectly, were declared to be of public utility and subject to expropriation.

The shares of YPF Sociedad Anónima subject to expropriation shall be distributed as follows: fifty-one percent (51%) shall belong to the NATIONAL GOVERNMENT and the remaining forty-nine percent (49%) shall be distributed among the provinces that are members of the FEDERAL ORGANIZATION OF HYDROCARBON-PRODUCING STATES (OFEPHI).

The aforementioned law stipulates that the conditions of the transfer must be considered, ensuring that the distribution of shares among the provinces that accept the transfer is carried out equitably, also taking into account for this purpose the levels of hydrocarbon production and proven reserves of each of them.

That the transfer of the political and economic rights of the shares subject to expropriation carried out by the NATIONAL GOVERNMENT in favor of the provincial governments that are members of the FEDERAL ORGANIZATION OF HYDROCARBON-PRODUCING STATES (OFEPHI) shall include the exercise of the corresponding share rights in a unified manner for a minimum period of fifty (50) years through a share syndication agreement.

ADD-4

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *7*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *08*

The appointment of the Directors of YPF Sociedad Anónima to be nominated to represent the shares subject to expropriation shall be made in proportion to the holdings of the NATIONAL GOVERNMENT, the provincial governments, and one to represent the company's employees.

Within the framework of the aforementioned Law, it was established that YPF Sociedad Anónima must make a strategic contribution to the fulfillment of the objectives set forth therein.

It is the intention of the Parties signing this agreement to establish the basic requirements necessary to define the actions of YPF Sociedad Anónima and the strategic contribution of said company to compliance with the provisions of Article 124 of the CONSTITUTION OF THE ARGENTINE NATION, insofar as it establishes that the Provinces have original ownership of the natural resources existing in their territories, Hydrocarbons Law 17,319 and the so-called Short Hydrocarbons Law 26,197, and the objectives established in Law 26,741, and, in particular, to regulate the implementation of the provisions of Articles 8 and 9 of the aforementioned law.

**Therefore, the Parties AGREE:**

ADD-5

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *8*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *09*

**FIRST:** EXERCISE OF POLITICAL RIGHTS. In order to ensure compliance with the objectives of Law 26,741, the National Executive Branch, either directly or through the agency it designates, shall exercise the political rights over all the shares of YPF Sociedad Anónima subject to expropriation until the transfer of the political and economic rights corresponding to the aforementioned shares to the provinces that are members of the FEDERAL ORGANIZATION OF HYDROCARBON-PRODUCING STATES (OFEPHI) is completed.

**SECOND:** EQUITABLE TRANSFER OF SHARES. The PROVINCES will accept that the transfer of forty-nine percent (49%) of the shares to be expropriated be carried out based on current production levels and the reserves of interest that YPF S.A. possesses in each of their territories due to their geographical location, and they consider the percentages expressed in the attached table number 1 to be fair and satisfactory for each of them.

**THIRD:** TERMS AND CONDITIONS OF THE TRANSFER. The NATIONAL GOVERNMENT and each of the PROVINCES shall sign specific agreements to regulate the definitive conditions for the transfer of the corresponding shares, with a view to achieving the priority objective of Law 26,741, which is self-sufficiency in hydrocarbons, the strengthening of YPF S.A. as a strategic company and its administration in accordance with best practices in the industry and corporate governance, preserving the interests of its shareholders and generating value through professional management.

ADD-6

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *9*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO
[hw:] *10*

Efforts will also be made, within the framework of increasing social inclusion, to guarantee growth, employment, the preservation of a healthy environment, and full respect for the inalienable and imprescriptible right of the provinces to obtain royalties for the natural resources located within their territory.

Such agreements shall regulate specific conditions, such as the reversion of areas, the renewal of concessions, the granting of new areas, the establishment of the company's first option on exploration blocks reverted to other operators and on new blocks, as well as the conditions for the exploration and exploitation of new blocks with unconventional reserves.

**FOURTH:** SYNDICATION OF SHARES: In order to articulate the relationship between the NATIONAL GOVERNMENT and the PROVINCES in accordance with the provisions of Law 26,741, the parties agree to enter into a share syndication agreement establishing the manner in which the political rights conferred by the syndicated shares will be exercised, with a view to harmonizing the management of YPF Sociedad Anónima, which will include, among other matters, the following:

1. Term of the syndication of shares agreement. The agreement shall be entered into for a minimum term of fifty (50) years from the date of its execution.

