# 25-1687

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 25-1687

◆‒◆‒◆

PETERSEN ENERGÍA INVERSORA, S.A.U.,
PETERSEN ENERGÍA S.A.U.,

*Plaintiffs-Appellees,*

—v.—

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

YPF S.A.

*Defendant.*

─────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*

SEAN S. BUCKLEY,
*Deputy United States Attorney for the
Southern District of New York,
Attorney for the United States,
Acting Under Authority
Conferred by 28 U.S.C. § 515.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2772

DAVID E. FARBER,
BENJAMIN H. TORRANCE,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Interest of the United States. . . . . . . . . . . . . . . . . . .  1

Issue Presented  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   Legal Principles of Foreign Sovereign
        Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    B.   Factual Background and
        Prior Proceedings . . . . . . . . . . . . . . . . . . . . .  5

    C.   The District Court's Decisions . . . . . . . . . . .  7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Foreign Sovereign Property Located Abroad
   Is Not Subject to Execution  . . . . . . . . . . . . . . . .  9

    A.   The FSIA Did Not Abrogate Execution
        Immunity for Foreign Sovereign Property
        Located Outside of the United States . . . . .  9

    B.   The District Court's Turnover Order
        Impermissibly Circumvented the
        Execution Immunity That Applies Here. .  22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

ii

PAGE

## TABLE OF AUTHORITIES

*Cases*:

*Astoria Federal Savings & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991) . . . . . . . . . . . . . . . . . . . . . . . 12

*Aurelius Capital Partners, LP v. Republic of*
    *Argentina,*
    584 F.3d 120 (2d Cir. 2009) . . . . . . . . . . . . . . . . 23

*Autotech Technologies LP v. Integral*
    *Research & Development Corp.,*
    499 F.3d 737 (7th Cir. 2007) . . . . . . . . . . 3, 12, 15

*Bainbridge Fund Ltd. v. Republic of Argentina,*
    690 F. Supp. 3d 411 (S.D.N.Y. 2023) . . . . . . *passim*

*Bainbridge Fund Ltd. v. Republic of Argentina,*
    No. 16 Civ. 8605, 2025 WL 1796379
    (S.D.N.Y. June 30, 2025) . . . . . . . . . . . . . . . 5, 7, 8

*Bolivarian Republic of Venezuela v. Helmerich &*
    *Payne Int'l Drilling Co.,*
    581 U.S. 170 (2017) . . . . . . . . . . . . . . . . . . . . 13, 15

*Clearstream Banking S.A. v. Peterson,*
    140 S. Ct. 813 (2020) . . . . . . . . . . . . . . . . . . . . 6, 16

*Connecticut Bank of Commerce v.*
    *Republic of Congo,*
    309 F.3d 240 (5th Cir. 2002) . . . . . . . 3, 10, 12, 23

*De Letelier v. Republic of Chile,*
    748 F.2d 790 (2d Cir. 1984) . . . . . . . . . . . . . 10, 15

iii

PAGE

*Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen,*
  43 F.2d 705 (2d Cir. 1930) . . . . . . . . . . . . . . . 10, 11

*EM Ltd. v. Republic of Argentina,*
  695 F.3d 201 (2d Cir. 2012) . . . . . . . . . . . . . . . . 23

*Federal Republic of Germany v. Philipp,*
  592 U.S. 169 (2021). . . . . . . . . . . . . . . . . . . . . . . . 20

*Havlish v. Taliban,*
  __ F.4th __, 2025 WL 2447193
  (2d Cir. Aug. 26, 2025) . . . . . . . . . . . . . . .   4, 11, 12

*Koehler v. Bank of Bermuda Ltd.,*
  577 F.3d 497 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 6

*New York & Cuba Mail Steamship Co. v.
  Republic of Korea,*
  132 F. Supp. 684 (S.D.N.Y. 1955) . . . . . . . . . . . . 10

*Permanent Mission of India to the
  United Nations v. City of New York,*
  551 U.S. 193 (2007). . . . . . . . . . . . . . . . . . . . . . . . 3

*Persinger v. Islamic Republic of Iran,*
  729 F.2d 835 (D.C. Cir. 1984). . . . . . . . . . . . . . . 20

*Petersen Energía Inversora, S.A.U. v. Argentine
  Republic,*
  No. 15 Civ 2739, 2025 WL 1796392
  (S.D.N.Y. June 30, 2025) . . . . . . . . . . .   5, 7, 8, 16

*Peterson v. Bank Markazi,*
  121 F.4th 983 (2d Cir. 2024) . . . . . . . . . . . . . . . 17

*Peterson v. Islamic Republic of Iran,*
  963 F.3d 192 (2d Cir. 2020) . . . . . . . . . . . . . . . 6, 17

iv

PAGE

*Peterson v. Islamic Republic of Iran*,
876 F.3d 63 (2d Cir. 2017) . . . . . . . . . . . . . . *passim*

