# 25-1687

## United States Court of Appeals

### *for the*

## Second Circuit

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees,*

– v. –

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

YPF S.A.,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* THE REPUBLIC OF CHILE,
## THE ITALIAN REPUBLIC, ROMANIA, UKRAINE,
## AND THE ORIENTAL REPUBLIC OF URUGUAY
## IN SUPPORT OF THE ARGENTINE REPUBLIC

LINKLATERS LLP
*Attorneys for Amici Curiae
Republic of Chile, Italian
Republic, Romania,
Ukraine, and Oriental Republic
of Uruguay*
1290 Avenue of the Americas
New York, New York 10104
(212) 903-9000
adam.lurie@linklaters.com

## CORPORATE DISCLOSURE STATEMENT

The Republic of Chile, the Italian Republic, Romania, Ukraine, and the

Oriental Republic of Uruguay are governmental entities not required to file a

corporate disclosure under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF AMICI CURIAE ................................................................................1

INTRODUCTION ........................................................................................................2

ARGUMENT ...............................................................................................................5

I.     THE TURNOVER ORDERS VIOLATE FUNDAMENTAL
PRINCIPLES OF INTERNATIONAL LAW ....................................................5

    A.    The Turnover Orders Infringe Foundational Principles of Sovereign
Equality and Territorial Sovereignty .........................................................5

    B.    The Turnover Orders Violate the Principles of Sovereign Immunity
and Territorial Jurisdiction ........................................................................9

II.    THE TURNOVER ORDERS ARE CONTRARY TO PRINCIPLES OF
INTERNATIONAL COMITY AND REASONABLENESS ..........................12

    A.    The Turnover Orders Create an Irreconcilable Conflict with Foreign
Law ...........................................................................................................13

    B.    The District Court Failed to Engage in the Required Comity
Analysis ....................................................................................................16

III.    THE TURNOVER ORDERS YIELD FAR-REACHING AND
NEGATIVE POLICY CONSEQUENCES .....................................................17

    A.    The Turnover Orders Could Discourage Sovereign Commerce and
Foreign Participation in U.S. Markets ......................................................17

    B.    The Turnover Orders Risk Exposing Sovereign States to Similar
Intrusive Orders Elsewhere.......................................................................18

    C.    The Turnover Orders Create Confusion and Instability in the
Conduct of Foreign Affairs.......................................................................20

CONCLUSION.........................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*The Antelope*,
   23 U.S. 66 (1825)....................................................................................................6

*In re Austrian & German Holocaust Litig.*,
   250 F.3d 156 (2d Cir. 2001) ........................................................................12, 14

*Bainbridge Fund Ltd. v. Republic of Argentina*,
   No. 16 Civ. 08605 (LAP), 2025 WL 1796379 (S.D.N.Y. June 30,
   2025) ......................................................................................................................2

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)..............................................................................................6

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016)............................................................................................20

*In re CINAR Corp. Sec. Litig.*,
   186 F. Supp. 2d 279 (E.D.N.Y. 2002).................................................................20

*F. Hoffmann-La Roche, Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004)............................................................................................12

*Fed. Republic of Germany v. Philipp*,
   592 U.S. 169 (2021)............................................................................................10

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) ..................................................................13, 14, 16

*Havlish v. Taliban*,
   No. 23-258-CV, 2025 WL 2447193 (2d Cir. Aug. 26, 2025)............................10

*IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*,
   982 N.E.2d 609 (N.Y. 2012)...............................................................................17

*Levin v. Bank of New York*,
   No. 22-624, 2022 WL 16962294 (2d Cir. Nov. 10, 2022)..................................11

*Mujica v. AirScan Inc.*,
  771 F.3d 580 (9th Cir. 2014) ......................................................................16, 20

*Next Invs., LLC v. Bank of China*,
  12 F.4th 119 (2d Cir. 2021) .................................................................................13

*Oetjen v. Cent. Leather Co.*,
  246 U.S. 297 (1918)..............................................................................................12

*Persinger v. Islamic Republic of Iran*,
  729 F.2d 85 (D.C. Cir.), *cert. denied*, 469 U.S. 881 (1984)...............................19