2. Board of Directors of YPF Sociedad Anónima. The NATIONAL GOVERNMENT and the provincial governments that are members of the FEDERAL ORGANIZATION OF HYDROCARBON-PRODUCING STATES (OFEPHI) shall be obliged to vote at each Ordinary Shareholders' Meeting at which the election of officers is to be held, so that directors are appointed to the Board of Directors of YPF Sociedad Anónima as follows:

ADD-7

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *10*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *11*

2.1.    The term of office for Directors shall be one (1) year.

2.2.    The NATIONAL GOVERNMENT shall be responsible for proposing six (6) permanent directors and an equal number of alternates.

Within this proposal, the NATIONAL GOVERNMENT will include a Director representing the company's employees and their alternate, establishing a mechanism that allows for succession every six months.

2.3. The provincial states that are members of the FEDERAL ORGANIZATION OF HYDROCARBON-PRODUCING STATES (OFEPHI) shall propose five (5) regular directors and an equal number of alternates, as follows:

2.3.1.    Four (4) permanent directors and an equal number of alternates: one permanent director and one alternate shall be proposed by each of the four (4) provinces with the highest levels of hydrocarbon production and proven reserves (Mendoza, Neuquén, Chubut, and Santa Cruz) for a term of one (1) year, and

2.3.2.    One (1) alternate director—hereinafter, the "Fifth Director"—will be proposed on a rotating basis by the provinces of Río Negro, Tierra del Fuego, Antártida y Islas del Atlántico Sur, Salta, La Pampa, Formosa, and Jujuy, in that order, establishing a mechanism that allows for succession every six months.

ADD-8

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *11*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *12*

2.4. THE NATIONAL GOVERNMENT shall nominate the remaining Directors to be nominated until the maximum number of Directors to be appointed in accordance with the Bylaws and the Assembly is reached.

In the Autonomous City of Buenos Aires, on the ninth day of August 2012, two (2) copies of the same tenor and for the same purpose are signed, one corresponding to the NATIONAL GOVERNMENT and the other to OFEPHI, with certified copies of this Agreement being sent to each of the signatory Provinces.

[signature] [signature] [signature] [signature] [signature] [signature] [signature] [signature] [signature] [signature]

ADD-9

[stamp:] ACUDGDyM[illegible] [hw:] *1069/2012*
[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT

[stamp:] MINISTRY OF HYDROCARBONS FOLIO [hw:] *12*
[stamp:] HONORABLE LEGISLATURE OF THE PROV. OF CHUBUT FOLIO [hw:] *13*

**ANNEX 1**

**Participation of the Provinces with respect to their 49%**

- <u>Province of Neuquén</u>: forty-one point eight percent (41.8%)

- <u>Province of Santa Cruz</u>: twenty point nine percent (20.9%)

- <u>Province of Mendoza</u>: twenty point six percent (20.6%)

- <u>Chubut Province:</u> eight point four percent (8.4%)

- <u>Rio Negro Province</u>: three point two percent (3.2%)

- <u>Tierra del Fuego, Antarctica and Tierra del Fuego South Atlantic Islands province</u>: two point five percent (2.5%)

- <u>Salta Province</u>: two percent (2.0%)

- <u>Province of La Pampa:</u> zero point five percent (0.5%)

- <u>Province of Formosa</u>: zero point two percent (0.2%)

ADD-10

**REGISTERED:** On this date, this AGREEMENT is entered into VOLUME: 3, FOLIO: 300 of the Registry of Works and Real Estate Lease Agreements of this General Notary's Office of the Government. - OFFICIALLY RECORDED. - There are ten (10) notarized pages.------------------------------------
**GENERAL GOVERNMENT NOTARY'S OFFICE.- RW. CHUBUT- July 15, 2025.------**

[seal:] PROVINCE OF CHUBUT GENERAL NOTARY'S OFFICE OF THE GOVERNMENT OF CHUBUT
[signature]
[stamp:] MARCELO LUIS LIZURUME GENERAL GOVERNMENT NOTARY'S OFFICE PROVINCE OF CHUBUT