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) . . . . . . . . . . *passim*

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014) . . . . . . . . . . . . . . . . . . . . *passim*

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945) . . . . . . . . . . . . . . . . . . . . . . . 3, 21

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008) . . . . . . . . . . . . . . . . . . . . . . . 12

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) . . . . . . . . . . . . . . . 24

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) . . . . . . . . . . . . . . . 3, 4, 12, 23

*Rubin v. Islamic Republic of Iran*,
830 F.3d 470 (7th Cir. 2016) . . . . . . . . . . . . . . . . 23

*Samantar v. Yousuf*,
560 U.S. 305 (2010) . . . . . . . . . . . . . . . 2, 4, 11, 18

*Schooner Exchange v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812) . . . . . . . . . . . . . 3, 13

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981) . . . . . . . . . . . . . . . . . . . . . . . 22

*Türkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) . . . . . . . . . . . . . . . . . . . 3, 4, 18

*United States v. Alaska*,
503 U.S. 569 (1992) . . . . . . . . . . . . . . . . . . . . . . . 13

v

PAGE

*United States v. Moore*,
    916 F.3d 231 (2d Cir. 2019) . . . . . . . . . . . . . . . . 17

*United States v. Texas*,
    507 U.S. 529 (1993). . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Türkiye Halk Bankasi*,
    120 F.4th 41 (2d Cir. 2024) . . . . . . . . . . . . . . . . 20

*Verlinden B.V. v. Central Bank of Nigeria*,
    461 U.S. 480 (1983). . . . . . . . . . . . . . . . . . . . . . . . 3

*Walters v. Industrial & Commercial
    Bank of China, Ltd.*,
    651 F.3d 280 (2d Cir. 2011) . . . . . . . . . . . . . . . . 11

*Statutes*:

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

28 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rules*:

N.Y. CPLR 5225(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-1687

───────────

PETERSEN ENERGÍA INVERSORA, S.A.U.,
PETERSEN ENERGÍA S.A.U.,

*Plaintiff-Appellee,*

—v.—

ARGENTINE REPUBLIC,

*Defendant-Appellant.*[1]

───────────

## BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*

───────────

### Interest of the United States

Plaintiffs in these three cases hold judgments of more than $16 billion against the Argentine Republic. They seek to execute those judgments against Argentina's shares in an energy company, YPF, S.A. The district court ordered Argentina to first transfer those shares to a bank account in the United States, then to direct the bank to transfer Argentina's interest in

───────

[1] The United States is filing substantially identical briefs as *amicus curiae* in three cases to be heard in tandem: Nos. 25-1686, 25-1687, and 25-1689.

2

those shares to plaintiffs. That was error. The YPF shares are property held by a foreign state outside the United States, and as such are entitled under principles of foreign sovereign immunity to complete immunity from execution.

The United States has a strong interest in the proper application of those principles under the Foreign Sovereign Immunities Act of 1976 ("FSIA") and federal common law. Litigation involving foreign states in U.S. courts can have significant ramifications for the United States' foreign relations and may affect the reciprocal treatment of the United States and its property in the courts of other nations. Because the district court's decision conflicts with longstanding principles of foreign sovereign immunity, its order should be reversed.

## Issue Presented

Whether a foreign sovereign's property outside of the United States is immune from execution by U.S. courts.

## Statement of the Case

### A. Legal Principles of Foreign Sovereign Immunity

"The doctrine of foreign sovereign immunity" originally "developed as a matter of common law." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010). For much of the Nation's history, principles adopted by the Executive Branch determined the immunity of foreign states in civil suits in courts of the United States. *See*

3

*Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-36 (1945). Until 1952, the Executive Branch adhered to the "absolute" theory of sovereign immunity, under which foreign states could not be sued without their consent, and foreign sovereign property was entirely shielded from attachment and execution. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010); *see also Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812) (Marshall, C.J.).

In 1952, the State Department adopted the "restrictive" theory of foreign sovereign immunity, under which foreign states were typically afforded immunity from suit "in cases involving a foreign state's public acts, but not its strictly commercial acts." *Türkiye Halk Bankasi A.S. v. United States* ("*Halkbank*"), 598 U.S. 264, 271 (2023) (citing *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018)); *accord Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007). But even after 1952, the "property of foreign states [remained] absolutely immune from execution." H.R. Rep. No. 94-1487 ("House Report") at 27 (1976). "This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Autotech Technologies LP v. Integral Research & Development Corp.*, 499 F.3d 737, 749 (7th Cir. 2007); *accord Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002).