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
  No. 15 Civ. 02739 (LAP), No. 16 Civ. 08569 (LAP), 2025 WL
  1796392 (S.D.N.Y. June 30, 2025) .............................................................*passim*

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  51 F.4th 456 (2d Cir. 2022) .................................................................................18

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992)..............................................................................................17

*Republic of Hungary v. Simon*,
  604 U.S. 115 (2025)..............................................................................................18

*Republic of Mexico v. Hoffman*,
  324 U.S. 30 (1945)................................................................................................19

*Ex parte Republic of Peru*,
  318 U.S. 578 (1943)..............................................................................................20

*Republic of Philippines v. Westinghouse Elec. Corp.*,
  43 F.3d 65 (3d Cir. 1994) .....................................................................................15

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S.
  Dist. of Iowa*,
  482 U.S. 522 (1987)..............................................................................................14

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)................................................................................................6

*The Paquete Habana*,
  175 U.S. 677 (1900)................................................................................................5

iv

*The Schooner Exch. v. McFaddon*,
11 U.S. 116 (1812).............................................................................................10

*United States v. Alaska*,
503 U.S. 569 (1992)..........................................................................................11

*In re Vitamin C. Antitrust Litig.*,
8 F.4th 136 (2d Cir. 2021) .....................................................................16, 18, 20

## OTHER AUTHORITIES

Benedict Kingsbury, *Sovereignty and Inequality*, 9 European J. Int'l
Law 599 (1998)....................................................................................................6

*Island of Palmas (Neth. v. U.S.)*,
2 R.I.A.A. 829 (Perm. Ct. Arb. 1928) .............................................................2, 7

Jurisdictional Immunities of the State (Ger. v. It.: Greece intervening),
Judgment, 2012 I.C.J. Rep. 99 (Feb. 3).....................................................4, 5, 7, 9

Law No. 26,741, May 4, 2012, [37,447] B.O. 1 (Arg.).........................................3, 4

Restatement (Fourth) of Foreign Relations Law (Am. L. Inst. 2018)...............10, 11

Restatement (Third) of Foreign Relations Law (Am. L. Inst. 1987)...........13, 14, 16

*The S.S. Lotus (Fr. v. Turk.)*,
1927 P.C.I.J. (ser. A), No. 10 (Sept. 7)...............................................................10

U.N. Charter art. 2, 59 Stat. 1031 (1945)...............................................................4, 7

## INTEREST OF AMICI CURIAE

The Republic of Chile ("**Chile**"), the Italian Republic ("**Italy**"), Romania, Ukraine, and the Oriental Republic of Uruguay ("**Uruguay**") (collectively, the "**Sovereign Nations**") submit this brief because the issues before the Court impact them.[1] All five sovereign states are committed to adherence to international law and are engaged in international commerce. Further, they regularly participate in commerce involving the United States, and therefore have an immediate and direct interest in this matter.

For these reasons, the Sovereign Nations also have a compelling interest in ensuring that U.S. courts uphold established principles of international law, particularly those governing sovereign immunity, territorial sovereignty, and limitations on extraterritorial enforcement. The District Court's Turnover Orders (defined below) set a dangerous precedent: they authorize U.S. courts to require foreign sovereigns to transfer property located entirely within their own territories to satisfy U.S. judgments. This approach threatens the sovereignty of all nations by

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part, nor did any person or entity other than *amici* or their counsel make a monetary contribution to the preparation or submission of this brief. Christian Albanesi, Mateo Noseda, Nicolle Sayers, Bhavana Sunder and Ty Cadogan of Linklaters LLP also contributed to this brief.

disregarding the fundamental rule that each state retains exclusive authority over assets within its own borders.

Moreover, such a rule would expose all sovereign nations to similar enforcement actions, fundamentally altering the balance of international law that has governed relations between states for centuries. This unprecedented expansion of judicial enforcement power undermines the bedrock principles of sovereign equality and territorial sovereignty that form the foundation of the international legal order. *See Island of Palmas (Neth. v. U.S.)*, 2 R.I.A.A. 829, 838 (Perm. Ct. Arb. 1928).