---

**I CERTIFY**: that these photocopies bearing the seal of this Official Registry are authentic copies of the original that I have seen, and I attest to their authenticity. - It is hereby certified that, in accordance with the provisions of Articles 1), 2) and 3) of Law III No. 12, in accordance with the Provincial Legal Digest (formerly Law No. 2349), with the sole signature of the issuing official, all legalization procedures in the Province of Chubut have been completed. There are ten (10) pages. - OFFICIALLY RECORDED.------- **GENERAL GOVERNMENT NOTARY'S OFFICE.- Rawson - Chubut - July 15, 2025. --------------**

---

[signature]
[stamp:] MARCELO LUIS LIZURUME GENERAL GOVERNMENT NOTARY'S OFFICE PROVINCE OF CHUBUT

ADD-11



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Acuerdo Federal para la Implementación de la Ley 26.741 - Anexo Ley XVII N. 163**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke

Sworn to before me this
September 26, 2025

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 2 7

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

ADD-12



# Value Chains
## CHUBUT

Undersecretary for Policies for
Development with Regional Equity

Secretariat of Provinces

Department of the
Interior
**Argentina**



ADD-13



# Demographic and economic data – Chubut

**Department of the Interior**
**Argentina**

### Demographic data
Area in km²: **224,686**
Population in 2022: **603,120**
Share of total national population (%): **1.3**

### Employment
Registered private sector employees (1st quarter 2023): **101,588 (1.54% of the national total)**

### Exports
They accounted for 2.9% of national exports in 2022. These were distributed as follows:

**Distribution by major categories**
➢ **Primary goods 21.2%**
➢ **AM 4.3%**
➢ **IM 26.6%**
➢ **F&E 47.9%**

**Main products**
- Crude oil
- Base metals and their products
- Unprocessed fish and seafood



# Production profile - Chubut



## Current production matrix
Aluminum, hydrocarbons, fishing, sheep farming, and tourism.

## Productive bets
Adding value to fishing, small fruits, and forestry chains.
Development in the central plateau.
Development of new sectors (olive growing, cannabis, and wine production).

## Basic infrastructure
Reclamation of land for production through water works.
Strengthening energy infrastructure for wind power.
Gas and digital connectivity throughout the province.

## Logistics and federal integration
Cost reduction through multimodality.
Trans-Patagonian Railway and road connectivity to strengthen the entire provincial territory.

ADD-15



Department of the
Interior
**Argentina**

# Main **current** and **emerging** value chains chosen for Chubut



## Emerging chains

- **Renewable Energy** value chain
- **Small fruits** value chain



## Current chains

- **Hydrocarbons** value chain
- **Fishing** value chain
- **Aluminum** value chain
- **Tourism** value chain
- **Sheep farming** value chain

ADD-16



# Current Value Chains
## CHUBUT

Department of the Interior

**Argentina**

Secretariat of Provinces

Undersecretary for Policies for Development with Regional Equity





Department of the Interior
**Argentina**

Current value chain in Chubut

# Hydrocarbons

## Overview

Chubut is the second largest oil-producing province in the country, behind only Neuquén. It is also the fifth largest gas-producing province, but its importance in the market lies in the production of crude oil.

Currently, the fields are in a mature state, with a decline in production levels being observed. While crude oil production remains stable, gas production was found to be declining until 2021, with a slight increase in production in 2022.

The number of people registered as employed in jobs related to oil and gas extraction in the province totaled almost 14,000 positions in 2022, equaling the total number of registered jobs in the province's manufacturing industries.



## Primary production

**Products:** Oil and gas

Hydrocarbon extraction occurs mainly in conventional gas and oil areas. It is concentrated in the San Jorge Gulf Basin, which it shares with the province of Santa Cruz.

In recent years, production in Chubut has declined, both due to the maturation of hydrocarbon wells and weakened interest in conventional production, given that the main investments in innovation and exploration are currently focused on the unconventional sector. In 2016, Chubut produced 9.7 million cubic meters per day (MSm³/d) and currently produces 8 MSm³/d. Crude oil production remained stable between 22,000 and 24,000 cubic meters per day over the last decade.

There are no large hydrocarbon processing complexes (gas separation, petrochemical processing, and refining) in the province, with most of the production being upstream (primary production), in which 17 companies operate. The main producing companies are Pan American Energy (PAE), YPF, Capsa, and Tecpetrol.