4

In 1976, Congress "codif[ied] the restrictive theory of sovereign immunity" in the FSIA, 28 U.S.C. §§ 1330, 1602-1611. *Samantar*, 560 U.S. at 313. The FSIA was intended to strike a "careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." *Rubin*, 583 U.S. at 208-09. The FSIA governs foreign states' immunity from suit ("jurisdictional immunity"), as well as the immunity of foreign states' property in the United States from execution or attachment ("execution immunity"). *See Havlish v. Taliban*, __ F.4th __, No. 23-258, 2025 WL 2447193, at *8 (2d Cir. Aug. 26, 2025). However, "a suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law.'" *Halkbank*, 598 U.S. at 280 (quoting *Samantar*, 560 U.S. at 324).

The FSIA's jurisdictional immunity provision, 28 U.S.C. § 1604, provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," subject to exceptions provided in 28 U.S.C. §§ 1605-1607. The FSIA's execution immunity provision, 28 U.S.C. § 1609, provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611." The principal exceptions in § 1610 specify that "property in the United States" belonging to a foreign state or its agency or instrumentality "shall not be immune" from "attachment in aid of execution, or from execution" under specified circumstances. *Id.* § 1610(a), (b). Section 1611 identifies certain types of foreign sovereign property that are immune from attachment and

5

execution "[n]otwithstanding the provisions of section 1610."

## B. Factual Background and Prior Proceedings

Plaintiffs collectively hold judgments against Argentina totaling more than $16 billion. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 2739, 2025 WL 1796392, at *1 (S.D.N.Y. June 30, 2025); *Bainbridge Fund Ltd. v. Republic of Argentina*, No. 16 Civ. 8605, 2025 WL 1796379, at *1 (S.D.N.Y. June 30, 2025). The judgments in *Petersen Energía* and *Eton Park*, entered in September 2023, arise from Argentina's expropriation of a majority stake in YPF in 2012 without making a tender offer to minority shareholders in conformity with YPF's by-laws.[2] *Petersen Energía*, 2025 WL 1796392 at *3. The judgment in *Bainbridge*, entered in December 2020, arises from Argentina's 2001 default on certain global debt securities. *Bainbridge Fund Ltd. v. Republic of Argentina*, 690 F. Supp. 3d 411, 413 (S.D.N.Y. 2023).

Plaintiff in the *Bainbridge* matter previously sought turnover of other assets held by Argentina and located abroad. *Id*. Although the district court denied this earlier turnover effort, the court held it had the power "to order a sovereign to bring assets held in that sovereign country's central bank and deliver them to New York." *Id*. at 421-22. In so holding, the district court relied on the reasoning in the vacated decision

---

[2]    Those judgments are currently pending appeal. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 23-7370 (2d Cir.).

6

*Peterson v. Islamic Republic of Iran* ("*Peterson II*"), in which this Court concluded that the FSIA superseded common-law execution immunity for assets held by a non-sovereign third party outside the United States, and therefore creditors could seek a turnover order directing a bank holding foreign sovereign assets outside the United States to bring those assets into the United States in aid of execution. 876 F.3d 63, 89-91 (2d Cir. 2017). *Peterson II* relied on *Koehler v. Bank of Bermuda Ltd.*, which held that New York law permits a court to issue a turnover order requiring a non-sovereign party over which it has personal jurisdiction to bring property into the state. 577 F.3d 497, 499 (2d Cir. 2009).

*Peterson II* was later vacated by the Supreme Court after the enactment of related legislation. *Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813 (2020) (granting certiorari, vacating judgment, and remanding). On remand, this Court declined to reinstate *Peterson II*'s "analysis as to whether the common law and *Koehler* provide the district court with jurisdiction over the extraterritorial asset." *Peterson v. Islamic Republic of Iran* ("*Peterson III*"), 963 F.3d 192, 196 (2d Cir. 2020). Despite the vacatur of *Peterson II*, the district court found its reasoning "persuasive and applicable," concluding that ordering Argentina to bring its property into the United States was permissible because the FSIA, as interpreted by the district court, does not immunize foreign sovereign assets held outside of the United States. *Bainbridge,* 690 F. Supp. 3d at 416. However, the district court declined to issue a turnover order at that time, or to determine whether the exceptions to execution immunity in 28 U.S.C. § 1610

7

applied, because the plaintiff in *Bainbridge* had not identified specific assets on which it sought to execute its judgment. *Id*. at 420-21.