The Sovereign Nations therefore urge this Court to reverse the District Court's Turnover Orders, thereby upholding the established principles of sovereign immunity and territorial sovereignty that have long been central to the international legal order.

## INTRODUCTION

This case arises out of two related judicial orders that collide with international law to which the United States has always adhered. On June 30, 2025, the United States District Court for the Southern District of New York issued "Turnover Orders" directing the Republic of Argentina ("**Argentina**") to transfer its majority stake in YPF S.A.—comprising 51% of the shares—to an account in Argentina of a sub-custodian of a New York financial institution to satisfy multi-

2

billion-dollar judgments awarded to private plaintiffs, even though Argentine law expressly restricts such a transfer.[2]

The path to this decision dates back to 1993, when Argentina privatized YPF, a previously government-owned petroleum company, through a worldwide initial public offering ("**IPO**") of its shares. *See* 2025 WL 1796392, at \*2. In 2012, Argentina enacted Law 26,741 (the "**YPF Law**"), announcing a plan to reassert control over YPF and requiring a two-thirds vote of its National Congress for any future transfer of its shares. 2025 WL 1796392, at \*2. Argentina subsequently paid for the shares it reasserted control over.

The current litigation stems from allegations that minority shareholders (Petersen and Eton Park) asserted in U.S. courts claiming that, in the course of Argentina's reassertion of control, Argentina breached YPF's bylaws by not extending a tender offer to them. In September 2022, the District Court entered judgments totaling US$16.1 billion, which remain on appeal. In the interim, plaintiffs sought an extraordinary remedy to satisfy the on-appeal US$16.1 billion judgment: a court order compelling Argentina to transfer its majority stake in YPF to an account where ownership would subsequently be transferred to private parties.

---

[2]  *See Bainbridge Fund Ltd. v. Republic of Argentina*, No. 16 Civ. 08605 (LAP), 2025 WL 1796379 (S.D.N.Y. June 30, 2025); *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 02739 (LAP), No. 16 Civ. 08569 (LAP), 2025 WL 1796392 (S.D.N.Y. June 30, 2025) (together, the "**Turnover Orders**").

On June 30, 2025, the District Court granted plaintiffs' motion, ordering the turnover of YPF shares as requested by the plaintiffs.

Argentine law governs these shares, which are held as uncertificated securities in book-entry form at Caja de Valores S.A. (Argentina's central securities depository) in Argentina. Article 10 of Argentina's YPF Law prohibits "any future transfer of the shares" "without permission of the National Congress by a two-thirds vote of its members." YPF Expropriation Law Art. 10. Yet the District Court dismissed these sovereign protections, reasoning that Argentina could simply receive permission from the National Congress by a two-thirds vote, take action to change the law, or satisfy the judgment through a separate agreement with the plaintiffs. *See* 2025 WL 1796392, at *11.

The Turnover Orders reflect judicial overreach, undermining bedrock principles of international law governing relations between sovereign states. Specifically, under international law, two core principles—sovereign equality and territorial sovereignty—have long protected property located within a sovereign's territory from the compulsory reach of foreign courts without the sovereign's consent. As the International Court of Justice has explained, the rule of State immunity "derives from the principle of sovereign equality of States, which, as Article 2, paragraph 1, of the Charter of the United Nations makes clear, is one of the fundamental principles of the international legal order." Jurisdictional

4

Immunities of the State (Ger. v. It.: Greece intervening), Judgment, 2012 I.C.J. Rep. 99, ¶ 57 (Feb. 3). This principle "has to be viewed together with the principle that each State possesses sovereignty over its own territory and that there flows from that sovereignty the jurisdiction of the State over events and persons within that territory." *Id.*

By authorizing the compelled transfer of a sovereign nation's assets held entirely within its territory—in violation of its own domestic law—the Turnover Orders depart from established international norms. They signal to the global community that domestic courts may override the fundamental independence of other sovereigns. If allowed to stand, this precedent would destabilize settled expectations, threaten international comity, and invite retaliatory measures— undermining the stability of the global legal order. The Sovereign Nations therefore respectfully urge this Court to reverse the Turnover Orders.