Crude oil exports (its main export product) grew by 71.6% in 2021 compared to 2020, and in 2022 they grew by 37% year-on-year, recording foreign sales of USD 1.226 billion. This subcategory accounts for 50% of the province's total exports.





Department of the Interior
**Argentina**

Current value chain in Chubut

# Fishing

## Overview

Chubut ranks second as a fishing province, after Buenos Aires.

The most important port for fishing activity is Puerto Madryn, followed by lesser ports such as Rawson, Comodoro Rivadavia, and Caleta Córdova.

During 2022, fishing-related activities had an average of 4,000 registered workers.



## Primary production

**Products:** Fish, crustaceans, mollusks

70% of the catch consists of crustaceans, mainly shrimp, while 20% consists of fish, mainly hake.

The province's fishing industry is heavily export-oriented. Due to processing, yields, and stock variations, the relationship between exported tons and catches is not linear.

The sector is the third most important export complex in the province. In 2022, USD 517 million in foreign sales were recorded.

## Industrial phase

**Products:** Canned goods, blocks and fillets, rings and tubes

There are almost 30 fish processing companies. The main ones are Spanish-owned (Pescapuerta Argentina, Iberconsa, Grupo Conarpesa, Altamare) and one is locally owned (Alpesca).

The Fishing Industrial Park, located in the city of Puerto Madryn, is home to some of the leading companies in the sector. According to SENASA [National Food Safety and Quality Service] data, there are 11 processing plants on land authorized to export fishery products to the European Union.





Current value chain in Chubut

# Aluminum

**Department of the Interior**
**Argentina**

## Overview

The epicenter of industrial activity in the city of Puerto Madryn revolves around the prominent presence of Aluar Aluminio Argentino SAIC, a company with four decades of experience in aluminum production and national origins.

Aluar occupies a prominent position in Argentina's aluminum industry and plays a crucial role in the local economy.

The company is the only producer of primary aluminum in the country and allocates 30% of its production to the domestic market and 80% to exports.



## Primary production

**Product:** Primary aluminum

The company employs around 1,600 people in the province. It has a power plant that uses gas as fuel.

The Puerto Madryn plant is home to the Primary Division, where primary aluminum is produced with an annual output of almost 460,000 tons.

The main product exported by the sector is raw aluminum (approximately 80%), followed by cable. In 2022, the province exported USD 679 million, making it the second most important export complex in the jurisdiction.

## Industrial phase

**Products:** Aluminum ingots, alloy, secondary aluminum, semi-finished products

The main players in the chain are Aluar Aluminio Argentino and Exal (Trivium). Aluar produces primary aluminum (the only producer in the country) and semi-finished aluminum products, while Exal is dedicated to the production of semi-finished products (roof tiles).

The rest of the chain is made up of smaller companies that are located further down the chain and are dedicated to processing the raw materials supplied by Aluar.

Case: 25-1687, 09/29/2025, DktEntry: 67.1, Page 46 of 52

**ADD-20**



# Tourism

## Overview

Within the country's provincial tourism offering, Chubut ranks fifth and seventh in terms of number of establishments (4.7% of the national total) and number of beds (2.8%), respectively.

Tourist activity in the province is mainly concentrated in the Valdés Peninsula area in Puerto Madryn.

During 2022, an average of 4,000 registered jobs in the "Hotels and restaurants" category were recorded in the province.



## Activities

**Products:** Winter activities, visits to natural parks, active tourism (trekking, rafting, mountaineering, kayaking), hiking, sport fishing, and paleontological tourism.

Tourist activity in the province takes place in the coastal and mountainous areas. The Valdés Peninsula was declared a World Heritage Site by UNESCO in 1999 and undoubtedly stands out. This tourist destination is notable for whale watching, marine wildlife, and bird watching. Puerto Madryn and Puerto Pirámides have the largest selection of hotels in the province.

At the other end of the province, next to the mountain range, you can enjoy snow-related activities, such as at the Esquel ski resort. The area around Epuyen, Trevelin, and the Los Alerces and Lago Puelo National Parks is also noteworthy. In these destinations, tourists enjoy trekking, rafting, mountaineering, and other active tourism activities.