## C. The District Court's Decisions

In April and May of 2024, plaintiffs filed separate motions in the district court seeking orders requiring Argentina to transfer its YPF shares held in Argentina into a global custody account at Bank of New York Mellon ("BNYM") in New York, and then to instruct BNYM to transfer ownership interests in those shares to plaintiffs or their designees. *Petersen Energía*, 2025 WL 1796392 at *1; *Bainbridge*, 2025 WL 1796379, at *1. In two substantially similar decisions, the district court (Loretta A. Preska, J.) granted those motions. *Id*. The court first evaluated whether the assets—apart from being located outside of the United States—were otherwise subject to execution immunity under the FSIA before ordering that they be brought to the United States. *Petersen Energía*, 2025 WL 1796392 at *7; *Bainbridge*, 2025 WL 1796379, at *7. The district court determined that the YPF shares are "used for a commercial activity in the United States" under 28 U.S.C. § 1610(a). *Petersen Energía*, 2025 WL 1796392 at *8; *Bainbridge*, 2025 WL 1796379, at *8. It next concluded (in the *Petersen Energía* and *Eton Park* case) that the assets were "used for the commercial activity upon which" the plaintiffs' claims are based, 28 U.S.C. § 1610(a)(2), and (in the *Bainbridge* case) that Argentina had waived its immunity from execution for purposes of § 1610(a)(1). *Petersen Energía*, 2025 WL 1796392 at *8-9; *Bainbridge*, 2025 WL 1796379, at *8.

8

The district court then considered whether the YPF shares were immune from turnover under New York law, concluding that the shares could be transferred and that Argentina was in possession or custody of the shares for purposes of N.Y. CPLR 5225(a). *Petersen Energía*, 2025 WL 1796392 at *9-10; *Bainbridge*, 2025 WL 1796379, at *8-9. The district court also determined that the YPF shares were not immune from turnover by virtue of being held outside of the United States, noting that "the Court previously ruled on this exact issue in *Bainbridge*, 690 F. Supp. 3d at 416." *Petersen Energía*, 2025 WL 1796392 at *10; *Bainbridge*, 2025 WL 1796379, at *9.

Next, the district court held that after being ordered to be transferred to a custody account at BNYM in New York, the YPF shares would qualify as property "in the United States" under § 1610(a) of the FSIA. *Petersen Energía*, 2025 WL 1796392 at *10; *Bainbridge*, 2025 WL 1796379, at *9-10. The district court further determined that principles of international comity did not counsel against granting the turnover order, finding that there was no "true conflict" between the law of the United States and Argentina. *Petersen Energía*, 2025 WL 1796392 at *11; *Bainbridge*, 2025 WL 1796379, at *10-11. Assuming *arguendo* that a true conflict existed, the district court found that comity considerations counseled in favor of the turnover order. *Petersen Energía*, 2025 WL 1796392 at *12; *Bainbridge*, 2025 WL 1796379, at *11-12.

On July 10, 2025, Argentina sought a stay of the turnover orders pending appeal, and on August 15,

9

2025, this Court ordered that the turnover orders be stayed pending resolution of these appeals. (No. 25-1689, Dkt. Entry No. 49).

# ARGUMENT

## Foreign Sovereign Property Located Abroad Is Not Subject to Execution

The question in this appeal is whether plaintiffs, who hold judgments against Argentina, can execute that judgment on assets belonging to Argentina that are located outside of the United States. Because principles of foreign sovereign immunity protect foreign state assets outside the United States against execution, plaintiffs cannot obtain that relief, and the turnover orders granted by the district court should be reversed.

## A. The FSIA Did Not Abrogate Execution Immunity for Foreign Sovereign Property Located Outside of the United States

Common-law sovereign immunity principles that predate the FSIA preclude execution by judgment creditors against foreign sovereign property outside the United States. Nothing in the FSIA can be read to abrogate those principles.

Before the enactment of the FSIA, foreign sovereign property, no matter where it was found, enjoyed complete execution immunity in U.S. courts. Even in cases where a foreign sovereign "consent[ed] to be sued" and where "a valid judgment ha[d] been entered," courts did not permit execution on the "proper-

10

ty of a sovereign government." *Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen*, 43 F.2d 705, 706-10 (2d Cir. 1930). That did not change after the Executive Branch's adoption of the restrictive theory of sovereign immunity in 1952: foreign sovereigns continued to have "complete immunity . . . from execution against their property" by judgment creditors. *Connecticut Bank of Commerce*, 309 F.3d at 252; *see New York & Cuba Mail Steamship Co. v. Republic of Korea*, 132 F. Supp. 684, 685-86 (S.D.N.Y. 1955) (adhering to the State Department's "direct and unequivocal position" that the shift to the restrictive theory of sovereign immunity did not affect execution immunity); House Report at 27 ("property of foreign states [remained] absolutely immune from execution").

In enacting the FSIA, Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property even in cases where a judgment could be had on the merits." *Connecticut Bank of Commerce*, 309 F.3d at 252. Rather, the FSIA "lift[ed] execution immunity [only] 'in part.'" *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984) (quoting House Report at 8); *see* House Report at 27. In doing so, Congress provided for certain exceptions to the existing rule of execution immunity for foreign sovereign property within the United States—but those exceptions were carefully limited. *See* 28 U.S.C. §§ 1609-1610. It would make no sense to conclude that Congress meticulously delineated the circumstances under which execution (and attachment in aid of execution) on foreign-state-owned assets in the United States would be allowed, but, through its silence, abandoned all such limits for

11

assets located abroad. The execution immunity of foreign sovereign property abroad "simply was not the particular problem to which Congress was responding when it enacted the FSIA." *Samantar*, 560 U.S. at 323. Thus, because the FSIA does not expressly address attachment or execution of foreign sovereign assets abroad, such execution and attachment remain "barred by foreign sovereign immunity under the common law." *Id.* at 324.