## ARGUMENT

## I. THE TURNOVER ORDERS VIOLATE FUNDAMENTAL PRINCIPLES OF INTERNATIONAL LAW

### A. The Turnover Orders Infringe Foundational Principles of Sovereign Equality and Territorial Sovereignty

Customary international law forms part of U.S. common law and establishes the foundational framework governing this case. The U.S. Supreme Court has repeatedly affirmed this integration, instructing courts to apply international legal principles in cases implicating foreign sovereigns. *See The Paquete Habana*, 175

5

U.S. 677, 700 (1900) (holding that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. . . . [W]here there is no treaty[,] and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of [c]ivilized nations"); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004) (noting that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations"). Federal courts are therefore to appropriately identify and apply rules of customary international law. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964) (noting that "rules of international law should not be left to divergent and perhaps parochial state interpretations").

At the foundation of international law is the principle of equal sovereignty: that all nations, regardless of size, wealth, or influence, possess the same status and dignity in law. This axiom was firmly established long before the U.N. Charter, which enshrines the sovereign equality of states as its first principle. *See* Benedict Kingsbury, *Sovereignty and Inequality*, 9 European J. Int'l Law 599, 603 (1998). As Chief Justice Marshall observed, "[n]o principle of general law is more universally acknowledged, than the perfect equality of nations. . . . [I]t results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone." *The Antelope*, 23 U.S. 66, 122 (1825). This

6

principle is captured in the maxim "par in parem non habet imperium" ("an equal has no dominion over an equal"), a cornerstone of the international legal system and codified in Article 2(1) of the United Nations Charter, 59 Stat. 1031 (1945), a binding treaty forming part of U.S. law. In short, the principle of equal sovereignty ensures that every nation is absolutely independent within its own borders, free from external compulsion or interference. Just as the equal rights of individuals underpin a fair domestic legal order, the sovereign equality of nations forms the essential basis for a just and orderly international community.

Territorial sovereignty operates together with sovereign equality to ensure exclusive state competence within its borders. International tribunals have equally affirmed that the "[e]xclusive competence of the State in regard to its own territory" forms the bedrock of peaceful international relations. As the Permanent Court of Arbitration stated, "[t]he development of the national organisation of States during the last few centuries and, as a corollary, the development of international law, have established this principle of the exclusive competence of the State in regard to its own territory." *See* Island of Palmas (Neth. v. U.S.), 2 R.I.A.A. at 838. The International Court of Justice has recognized that sovereign equality and territorial sovereignty are to be "viewed together," forming the constitutional foundation of the global legal order from which all other protective doctrines flow. *See* Jurisdictional

Immunities of the State (Germ. v. It.: Greece intervening), Judgment, 2012 I.C.J. Rep. 99, ¶ 57 (Feb. 3).

The District Court's Turnover Orders are inconsistent with these core rules. By directing Argentina to transfer shares located in its own territory in violation of its own domestic law (or, failing that, to legislate a change), the Turnover Orders force a foreign sovereign to yield its legislative and executive autonomy to the directive of a U.S. court. This does not merely undermine Argentina's sovereign equality; it treats Argentina as a subject to U.S. judicial authority rather than a nation with independent status under international law.

Simultaneously, the Turnover Orders improperly extend U.S. authority into Argentine territory, violating territorial sovereignty. That is precisely what these foundational principles were developed to prevent, and their breach here carries profound international consequences.

Having analyzed the fundamental principles of sovereign equality and territorial sovereignty, it is critical to consider the specific doctrines that operationalize and protect these principles under international law. The doctrines of sovereign immunity and territorial jurisdiction serve as the key mechanisms that defend a foreign state's assets and autonomy from the compulsory reach of foreign courts. The following section explains how the Turnover Orders violate these complementary pillars of international law.

**B.      The Turnover Orders Violate the Principles of Sovereign Immunity and Territorial Jurisdiction**

The Turnover Orders violate two additional distinct but complementary pillars of international law: sovereign immunity and territorial jurisdiction.