In addition to the National Parks mentioned above, there are twelve Protected Natural Areas that serve as home to a wide variety of bird species, land animals, and marine life.



Department of the Interior
**Argentina**

ADD-21



**Department of the Interior**
**Argentina**

Current value chain in Chubut

# Sheep farming

## Overview

As of March 2022, Chubut is the province with the largest sheep population in the country. It has a stock of 3,109,746 heads, including rams, ewes, wethers, and lambs, which represents 25% of the national total.

The main focus of the establishments is on the production of fine wool. The process of washing, carding, and combing wool takes place at the Trelew Hub, which plays a key role in industrializing and marketing nearly 90% of the country's wool production.

During 2022, livestock farming and wool production employed an average of more than 1,500 registered workers in the province.



## Primary production



**Product:** Head of sheep

The primary structure of producers is very dissimilar. Most production (90%) takes place in large establishments with more than 5,000 head of cattle. The remaining 10% of production comes from small establishments, which account for 60% of the total number of production units engaged in this activity.

Over the last ten years, activity has been hampered by external factors such as droughts and ash fall, which have devastated the availability of fodder for livestock. The wool sector is currently experiencing a sharp drop in the international price of wool.

## Industrial phase



**Products:** Wool, wool yarns, knitted fabrics, sheep meat

In 2021, Chubut produced around 11,000 tons of raw wool, representing around 27% of national production.

Wool exports (both raw and processed) reached USD 107 million in 2022, accounting for around 4% of the province's total exports.

The province is the country's leading exporter, accounting for over 50% of sales of all products in Argentina's wool industry.

ADD-22



# Emerging Value Chains
## Chubut

Undersecretary for Policies for
Development with Regional Equity

Secretariat of Provinces

Department of the
Interior
**Argentina**





# Emerging value chains in Chubut

Department of the Interior
**Argentina**

**RENEWABLE ENERGIES**

In 2018, Chubut had 184 MW of installed renewable power, accounting for 26% of the country's total alternative energy.

By 2022, it became the province with the highest renewable energy generation in the country with 433.7 MW, surpassing Buenos Aires. This generation capacity currently represents 37.7% of the total produced from renewable energies in Argentina.

Renewable energy in the province is mainly provided by wind farms, several of which are among the largest in the country. The Rawson Wind Farm was the first large-scale wind farm in the country. It consists of three projects launched consecutively, the first two within the framework of GenRen and the third within the framework of Mater. All of them have a capacity factor that places them among the highest-performing facilities in the world: Rawson I and II, each with 42%, and Rawson III, with 49.2%. Together, they contribute 416 GWh annually from 55 wind turbines.

The main limitations in electricity generation lie in the system's transmission capacity.

**SMALL FRUITS**

In Chubut, the production of small fruits consists mainly of cherries and, to a lesser extent, raspberries and other berries.

The province concentrates its agricultural production in irrigated areas. These cover a total of 120,000 hectares, of which approximately 45,000 are irrigated, located in the Lower Chubut River Valley (VIRCh), Colonia Sarmiento Valley, 16 de Octubre Valley, El Maitén Valley, Comarca Andina, Telsen Valley, and Comodoro Rivadavia (in the latter area with water from springs), currently reaching more than 400 hectares of cherry trees.

Fruit cultivation, mainly dominated by the small fruits subcategory, reached 1,357 employees in the last four months of 2021.

The value of Argentina's fresh cherry exports has shown a strong upward trend in recent years.

ADD-24



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**chubut_-_cadenas_de_valor (1)**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Jacqueline Yorke