That understanding is confirmed by reading the FSIA as a whole. The FSIA's grant of "'execution immunity afforded sovereign property is broader than the jurisdictional immunity afforded the sovereign itself.'" *Havlish*, 2025 WL 2447193, at *8 (quoting *Walters v. Industrial & Commercial Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011)); *accord Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014). For example, the FSIA codifies an exception to jurisdictional immunity for suits "based upon a commercial activity carried on in the United States by the foreign state," 28 U.S.C. § 1605(a)(2), but the corresponding execution-immunity exception applies only to property that "is or was used for the commercial activity upon which the claim is based" in the United States, *id.* § 1610(a)(2). The statute thus contemplates that some judgment creditors will "have to rely on foreign states to voluntarily comply with U.S. court judgments," *Peterson*, 627 F.3d at 1128, as was true before the FSIA, *see Dexter & Carpenter*, 43 F.2d at 710. The narrower scope of the exceptions to the FSIA's broad execution immunity reflects a judgment that authorizing execution against a sovereign's property is often a greater intrusion on sovereignty than merely exer-

12

cising jurisdiction. *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008) (discussing the "specific affront that could result" to a state from seizure of its property "by the decree of a foreign court"); *Havlish*, 2025 WL 2447193, at *8 ("This special protection afforded to the property of a foreign sovereign derives from the fact that at the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." (quotation marks omitted)); *Connecticut Bank of Commerce*, 309 F.3d at 255-56; *Peterson*, 627 F.3d at 1128.

In addition, Congress is "understood to legislate against a background of common-law . . . principles," *Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991), and to abrogate those principles, "the statute must speak directly to the question addressed by the common law," *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation marks omitted). The FSIA contains no such clear statement; to the contrary, "[t]he FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world." *Autotech*, 499 F.3d at 750. "[S]ome hint from Congress" would be necessary for a court to "adopt[] such a breathtaking assertion of extraterritorial jurisdiction." *Id.*; *cf. Rubin*, 583 U.S. at 215 ("Out of respect for the delicate balance that Congress struck in enacting the FSIA, we decline to read into the statute a blanket abrogation of attachment and execution immunity for § 1605A judgment holders absent a

13

clearer indication of Congress' intent." (construing § 1610(g))).

Moreover, the view that there is no execution immunity for extraterritorial sovereign assets would be inconsistent with customary international law. The FSIA "for the most part embodies basic principles of international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 179 (2017) (citing *Schooner Exchange*, 11 U.S. (7 Cranch) at 136-37). "Under customary international law, a state may not exercise jurisdiction to enforce in the territory of another state without the consent of that other state." Restatement (Fourth) of Foreign Relations Law § 432 (2018). The United States accepts that this principle reflects a widely accepted international norm and practice. *See United States v. Alaska*, 503 U.S. 569, 588 n.10 (1992) (accepting principle as customary international law based on government's representation that the United States recognized it as such). This principle is also reflected in other international agreements. *E.g.,* European Convention on State Immunity, art. 23, ETS No. 74, https://rm.coe.int/16800730b1 ("No measures of execution or preventive measures against the property of a Contracting State may be taken [without its consent] in the territory of another Contracting State."), *cited in* House Report at 23, 25; United Nations Convention on the Jurisdictional Immunities of States and Their Property (prohibiting execution upon the property of a state, without that state's consent, "in connection with a proceeding before a court of another State," except if the relevant property "is in the territory of the State of

14

the forum").[3] That this principle is generally accepted by the international community is confirmed by the fact that the government is not aware of any foreign state that, either at the time of the FSIA's enactment or now, allows judgment creditors to reach a foreign sovereign's extraterritorial assets to satisfy a judg-

------

[3] Report of the Sixth Committee to the General Assembly, United Nations Convention on the Jurisdictional Immunities of States and Their Property, art. 19(c), U.N. Doc. A/59/508 (Nov. 30, 2004), *https://treaties.un.org/doc/source/docs/A_59_508-E.pdf*; *see* Report of the International Law Commission on the Work of Its Forty-Third Session, commentary on art. 18, para. 6, U.N. Doc. A/46/10 (1991) ("[B]efore any measures of constraint are implemented, a proceeding to that effect should be instituted before a court of the State where the property is located."), *https://legal.un.org/ilc/documentation/english/reports/a_46_10.pdf*. The Convention on Jurisdictional Immunity is not yet in force and the United States has not signed it. *See* United Nations Treaty Collection, United Nations Convention on Jurisdictional Immunities of States and Their Property (Dec. 2, 2004), *https://treaties.un.org/doc/Publication/MTDSG/Volume%20I/Chapter%20III/III-13.en.pdf*. While the United States considers the prohibition on execution upon sovereign property outside of the forum of the foreign court to be widely accepted international practice, it takes no position on whether other aspects of the Convention also embody customary international law principles.

15

ment against that foreign sovereign. Congress drafted the FSIA to "conform fairly closely" to those "accepted international standards" in order to "diminish the likelihood that other nations would each go their own way, thereby subjecting the United States abroad to more claims than we permit in this country." *Bolivarian Republic*, 581 U.S. at 181 (quotation marks and alterations omitted); *see De Letelier*, 748 F.2d at 799 ("Congress passed the FSIA on the background of the views of sovereignty expressed in the 1945 charter of the United Nations and the 1972 enactment of the European Convention [on State Immunity], which left the availability of execution totally up to the debtor state, and its own understanding as the legislative history demonstrates, that prior to 1976 property of foreign states was absolutely immune from execution.").

The Supreme Court's opinion in *NML Capital*, 573 U.S. 134, is not to the contrary. *NML Capital* presented the "single, narrow question" of whether the FSIA limits the scope of post-judgment discovery in aid of execution when the judgment debtor is a foreign state. 573 U.S. at 140. In concluding that the FSIA does not confer immunity from "discovery of information concerning extraterritorial assets," *id.* at 145 n.4, the Court did not address whether such assets are subject to execution in U.S. courts. The Court instead justified discovery as a means of determining whether foreign sovereign property abroad might be "executable under the relevant jurisdiction's law," *id.* at 144, which accords with the usual practice for seeking to enforce the judgment of a U.S. court in a foreign jurisdiction, *see, e.g., Autotech*, 499 F.3d at 751 ("If assets exist in another country, the person seeking to reach

16

them must try to obtain recognition and enforcement of the U.S. judgment in the courts of that country."). Nothing about the Court's holding or reasoning suggests that it announced a new rule allowing execution in U.S. courts against extraterritorial foreign sovereign assets.

In *Peterson II*, a panel of this Court was incorrectly persuaded that *NML Capital* "squarely rejected the argument that any common law execution immunity afforded to 'a foreign state's extraterritorial assets' survived the enactment of the FSIA." 876 F.3d at 90 (quoting *NML Capital*, 573 U.S. at 144). Based on this conclusion, *Peterson II* held that creditors could seek a turnover order directing a bank holding foreign sovereign assets outside the United States to bring those assets into the United States in aid of execution. 876 F.3d at 91. The district court applied similar reasoning here, relying on the decision in *Peterson II* as "persuasive and applicable," despite the fact that *Peterson II* involved turnover of assets held abroad by a non-sovereign third-party garnishee, and the current orders seek to compel Argentina itself to turn over its sovereign property located in its own territory. *Bainbridge*, 690 F. Supp. 3d at 416, *cited in Petersen Energía*, 2025 WL 1796392, at *10. However, *Peterson II* carries no weight: it was vacated by the Supreme Court after the intervening enactment of legislation, *see Clearstream Banking S.A.*, 140 S. Ct. 813, and this Court chose not to reinstate its reasoning on

17

remand, *Peterson III*, 963 F.3d at 196.[4] A vacated opinion "has no precedential value." *United States v. Moore*, 916 F.3d 231, 241 (2d Cir. 2019).

Nor is *Peterson II* persuasive given its flawed reasoning. The panel concluded that *NML Capital*'s statement that the FSIA's framework is "'comprehensive'" meant that the statute "supersedes the pre-existing common law of foreign sovereign immunity." 876 F.3d at 89 (quoting *NML Capital*, 573 U.S. at 141; some quotation marks omitted); *accord id.* ("'any sort of immunity defense made by a foreign sovereign in an American court must stand on the [FSIA's] text. Or it must fall.'" (quoting 573 U.S. at 141-42)). But the panel read the Supreme Court's words out of context.

───────────

4   In a later appeal in *Peterson*, the Court suggested that foreign state assets abroad have no execution immunity, and that *Peterson II* had "noted that if [assets] were brought into the United States pursuant to a turnover order it would then be necessary to conduct an execution immunity analysis under the FSIA because they would become assets 'in the United States.'" *Peterson v. Bank Markazi*, 121 F.4th 983, 996 n.3 (2d Cir. 2024) (quoting § 1609; citing *Peterson II*, 876 F.3d at 94), *cert. denied*, 145 S. Ct. 2819 (2025). But those statements are dicta, as the Court's holding was that a separate statute abrogated Iran's execution immunity but not its jurisdictional immunity. *Id.* at 995-96. And the Court again did not reinstate *Peterson II*'s vacated holding. Its passing mention of the point, in dicta in a footnote, thus has no effect on this case.

18

*See Halkbank*, 598 U.S. at 278 ("general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering" (quotation marks omitted)). As described above, the Supreme Court in *NML Capital* was considering whether the FSIA, which includes express provisions for jurisdictional and execution immunity, could also be understood to contain an implicit "third provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets" when the statute "says not a word on the subject." 573 U.S. at 142-43. *NML Capital* held that the FSIA's "silence" regarding immunity from discovery in aid of execution means that no such immunity exists. Read in that context, *NML Capital* did not decide that the FSIA completely supersedes common-law execution immunity for assets located abroad. To the contrary, the Supreme Court has recognized that when "a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324; *accord Halkbank*, 598 U.S. at 280.

The *Peterson II* panel further misunderstood *NML Capital* when it relied on the Supreme Court's instruction that "even if" a foreign state's extraterritorial assets were immune from execution under pre-FSIA law, "then it would be obvious that the terms of § 1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property 'in the United States.'" *NML Capital*, 573 U.S. at 144 (emphasis omitted). The panel read that to mean that

19

the FSIA vitiated case law prior to *NML Capital* that foreign sovereign property outside the United States is not subject to execution in U.S. courts. *Peterson II*, 876 F.3d at 91-93. But that is incorrect: the Supreme Court was responding to the argument that "§ 1609 execution immunity implies coextensive discovery-in-aid-of-execution immunity," and reasoned that, because the FSIA itself, in § 1609, does not expressly address immunity for foreign sovereign assets abroad, then neither does the FSIA itself confer immunity from discovery about those assets. *NML Capital*, 573 U.S. at 144. The Supreme Court did not say that the FSIA abrogated the immunity from execution those assets would have enjoyed before enactment of the FSIA, nor that the statute forecloses whatever execution immunity those assets now would enjoy independent of the FSIA.[5]

———————

[5] In addition, the *NML Capital* Court did not address the procedural mechanism discussed in *Peterson II* and employed by the district court in this case, by which a U.S. court might leverage its exercise of personal jurisdiction over a litigant in the United States to require the litigant to bring foreign sovereign property to the United States for execution. To the contrary, the Court's analysis rested on the assumption that U.S. courts "generally lack authority . . . to execute against property in other countries." *NML Capital*, 573 U.S. at 144. No party appears to have raised the possibility of such a means of execution, and the Court accordingly had no occasion to address it.

20

For all those reasons, there is no indication that in enacting the FSIA, Congress intended to implement, *sub silentio*, a wholesale revocation of execution immunity for foreign sovereigns' property abroad. The district court's contrary holding is not only inconsistent with the history of foreign sovereign immunity and the text and structure of the FSIA, it would lead to the anomalous result that foreign state property in the United States, which is subject to attachment or execution only within the strict limitations set forth in § 1610, would be entitled to greater protection from coercive measures than a foreign state's property in its own territory. Such a result could in turn put U.S. property at risk, given the possibility of reciprocal adverse treatment of the United States in foreign courts. *See, e.g.*, *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 184 (2021) (to permit suit against foreign governments in U.S. courts may "lead[] some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation" (quotation marks omitted)); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984) ("some foreign states base their sovereign immunity decisions on reciprocity"); Foreign State Immunity Law of the People's Republic of China, art. 21 (eff. January 1, 2024), translated at http://en.npc.gov.cn.cdurl.cn/2023-09/01/c_924629.htm ("If the immunity accorded by a State to the People's Republic of China and its property is less favorable than those provided by this Law, the People's Republic of China applies the principle of reciprocity."); *see also United States v. Türkiye Halk Bankasi*, 120 F.4th 41, 50 (2d Cir. 2024) ("'[t]he judicial seizure of the

21

property of a friendly state may be regarded as such an affront to its dignity and may . . . affect our relations with it'" (quoting *Hoffman*, 324 U.S. at 35-36)), *petition for cert. filed*, No. 24-1144 (U.S. May 5, 2025). Here, the United States has a strong interest in enforcing the limits of the FSIA's exceptions to execution immunity, on the basis of comity and respect for fellow sovereigns, as well as to avoid the risk of reciprocal actions against the United States and its property in foreign courts.[6]

---

[6] In their papers opposing a stay of the district court's order in this case, plaintiffs in *Petersen Energía* and *Eton Park* pointed to the government's statement to the Supreme Court at an earlier stage in this litigation that the United States has an "'interest in ensuring that foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations.'" (Opp. to U.S. Mot. for Leave to File as Amicus, No. 25-1687, Dkt. Entry No. 42, at 19-20 (quoting Br. for United States as Amicus Curiae at 18, *Argentine Republic v. Petersen Energía Inversora S.A.U.*, No. 18-575 (U.S. May 21, 2019), *cert. denied*, 139 S. Ct. 2741)). But the issue before the Supreme Court then was the applicability of the FSIA's commercial-activity exception to jurisdictional immunity. While plaintiffs are thus correct that at that time the United States "supported [their] position that Argentina is not entitled to immunity from [their] claims" (*id.*), they disregard the fact that the government's position concerned only jurisdictional immunity under §§ 1604-1605, not the

22

### B. The District Court's Turnover Order Impermissibly Circumvented the Execution Immunity That Applies Here

Because sovereign immunity principles preclude execution by judgment creditors against foreign sovereign property outside the United States, the district court's turnover order was error. In essence, the district court circumvented the execution immunity accorded foreign state assets outside the United States by ordering them to be brought into the United States —a result that makes a foreign state's execution immunity for assets abroad largely meaningless. Accordingly, even assuming New York's turnover statute can be construed as applying to a foreign sovereign's property outside of the United States, its use in the manner ordered by the district court is prohibited. *See Texas Industries, Inc. v. Radcliff Materials, Inc.*,

––––––––––

question of execution immunity under §§ 1609-1610 now before this Court.

Nor is it "notable" that "the government did not file an amicus brief in the now-fully-briefed merits appeal" in this matter (*id.*), which involves significantly different questions of forum non conveniens, contract law, and international comity. That the government has not weighed in on these separate issues in connection with the merits appeal does not mean the government agrees with plaintiffs' position—much less does it suggest that the government, now or previously, has ever endorsed plaintiffs' position regarding sovereign immunity for extraterritorial assets.

23

451 U.S. 630, 641 (1981) (federal common law, including in the area of "international disputes implicating the conflicting rights of States or [U.S.] relations with foreign nations," supersedes state law).

The FSIA required the district court in this case to first determine if the property at issue is "property in the United States of a foreign state." 28 U.S.C. § 1610(a). Only if so would the district court be permitted to assess whether that property is subject to any of § 1610(a)'s exceptions to immunity from execution. Indeed, every decision of a federal court of appeals that has addressed the issue, apart from the now-vacated opinion in *Peterson II*, has treated the presence of foreign sovereign property in the United States as a prerequisite to execution in U.S. courts. *See Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 475 (7th Cir. 2016) (identifying as one of the "basic criteria" for attachment that the foreign sovereign property "must be within the territorial jurisdiction of the district court"), *aff'd*, 583 U.S. 202 (2018); *Peterson*, 627 F.3d at 1131-32 (foreign state property abroad is "not property in the United States" and is therefore "immune from execution" (quotation marks omitted)); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("[A] district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries."); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("[P]roperty that is subject to attachment and execution must be property in the United States of a foreign state." (quotation marks omitted)); *Connecticut Bank of Commerce*, 309 F.3d at 247 (U.S. courts "may execute only against property that meets" specified criteria,

24

including that the property be "'in the United States'" (quoting 28 U.S.C. § 1610(a))); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) ("section 1610 does not empower United States courts to levy on assets located outside the United States").

In earlier submissions to this Court, plaintiffs insisted that "this case does not involve execution on foreign-state property located abroad," but instead only "involves the district court's authority under federal and New York law to order a judgment debtor to bring property *into* its territorial jurisdiction for execution *within* that jurisdiction." (Opp. to U.S. Mot. for Leave to File as Amicus, No. 25-1687, Dkt. Entry No. 42, at 3). But that merely begs the question of whether a federal court may use that two-step procedure to avoid the execution immunity that applies to foreign state assets outside the United States. Section 1610(a) permits "attachment in aid of execution" against foreign state property under specified circumstances, and that phrase "include[s] attachments, garnishments, and supplemental proceedings available under applicable Federal or State law to obtain satisfaction of a judgment." House Report at 28. But by limiting the exception to execution immunity to "property in the United States," Congress limited the availability of any such "attachment in aid of execution" or state-law "supplemental proceeding[s]" to situations where the foreign sovereign's property is already located in this country. By ordering property abroad to be brought to the United States, the district court improperly circumvented those requirements, and incorrectly permitted a state law's enforcement mechanism to

25

override the strictures of foreign sovereign immunity. *See Peterson*, 627 F.3d at 1130-32 (because state law "on the enforcement of judgments applies . . . insofar as it does not conflict with the FSIA," and the "FSIA abrogates the immunity of [a foreign state's] commercial property in the United States," that foreign state's "right to payment . . . is assignable only if that right is located in the United States").

## CONCLUSION

**The order of the district court should be reversed.**

Dated:     New York, New York
               October 2, 2025

                          Respectfully submitted,

                          SEAN S. BUCKLEY,
                          *Deputy United States Attorney for the*
                          *Southern District of New York,*
                          *Attorney for the United States as*
                              *Authorized by 28 U.S.C. § 515*

DAVID E. FARBER,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
              *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 5917 words in this brief.

SEAN S. BUCKLEY,
*Deputy United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States as*
*Authorized by 28 U.S.C. § 515*

By: DAVID E. FARBER,
*Assistant United States Attorney*