Sovereign immunity and territorial jurisdiction are two sides of the same coin. As the ICJ explained, sovereign immunity "derives from the principle of sovereign equality of States" and territorial jurisdiction flows from the principle "that each State possesses sovereignty over its own territory and that there flows from that sovereignty the jurisdiction of the State over events and persons within that territory." Jurisdictional Immunities of the State (Germ. v. It.: Greece intervening), Judgment, 2012 I.C.J. Reports 99, ¶ 57 (Feb. 3). These principles work together to protect state sovereignty: sovereign immunity provides defensive protection against foreign court interference, while territorial jurisdiction provides affirmative protection of a state's exclusive authority within its borders.

Execution immunity is one of sovereign immunity's strongest forms: it prevents foreign courts from attaching or executing against a state's property—a safeguard designed to uphold autonomy and respect among equal sovereigns.

Customary international law draws a bright line regarding enforcement jurisdiction: a state may enforce judgments only within its own territory, unless the sovereign whose territory is at issue consents. This rule is reflected in the

Restatement (Fourth) of Foreign Relations Law § 432 (Am. L. Inst. 2018)[3] and in the Foreign Sovereign Immunities Act ("FSIA")[4], and has long been recognized by the U.S. Supreme Court. *See The Schooner Exch. v. McFaddon*, 11 U.S. 116, 137 (1812) ("One sovereign being in no respect amenable to another . . . can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him."). The Permanent Court of International Justice[5] has likewise established that absent an express permissive rule, no state may exercise its power in any form within another state's territory. *See The S.S. Lotus (Fr. v. Turk.)*, 1927 P.C.I.J. (ser. A), No. 10, ¶

---

[3]    *See* Restatement (Fourth) of Foreign Relations Law § 432(a) & (b) (under customary international law: (a) a state may exercise jurisdiction to enforce in its own territory; and (b) a state may not exercise jurisdiction to enforce in the territory of another state without the consent of the other state).

The Restatement (Fourth) of Foreign Relations Law was published by the American Law Institute in 2018 ("**Restatement**"). U.S. courts frequently rely upon the Restatement and treat it as a persuasive source. *See Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 183 (2021) (citing the Restatement in its discussion on the limits of sovereign immunity); *Havlish v. Taliban*, No. 23-258-CV, 2025 WL 2447193, at \*23 (2d Cir. Aug. 26, 2025) (relying upon the Restatement in deciding whether an entity is immune under the FSIA).

[4]    The FSIA's text and structure limit U.S. courts' authority to attach, execute or encumber foreign sovereign property, and judicial authority stops at the foreign state's border unless there is express consent.

[5]    The Permanent Court of International Justice, often called the World Court, was an international court attached to the League of Nations. It existed from 1922 to 1946.

45 (Sept. 7) ("The first and foremost restriction imposed by international law upon a State is that failing the existence of a permissive rule to the contrary it may not exercise its power in any form in the territory of another State.").

Consistent state practice also supports this point. Notably, in this case, the U.S. Government itself has stated "the government is not aware of any foreign state that . . . allows judgment creditors to reach a foreign sovereign's extraterritorial assets to satisfy a judgment." Br. for the United States as Amicus Curiae, *Levin v. Bank of New York*, No. 22-624, 2022 WL 16962294 at *28-29 (2d Cir. Nov. 10, 2022). This is significant, as consistent state practice and *opinio juris* together form the content of customary international law. Restatement (Fourth) of Foreign Relations Law § 402 ("Customary international law results from a general and consistent practice of states followed out of a sense of international legal right or obligation.").[6]

The District Court's Turnover Orders are inconsistent with these rules of sovereign immunity and territorial jurisdiction. As discussed above, they compel Argentina to transfer property located entirely within its own borders—and under its own law—solely to satisfy a U.S. judgment. This contravenes both Argentina's

---

[6] This representation further confirms the widely accepted rule of customary international law. *See United States v. Alaska*, 503 U.S. 569, 588 n.10 (1992) (accepting principle as customary international law based on government's representation that the United States recognized it as such).

territorial jurisdiction and its execution immunity. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."); *F. Hoffmann-La Roche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (presumption against extraterritoriality "reflects principles of customary international law").

Further, in directing Argentina's legislative and executive authority, the Turnover Orders represent an even deeper level of improper intervention. They ask that Argentina "receive permission" from its Congress or "change the law," thereby placing pressure on another nation's legislative autonomy. U.S. courts have firmly rejected the premise that they may require a foreign state or its legislature to take, withhold, or alter legislative action. *See In re Austrian & German Holocaust Litig.*, 250 F.3d 156, 165 (2d Cir. 2001).

For all these reasons, the Turnover Orders are irreconcilable with customary international law governing extraterritorial enforcement jurisdiction and should therefore be vacated.

## II. THE TURNOVER ORDERS ARE CONTRARY TO PRINCIPLES OF INTERNATIONAL COMITY AND REASONABLENESS

Not only do the Turnover Orders breach customary international law—including core principles of sovereign immunity and territorial jurisdiction—they

12

also run afoul of the doctrine of international comity. This additional failure implicates the broader framework of mutual respect and reasonableness that underpins cooperation between nations, heightening the gravity of permitting the court's overreach to stand.

The doctrine of comity requires courts to act with respect and deference toward the laws and interests of foreign states. This duty becomes paramount when a U.S. court order seeks to compel legislative action of a foreign sovereign. As the Second Circuit has consistently observed, U.S. courts have "long recognized the principles of international comity and have advocated [for] them in order to promote cooperation and reciprocity with foreign lands." *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021); *see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 139 (2d Cir. 2014). The Restatement (Third) of Foreign Relations Law similarly instructs that even when a nation may lawfully prescribe rules of conduct, it nonetheless must refrain from exercising that jurisdiction "with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." Restatement (Third) of Foreign Relations Law § 403(1) (Am. L. Inst. 1987).

## A. The Turnover Orders Create an Irreconcilable Conflict with Foreign Law

International comity instructs courts to avoid imposing obligations that would put parties in impossible positions of conflicting legal duties. As established in the

13

Restatement (Third) of Foreign Relations Law § 441, "a state may not require a person . . . to do an act in another state that is prohibited by the law of that state." And the case law is clear: when legal compliance with both regimes is impossible, courts must rigorously assess the implications before issuing an order with extraterritorial effect. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 555 (1987); *Gucci Am., Inc.*, 768 F.3d at 139 (where a foreign bank invoked an apparent conflict with the requirements of Chinese law, "comity principles required the district court to consider the Bank's legal obligations pursuant to foreign law before compelling it to comply").

Here, the Turnover Orders present precisely such an irreconcilable conflict. Compliance would require Argentina to amend its domestic statutes or secure an action of its legislature at the direction of a foreign court. The District Court suggested Argentina could "(1) receive the permission of the National Congress by two-thirds vote, (2) take action to change the law, or (3) satisfy the judgment through a separate agreement with Plaintiffs." 2025 WL 1796392 at *11. The District Court exceeded the legitimate scope of judicial authority. U.S. courts do not have the authority to direct even their own legislature to act, let alone to require a foreign congress to enact, amend, or repeal statutes as a condition of compliance. The enactment of laws is a core sovereign function that is immune from external jurisdictional control, whether domestic or foreign. *See In re Austrian, German*

14

*Holocaust Litig.*, 250 F.3d at 164 (requiring the district court to amend its order, which required the German government to pass additional legislation, and indicating that federal courts could not interfere with the executive's conduct of foreign relations by demanding that a foreign nation enact legislation); *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 79 (3d Cir. 1994) ("[E]ach sovereign nation has the sole jurisdiction to prescribe and administer its own laws . . . .").

It is insufficient to argue, as the District Court did, that legislative action is "theoretically" available. Such "theoretical" alternatives would, by definition, always be available in any case and under any circumstances, so long as a foreign nation surrenders its legislative function to a U.S. court. Comity is designed to prevent placing a nation in conflict with its own law—particularly where compliance is impossible unless sovereignty is compromised. The Turnover Orders therefore represent a textbook "true conflict": Argentina cannot comply with both the Turnover Orders and its own law unless it surrenders legislative autonomy to a foreign court. Nor can this conflict be avoided simply because Argentina could theoretically "satisfy the judgment through a separate agreement with Plaintiffs," *see* 2025 WL 1796392, at *11; that possibility exists in every case involving an execution order, yet it does not cure what would otherwise be an unlawful intrusion into another sovereign's legal autonomy. This is precisely the kind of interference

15

the comity doctrine is designed to guard against, and one which American courts have repeatedly recognized must be avoided. *See In re Vitamin C. Antitrust Litig.*, 8 F.4th 136, 147 (2d Cir. 2021).

### B. The District Court Failed to Engage in the Required Comity Analysis

When a true conflict arises, U.S. courts must conduct a comprehensive, good-faith inquiry into the affected sovereign's interests before compelling compliance. *See Gucci Am.*, 768 F.3d at 139, n.20 (holding that "comity principles required the district court to consider the Bank's legal obligations pursuant to foreign law before compelling it to comply" and "to [consider] its own as well as the other state's interest in exercising jurisdiction, in light of all the relevant factors").

Here, the District Court focused narrowly on Argentina's "interest in avoiding execution," without acknowledging its broader sovereign interests: exclusive control over property within its territory, authority to regulate commercial affairs, and the right to legislate for itself, free from interference. These interests, including legislative autonomy and respect for property and regulation, are protected under international law and have specific recognition in the Restatement (Third) of Foreign Relations Law § 403's factors for comity analysis. By failing to properly account for these foundational interests, the District Court neglected the substantive inquiry required by comity. *See Mujica v. AirScan Inc.*, 771 F.3d 580, 611 (9th Cir. 2014) ("[I]nherent in the concept of comity is the desirability of having the courts of one

nation accord deference to the official position of a foreign state . . . .").  Thus, the court should have engaged in a more fulsome comity analysis.

In sum, the District Court created both a true legal and sovereignty conflict and failed to undertake the rigorous analysis required by comity and reasonableness. Taken together, these defects demonstrate why the Turnover Orders should be vacated.

## III.  THE TURNOVER ORDERS YIELD FAR-REACHING AND NEGATIVE POLICY CONSEQUENCES

The Turnover Orders risk inflicting lasting and severe harm to the international legal order and cross-border commercial relations, as they create uncertainty among sovereign states regarding the enforceability of their domestic laws and may discourage participation in the global marketplace.

### A.  The Turnover Orders Could Discourage Sovereign Commerce and Foreign Participation in U.S. Markets

The global commercial system relies on predictability and respect for sovereign autonomy.  New York's status as a world financial center is rooted in its ability to provide a stable, reliable environment where sovereigns and foreign entities can transact with confidence in the legal framework.  *See  Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (endorsing the Second Circuit's recognition of "New York's status as a . . . financial leader")*; IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*, 982 N.E.2d 609, 612 (N.Y. 2012) ("The goal

17

of [New York's General Obligations Law] was to promote and preserve New York's status as a commercial center and to maintain predictability for the parties."); *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 460 (2d Cir. 2022) (recognizing New York's "status as a commercial center"). By authorizing courts to demand compliance that may undermine foreign law—or compel sovereign legislative action—the Turnover Orders risk creating disincentives for sovereign states considering participation in U.S. markets. Such measures could potentially chill future sovereign participation in U.S. markets, introducing uncertainty into global markets.

## B. The Turnover Orders Risk Exposing Sovereign States to Similar Intrusive Orders Elsewhere

The District Court's ruling would create grounds for foreign courts to impose similarly intrusive orders against any sovereign state. Many nations adhere to the principle of reciprocity in sovereign immunity decisions: the treatment one sovereign affords to foreign sovereign interests will be reflected, in kind, in future cases involving that sovereign's own assets and agencies abroad. *See Republic of Hungary v. Simon*, 604 U.S. 115, 132 (2025) (noting that the United States has a "'reciprocal self-interest' in receiving sovereign immunity in foreign courts" (citing *Fed. Republic of Germany*, 592 U.S. at 184)). History and precedent both attest that unfavorable precedent travels swiftly between international tribunals. *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 8 F.4th at 161 (dismissing the case "because that

decision would set a precedent for foreign judgments against American companies acting in accord with requirements of the U.S. Government"); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35–36 (1945) ("The judicial seizure of the property of a friendly state may be regarded as such an affront to its dignity and may so affect our relations with it . . . .").

As the U.S. Government explained in its Statement of Interest, "any decision that foreign state property located outside of the Court's jurisdiction is subject to turnover implicates important foreign policy interests of the United States with respect to reciprocity." Letter from Damian Williams to The Honorable Loretta A. Preska, U.S. Dist. Judge at 8, *Peterson Energia Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP) (S.D.N.Y. Nov. 6, 2024), ECF No. 679. If a court determines that such statutes reach foreign state property abroad—"let alone foreign sovereign property in that sovereign's own territory"—it risks exposing U.S. assets to similar adverse measures in foreign courts. *See id.*

If the Turnover Orders stand, they create a blueprint that foreign courts worldwide may invoke to justify subjecting any sovereign nation—including the United States, Chile, Italy, Romania, Ukraine, Uruguay, or any other sovereign—to similarly sweeping and intrusive measures that trample legislative prerogatives and threaten sovereign assets abroad. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 85, 841 (D.C. Cir.) (noting that "some foreign states base their sovereign

19

immunity decisions on [the principle of] reciprocity"), *cert. denied*, 469 U.S. 881 (1984). The precedent thus threatens the sovereign equality that protects all nations in the international legal system, as what one court permits against one sovereign becomes available for use against any sovereign in reciprocal proceedings.

## C. The Turnover Orders Create Confusion and Instability in the Conduct of Foreign Affairs

The District Court's order also obscures diplomatic channels and injects harmful uncertainty into international affairs.

Foreign relations is "a domain in which the controlling role of the political branches is both necessary and proper." *Bank Markazi v. Peterson*, 578 U.S. 212, 234 (2016). Courts must "take special care to avoid potential conflicts and entanglements in the area of international relations" and "respect the Constitution's commitment of the foreign affairs authority to the political branches." *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 291 (E.D.N.Y. 2002); *Mujica*, 771 F.3d at 606. Likewise, policymakers of all sovereigns will find their ability to resolve sensitive foreign affairs increasingly hampered by ongoing litigation beyond their control. This, among other reasons, is why foreign relations are typically reserved to the political branches, not the judiciary. *See In re Vitamin C Antitrust Litig.*, 8 F.4th at 161; *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943) ("[O]ur national interest will be better served . . . if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by

the compulsions of judicial proceedings."). This judicial overreach threatens the stability of international relations by encouraging courts in all jurisdictions to substitute the judgment of their respective political branches with their own judgment in matters affecting foreign sovereigns.

## CONCLUSION

For these reasons, and because U.S. courts respect fundamental principles of international law governing sovereign immunity, territorial sovereignty, and extraterritorial enforcement, *amici curiae* respectfully urge this Court to reverse the District Court's Turnover Orders.

Dated:   New York, New York
         October 2, 2025

Respectfully submitted,

By:   */s/ Adam S. Lurie*

**LINKLATERS LLP**
Adam S. Lurie
Emilio Minvielle
601 13th St. NW #400
Washington, D.C. 20005
(202) 654-9200
adam.lurie@linklaters.com
emilio.minvielle@linklaters.com

Patrick Ashby
Aviva Kushner
1290 Avenue of Americas
New York, NY 10104
(212) 903-9000
patrick.ashby@linklaters.com
aviva.kushner@linklaters.com

Counsel for Amici Curiae
*The Republic of Chile*
*The Italian Republic*
*Romania*
*Ukraine*
*The Oriental Republic of Uruguay*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limitation of Fed. R. App. P 29(a)(5) and U.S. Ct. of App. 2nd Cir. Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains **4,759** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

Dated: October 2, 2025

*/s/ Adam S. Lurie*
Adam S. Lurie

## CERTIFICATE OF SERVICE

I certify that on October 2, 2025, the foregoing was filed with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit using the appellate ACMS system. All participants in this case are registered ACMS users and will be served by the system.

*/s/ Adam S. Lurie*
Adam S. Lurie