Sworn to before me this
September 26, 2025

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

**ADD-25**

# Official Section

## PROVINCIAL LAWS

**THE "FEDERAL AGREEMENT FOR THE IMPLEMENTATION OF NATIONAL LAW NO. 26,741" IS APPROVED IN ITS ENTIRETY**

### LAW XVII No. 163

THE LEGISLATIVE BODY OF THE PROVINCE OF CHUBUT
**DOES HEREBY ENACT AS LAW**

Article 1.- The "Federal Agreement for the Implementation of National Law No. 26,741" is hereby approved in its entirety which establishes the basic requirements necessary to define the actions of YPF Sociedad Anónima and the strategic contribution of said company to compliance with the provisions of Article 124 of the Constitution of the Argentine Nation, signed in the Autonomous City of Buenos Aires on August 9, 2012, between the National Government, represented by Architect Julio Miguel DE VIDO, and the provinces that are members of the Federal Organization of Hydrocarbon Producing States (OFEPHI), represented as indicated below: Mr. Martín BUZZI for the Province of Chubut, Mr. Jorge Oscar IBÁÑEZ for the Province of Formosa, Mr. Eduardo Alfredo FELLNER for the Province of Jujuy, Mr. Oscar Mario JORGE for the Province of La Pampa, Mr. Francisco Humberto PÉREZ for the Province of Mendoza, Mr. Jorge Augusto SAPAG for the Province of Neuquén, Mr. Alberto Edgardo WERETILNECK for the Province of Río Negro, Mr. Juan Manuel URTUBEY for the Province of Salta, Mr. Ariel IVOVICH for the Province of Santa Cruz, and Mr. Roberto Luis CROCIANNELLI for the Province of Tierra del Fuego, Antarctica, and South Atlantic Islands, recorded in Volume 3, Folio 300 of the Register of Works and Real Estate Lease Agreements of the General Notary Office of the Government of the Province of Chubut, on July 15, 2025.

Article 2.- The National Executive Power is hereby authorized to take the necessary judicial and extrajudicial actions to finalize the transfer and registration of the shares of YPF S.A. by the National Government to the Province of Chubut.

Article 3.- The National Executive Power is hereby authorized to take the necessary judicial and extrajudicial actions to defend the actions of YPF S.A. that correspond to the Province of Chubut, in relation to the preventive seizure currently imposed by Judge PRESKA, Loretta of the Southern District Court of New York, as well as any other claims by third parties before any national or international court that may affect the shares that rightfully belong to the Province of Chubut.

Article 4.- The percentages of YPF S.A. shares established in favor of the Province of Chubut in the agreement approved in Article 1 are hereby declared harmful, insufficient, and arbitrary, and, consequently, it is hereby stated that the approval of this agreement does not prevent new negotiations or legal claims from being brought in the interests of the province, authorizing The National Executive Power to seek a fairer agreement for the interests of the Province and/or any other measures that may be necessary.

Article 5.- GENERAL LAW. The National Executive Power is hereby notified.

GRANTED IN THE CHAMBER OF THE HONORABLE LEGISLATIVE BODY OF THE PROVINCE OF CHUBUT, ON THE TWENTY-FOURTH DAY OF JULY, TWO THOUSAND TWENTY-FIVE.

Dep. LUIS E. JUNCOS
First Vice President
The Honorable Legislative Body of Chubut

MARÍA LIGIA MORELL
Legislative Secretary
The Honorable Legislative Body of the
Province of Chubut

**Decree No. 920**
**Rawson, August 8, 2025**

WHEREAS:
The bill to approve in its entirety the "Federal Agreement for the Implementation of National Law

No. 26,741"; ENACTED BY THE HONORABLE LEGISLATIVE BODY OF THE PROVINCE OF CHUBUT ON JULY 24, 2025, AND THE POWER GRANTED TO THE NATIONAL EXECUTIVE POWER BY ARTICLE 140 OF THE PROVINCIAL CONSTITUTION;

THEREFORE:
Let it be known as Provincial Law: XVII No. 163
Bet it hereby executed, communicated, and published in the Official Gazette.

IGNACIO AGUSTÍN TORRES, Esq.
Dr. VICTORIANO ERASO PARODI

---

**THE "WORK COMMENCEMENT AGREEMENT" BETWEEN THE PROVINCE OF CHUBUT, THE PROVINCE OF NEUQUÉN, THE PROVINCE OF RÍO NEGRO, CAMUZZI GAS DEL SUR S.A., AND THE NATIONAL GAS REGULATORY AUTHORITY IT IS HEREBY APPROVED IN ITS ENTIRETY.**

### LAW XX No. 97

THE LEGISLATIVE BODY OF THE PROVINCE OF CHUBUT
**DOES HEREBY ENACT AS LAW**

Article 1.- The [text cut off]

ADD-26



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Ley XVII N. 163 y Decreto 920.2025**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Jacqueline Yorke

Sworn to before me this
September 26, 2025

_____
Signature, Notary Public

**WENDY POON**
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE