# 25 - 1687

IN THE

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees,*

– v. –

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

YPF S.A.,

*Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(No. 1:15-cv-02739) (Hon. Loretta A. Preska)

## BRIEF FOR *AMICUS CURIAE* THE AMERICAN CHAMBER OF COMMERCE IN ARGENTINA IN SUPPORT OF ARGENTINE REPUBLIC

DAVID A. BERGER
MICHAEL S. VOGEL
ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

*Attorneys for Amicus Curiae American
Chamber of Commerce in Argentina*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus* states as follows:

The American Chamber of Commerce in Argentina is an Argentine not-for-profit civil organization.  It has no parent corporation and no stock.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT ........................................................................................ 7

I.     THE ORDER IS AN AFFRONT TO ARGENTINE
      SOVEREIGNTY AND RULE OF LAW. ........................................ 7

II.    THE ORDER HAS THE POTENTIAL TO DESTABILIZE
      ARGENTINA'S ECONOMY. ....................................................... 12

III.   THE ORDER CREATES A NEW AREA OF RISK FOR
      ARGENTINE-AMERICAN BUSINESS RELATIONS. ............................. 17

CONCLUSION ..................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

Cases

*In re A.T. Reynolds & Sons, Inc.*,
452 B.R. 374 (S.D.N.Y. 2011) ................................................................10

*In re Austrian & German Holocaust Litig.*,
250 F.3d 156 (2d Cir. 2001) .....................................................................9

*Kothe v. Smith*,
771 F.2d 667 (2d Cir. 1985) ....................................................................10

*LaSala v. UBS, AG*,
510 F. Supp. 2d 213 (S.D.N.Y. 2007) ....................................................10

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
116 F.R.D. 517 (S.D.N.Y. 1987) ............................................................11

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004).......................................................................9

*Walters v. Indus. & Com. Bank of China, Ltd.*,
651 F.3d 280 (2d Cir. 2011) ....................................................................17

Statutes

28 U.S.C. § 1609 ....................................................................................18

28 U.S.C. § 1610(a) ................................................................................17

Argentina Law 26.741...........................................................................6, 8

Argentina Law 26.944 .............................................................................11

Argentina Penal Code § 248 ...................................................................11

Foreign Sovereign Immunities Act ...............................................16, 17, 18

<u>Other Authorities</u>

Agustín Maza, *YPF, la empresa que más aporta a la economía local y que quedó en el centro de la escena por un fallo contra la Argentina*, INFOBAE (Jul. 1, 2025), available at https://www.infobae.com/economia/2025/07/01/ypf-la-empresa-que-mas-aporta-a-la-economia-local-y-que-quedo-en-el-centro-de-la-escena-por-un-fallo-contra-la-argentina/ ............................................................6, 13

Alan Rappeport and Colby Smith, *U.S. Pledges Support for Argentina's Economy and a Trump Ally in Crisis*, N.Y. TIMES, Sept. 22, 2025, available at https://www.nytimes.com/2025/09/22/us/politics/us-argentina-bessent-javier-milei.html ...........................................................15

*Argentina Country Commercial Guide*, U.S. INT'L TRADE ADMIN. (Aug. 1, 2025), https://www.trade.gov/country-commercial-guides/argentina-market-overview ........................................................12

*Argentina tuvo un año histórico en la producción de hidrocarburos*, MINISTRY OF THE ECONOMY OF ARGENTINA (Jan. 24, 2025), available at https://www.argentina.gob.ar/noticias/argentina-tuvo-un-ano-historico-en-la-produccion-de-hidrocarburos#:~:text=En%20particular%2C%20en%20el%20mes,la%20libertad%20y%20la%20prosperidad ...........................................14

David Cayon, *Un Congreso fragmentado y la falta de acuerdos bloquean las leyes: solo se aprobaron 8 de casi 1500*, INFOBAE (Jul. 24, 2025), available at https://www.infobae.com/politica/2025/07/25/un-congreso-fragmentado-y-la-falta-de-acuerdos-bloquean-las-leyes-solo-se-aprobaron-8-de-casi-1500/ ..........................................................8

*IDB Approves 2025-2028 Country Strategy for Argentina*, INTER-AMERICAN DEVELOPMENT BANK (July, 16. 2025), available at https://www.iadb.org/en/news/idb-approves-2025-2028-country-strategy-argentina ..........................................................16

Javier Lorca, *US announces it will do 'whatever is necessary to support Argentina*,' EL PAÍS (Sept. 22, 2025), available at https://english.elpais.com/economy-and-business/2025-09-22/us-announces-it-will-do-whatever-is-necessary-to-support-argentina.html ...................3

iv

Josefina Salomon, *Milei tames inflation, but Argentines still struggle to afford basics,* ALJAZEERA (Jul. 25, 2025), available at https://www.aljazeera.com/economy/2025/7/25/milei-tames-inflation-but-argentines-still-struggle-to-afford-basics ...........................................................16

*Las diez marcas más valiosas de Argentina crecieron un 18,33% respecto al año anterior, alcanzando un valor total de 8.624,83 millones de dólares en 2024* (The ten most valuable brands in Argentina grew by 18.33% compared to the previous year, reaching a total value of 8.62483 billion dollars in 2024), BRANDFINANCE (2024), available at https://brandirectory.com/reports/argentina/2024 ..................13

Restatement (Third) of Foreign Relations Law § 441 (1987) ...................................9

*US Mulls Economic Lifeline For Ally Argentina*, BARRON'S (Sept. 22, 2025), available at https://www.barrons.com/news/us-mulls-economic-lifeline-for-ally-argentina-5c8db0f5; .........................................................3

*US support is only a temporary fix for Argentina*, FINANCIAL TIMES, Sept. 24, 2025, available at https://www.ft.com/content/e7a9f837-eb98-4f9e-b050-ccd6ecb38ad4 .................................................................15

Warrick Smith and Mary Hallward-Driemeier, *Understanding the Investment Climate*, INTERNATIONAL MONETARY FUND (Mar. 2024), https://www.imf.org/external/pubs/ft/fandd/2005/03/pdf/smith.pdf ......................12

*World Investment Report 2025*, UNITED NATIONS CONFERENCE ON TRADE AND DEVELOPMENT (2025), https://unctad.org/system/files/official-document/wir2025_en.pdf........................12

*YPF Investor Presentation*, YPF (July 2024), available at https://investors.ypf.com/documents/presentaciones/YPF%20Investor%20Presentation%20Q1%202024.pdf ...................................................13

*YPF se convirtió en el principal exportador de petróleo de Argentina*, YPF NOTICIAS (Nov. 13, 2025), available at https://novedades.ypf.com/ypf-se-convirtio-en-el-principal-exportador-de-petroleo-de-argentina.html ...............................................13

## INTEREST OF *AMICUS CURIAE*[1]

The American Chamber of Commerce in Argentina ("AmCham") is an Argentine not-for-profit civil association whose mission is to strengthen and promote economic ties between Argentina and the United States. AmCham has been advocating for bilateral trade and investment between Argentina and the United States for more than 107 years. AmCham's membership comprises 694 companies, which together represent a significant segment of the Argentine economy. Its members produce 24% of Argentina's Gross Domestic Product, 39% of the country's total tax revenue, 35% of Argentine imports, and 45% of its national exports. These members directly employ over 420,000 individuals, and indirectly generate employment for more than four million. *Id.* Forty-four percent of AmCham's member companies originated in the United States before establishing a presence in Argentina. *Id.*

AmCham's founding mission is to "promote bilateral trade, direct investment, technology transfer, and all interests that strengthen relations between

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1(b), *amicus* declares that no party's counsel authored this brief in whole or in part, and no person other than *amicus* and its counsel contributed money intended to fund this brief's preparation or submission.

All parties have consented to the filing of this amicus brief. Accordingly, pursuant to Fed. R. App. P. 29(a)(2), this brief may be filed without leave of the Court.

[Argentina and the United States].”[2]  The organization works on behalf of its members to encourage economic exchange between the two nations.  It does so by hosting seminars and conferences, facilitating networking and business interactions, offering support to companies in their government relations, and publishing informational business resources.  AmCham also hosts an annual summit which brings together Argentine and American government officials, business leaders, and prominent representatives of civil society to discuss challenges and opportunities in bilateral relations between Argentina and the United States.

AmCham is in a unique position to shed light on the conditions that encourage transnational economic exchange.  Generally, to attract foreign investment, sovereign states must ensure that certain conditions are in place.  Chief among these conditions are predictability and respect for rule of law in the host country of investments.  Maintaining a predictable and stable legal landscape requires nation states to have independent governments capable of upholding institutional order, protecting rights to property, and providing a transparent and stable regulatory framework.  In other words, a state must be able to exercise the full breadth of its sovereignty—as reflected in its rule of law—without

---

[2] As articulated in Article 2 of AmCham's bylaws.

interference, while principles of comity guide relations between and among sovereign states.

The order in question in this appeal has the potential to significantly disrupt established American-Argentine patterns of sovereignty and comity, and with them economic cooperation between the two nations—a cooperation that is a priority of U.S. foreign policy.[3] If this Court upholds the District Court's June 30, 2025, Order (*Petersen Energia Inversora, S.A.U. et al. v. The Republic of Argentina*, No. 1:15-cv-02739 (LAP) (S.D.N.Y.), Dkt, 742; *Eton Park Capital Management L.P. et al. v. The Republic of Argentina*, No. 16 Civ. 08569 (LAP), Dkt. No. 742; *Bainbridge Fund Ltd. v. The Republic of Argentina*, No. 16-cv-8605 (S.D.N.Y.), Dkt. No. 189; the "Order"), requiring Argentina to turn over its shares in YPF S.A. ("YPF") to private creditors, companies that operate in both Argentina and the United States would face an unprecedented risk in connection with cross-border business. Such a decision would open an entirely new area of liability for both Argentine companies operating in the United States and for American companies seeking to operate in Argentina. Further, affirming the Order, which

---

[3] *See e.g., US Mulls Economic Lifeline For Ally Argentina*, Barron's (Sept. 22, 2025), available at https://www.barrons.com/news/us-mulls-economic-lifeline-for-ally-argentina-5c8db0f5; Javier Lorca, *US announces it will do 'whatever is necessary to support Argentina*,' El País (Sept. 22, 2025), available at https://english.elpais.com/economy-and-business/2025-09-22/us-announces-it-will-do-whatever-is-necessary-to-support-argentina.html.

unapologetically demands that Argentina either change its law or break it, would undermine Argentina's sovereignty and rule of law, thus upending the legal system that businesses have come to rely upon. Finally, because the Order threatens the majority interest in one of Argentina's largest companies, a company whose operations are integrated with numerous businesses throughout Argentina, it has the potential to destabilize the country's recovering economy, thus also sabotaging the active efforts of the United States Treasury to assist a key ally.

For these reasons, AmCham respectfully submits this brief in support of the Republic of Argentina's Opening Brief and urges the Court to reverse the Order.

## SUMMARY OF ARGUMENT

The Order threatens to severely disrupt the economic relationship between Argentina and the United States. For transnational business relations to flourish, certain conditions must be in place. These include an established rule of law, a stable economy, and predictable business conditions. By requiring the Republic of Argentina to violate its own established law and suddenly transfer a majority interest in the largest energy company in Argentina, the Order undermines each of the stated conditions. As such, it would cause irreparable damage to the long-cultivated business relationships that operate between Argentina and the United States.

Permitting the Order to proceed would undermine Argentine sovereignty and rule of law, inevitably forcing United States and other international businesses to reevaluate their presence in Argentina. Such an order against a foreign sovereign is unprecedented. Not only has the District Court ignored long established principles of international comity, but it has boldly and expressly demanded that Argentina either change its law or violate it. A foreign court should not—and cannot—request this of a sovereign nation.

If upheld, the Order would also be highly disruptive to business relations because it would destabilize the rule of law on which foreign sovereigns and multinational corporations structure their economic activity. Stability and predictability are key to encouraging companies to invest in a particular state, as foreign companies must be able to trust that a state will adhere to its own laws in the course of business. They must also be confident that they can operate under the laws of a state without the sovereign will of the nation being displaced by a foreign court. Such circumstances would discourage future investment, erode the value of existing investments, and negatively affect the economic ties between Argentina and the United States.

Further, the Order has the potential to destabilize Argentina's recovering economy. YPF is Argentina's leading energy company and a cornerstone of national economic development. It is the single largest contributor

5

to Argentina's economy, generating over 1.5% of Argentina's total gross domestic product ("GDP") and supplying six out of every ten liters of fuel sold across Argentina.[4]  Given YPF's central role in Argentina's economy, a sudden shift in majority ownership, which could also result in an event of default under agreements governing the company's indebtedness, could unavoidably damage the Argentine energy industry (in which U.S. companies have significant interest) and affect the Argentine economy as a whole.  This is one of the key reasons why Argentina has a law in place, predating this litigation, that prohibits the transfer of the Republic's majority stake in YPF without the authorization of two-thirds of the National Congress.  Argentina Law No. 26.741, Section 10.[5]  In other words, the Order seeks to do what even a simple majority of Argentina's Congress could not, by forcing an involuntary transfer of a majority interest in YPF.  For Argentina to transfer its shares, as ordered by the District Court, it would either have to violate its own domestic law, or its Congress would have to assemble a supermajority to amend the law under pressure from a foreign court.  In either scenario, compliance

---

[4] Agustín Maza, *YPF, la empresa que más aporta a la economía local y que quedó en el centro de la escena por un fallo contra la Argentina* (YPF, the company that contributes the most to the local economy and that has been thrust into the spotlight by a ruling against Argentina), INFOBAE (Jul. 1, 2025), available at https://www.infobae.com/economia/2025/07/01/ypf-la-empresa-que-mas-aporta-a-la-economia-local-y-que-quedo-en-el-centro-de-la-escena-por-un-fallo-contra-la-argentina/.
[5] Available at https://www.argentina.gob.ar/normativa/nacional/ley-26741-196894/actualizacion.

with the Order would set a precedent that undermines the sovereignty of all nations that choose to do business with the United States, and it would have immediate, unpredictable, and deleterious effects on Argentina's economy, and on American-Argentine business and commercial relations.

Moreover, if upheld, the Order would put transnational businesses into dangerous uncharted territory. By imposing extreme and unprecedented relief, the Order creates a new area of risk which may force companies to reconsider their presence in either Argentina or the United States. This places the Order in direct opposition to the goal of AmCham and its members, which is to promote bilateral trade and investment to the benefit of both Argentina and the United States.

In sum, the impact of the Order would extend far beyond this case. It has the potential to upend Argentina's sovereignty and economic credibility, and overall business confidence in Argentina's legal framework. The result would be a significant negative impact on trade, investment, and the entire economic relationship between Argentina and the United States.

## ARGUMENT

## I.     THE ORDER IS AN AFFRONT TO ARGENTINE SOVEREIGNTY AND RULE OF LAW.

On June 30, 2025, Judge Preska directed the Republic of Argentina to "transfer" or "turn over" its 51% stake in YPF "to a global custody account at the Bank of New York Mellon ('BNYM') in New York" and "instruct BNYM to

initiate a transfer of the Republic's ownership interests in its YPF Shares to Plaintiffs." *Petersen* Order at 33; *Bainbridge* Order at 32."  This directive is in direct conflict with Argentine Law 26.741, which prohibits the transfer of the Republic's 51% stake in YPF without a two-thirds majority vote of Congress.[6]  Such a highly contentious vote is very unlikely to occur because the current government does not have a majority in the legislature.[7]  Therefore, the Order requires the Argentine Republic to violate its own law, thereby ignoring basic principles of international comity and threatening Argentina's sovereignty, an extraordinary act that would have Draconian implications.  Of course, forcing the legislature of a sovereign nation to vote in accord with the dictates of a foreign court is equally an affront to the core principles governing international relations.

The Order expressly demands that a foreign state violate a domestic law created by its democratically-elected Congress.  It is thus in violation of established principles of international comity, which require "that 'a state may not require a person to do an act in another state that is prohibited by the law of that

---

[6] Available at https://www.argentina.gob.ar/normativa/nacional/ley-26741-196894/actualizacion.

[7] *See* David Cayon, *Un Congreso fragmentado y la falta de acuerdos bloquean las leyes: solo se aprobaron 8 de casi 1500* (A fragmented Congress and lack of agreements block laws: only 8 out of nearly 1,500 were approved), INFOBAE (Jul. 24, 2025), available at https://www.infobae.com/politica/2025/07/25/un-congreso-fragmentado-y-la-falta-de-acuerdos-bloquean-las-leyes-solo-se-aprobaron-8-de-casi-1500/.

state.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting

Restatement (Third) of Foreign Relations Law § 441 (1987)).  This Court has also

held that United States courts have no power to require "the legislature of a foreign

sovereign" to "enact or change a law." *In re Austrian & German Holocaust Litig.*,

250 F.3d 156, 164-165 (2d Cir. 2001).  The Order thus violates established

precedent and, by undermining the self-determination of Argentinians, erodes

Argentine sovereignty over its own state and government.  In light of the Order's

obvious overreach, the United States government, which filed a statement of

interest in opposition to the Order, emphasized that "the injunctive relief ordered in

this case 'impinge[s] on the sovereignty' of Argentina." *Petersen Energia*

*Inversora, S.A.U. et al. v. Argentine Republic*, No. 25-1687 (2d Cir.), Dkt. No.

40.1; *Bainbridge Fund Ltd. v. The Republic of Argentina*, No. 25-1686 (2d Cir.),

Dkt. No. 27.1.  This Court should not allow a district judge to override Argentina's

legislature.

       The District Court reasoned that comity was not implicated by its

Order because there is no true conflict between the Order and the laws of

Argentina.  *Petersen* Order at  29-30; *Bainbridge* Order at 28.  Yet, the District

Court itself acknowledged the extraordinary difficulty of complying both with the

Order and Argentine law: "The Republic has several choices it can legally pursue:

(1) receive the permission of the National Congress by two-thirds vote, (2) take

action to change the law, or (3) satisfy the judgment through a separate agreement with Plaintiff." *Petersen* Order at 30; *Bainbridge* Order at 28. However, a District Court cannot demand that Argentina reach an agreement with the Plaintiffs. *See Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985) ("the law . . . does not sanction efforts by trial judges to effect settlements through coercion"); *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 382 (S.D.N.Y. 2011) ("It is well-settled that a court cannot force a party to settle, nor may it invoke 'pressure tactics' designed to coerce a settlement"). Thus, since the parties have been unable to come to an agreement, the remaining choices require a foreign sovereign to either break its own law or change it because of the ruling of a foreign court. This is an impossible choice, laying bare the conflict between the Order and Argentine law.

Moreover, the District Court provided an incomplete depiction of what is at stake for Argentina's government. The District Court asserted that the competing interests at play are the United States' interest in enforcing judgments versus Argentina's interest in avoiding the execution of assets. But this ignores the strong interest that Argentina has in upholding its sovereign law, including the public interest goals set forth in the law mandating the Republic's expropriation of a 51% interest in YPF, and accordingly the interest that Argentina has in maintaining stable rule of law when it comes to its commercial sector, including the energy industry. *See, e.g., LaSala v. UBS, AG,* 510 F. Supp. 2d 213, 232

10

(S.D.N.Y. 2007) (finding that Switzerland's interest in regulating the banking sector was great, "particularly where the bank is a leading financial services provider in the country," and noting that "[t]he reputability of the country's banking system is intimately connected to the effectiveness of the country's regulation of its banks").

It also ignores the possible implications in Argentina of forcing the government to violate its own laws. Argentina has statutes in place which establish civil and criminal liability for government officials should they break the law in an official capacity. *See* Argentina Law 26.944[8]; Penal Code of Argentina Article 248[9] (providing that a public official who issues orders in violation of the law may be subject to imprisonment of up to two years). The Order therefore may force Argentine officials to risk incarceration in order to comply with the will of a foreign court. This, again, is an unacceptable choice. *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 529 (S.D.N.Y. 1987) (strong national interest at stake where compliance with court order would place Swiss entity and its employees in violation of Swiss criminal law).

---

[8] Available at https://www.argentina.gob.ar/normativa/nacional/ley-26944-233216/texto.

[9] Available at https://servicios.infoleg.gob.ar/infolegInternet/anexos/15000-19999/16546/texact.htm#25.

Finally, if upheld, the Order would cause significant disruption to commercial relationships between the United States and Argentina. The Order, by destabilizing the Argentine rule of law around which multinational corporations operating in Argentina structure their economic activity, may force businesses to reconsider their investments in the country. This is because a nation that violates its own laws is not one that is favorable for foreign investment.[10] If Argentina were to break a long-established law, affecting a major player in the country's economy, companies will wonder what is stopping other entities from upending the laws that protect their investments. The result could be an immediate chilling of new investments in Argentina, which would directly harm AmCham's members, as well as the over 300 U.S. companies currently present in Argentina.[11]

## II.    THE ORDER HAS THE POTENTIAL TO DESTABILIZE ARGENTINA'S ECONOMY.

---

[10] *See World Investment Report 2025*, UNITED NATIONS CONFERENCE ON TRADE AND DEVELOPMENT (2025), https://unctad.org/system/files/official-document/wir2025_en.pdf (finding that weak governance and regulatory frameworks that create uncertainty deter long-term investment and that insufficient legal protections make for a poor investment environment). *See also* Warrick Smith and Mary Hallward-Driemeier, *Understanding the Investment Climate*, INTERNATIONAL MONETARY FUND (Mar. 2024), https://www.imf.org/external/pubs/ft/fandd/2005/03/pdf/smith.pdf (Researchers looking at multiple factors, including rule of law, underscored the importance of secure property rights and good governance to economic growth).
[11] *See Argentina Country Commercial Guide*, U.S. INT'L TRADE ADMIN. (Aug. 1, 2025), https://www.trade.gov/country-commercial-guides/argentina-market-overview.

The Order, by requiring a change in the majority ownership of one of Argentina's largest and most important companies, has the potential to significantly disrupt Argentina's economy. YPF is the single largest contributor to Argentina's GDP, alone generating upwards of 1.5% of GDP.[12] The company produces six out of every ten liters of fuel sold across Argentina, and is the nation's leading oil exporter.[13] It is also a 103-year old brand, which is engrained in Argentine national identity.[14] Argentina's economy is characterized by a high

---

[12] Agustín Maza, *YPF, la empresa que más aporta a la economía local y que quedó en el centro de la escena por un fallo contra la Argentina* (YPF, the company that contributes the most to the local economy and that has been thrust into the spotlight by a ruling against Argentina), INFOBAE (Jul. 1, 2025), available at https://www.infobae.com/economia/2025/07/01/ypf-la-empresa-que-mas-aporta-a-la-economia-local-y-que-quedo-en-el-centro-de-la-escena-por-un-fallo-contra-la-argentina/.

[13] *Id. YPF se convirtió en el principal exportador de petróleo de Argentina* (YPF became Argentina's leading oil exporter), YPF NOTICIAS (Nov. 13, 2025), available at https://novedades.ypf.com/ypf-se-convirtio-en-el-principal-exportador-de-petroleo-de-argentina.html.

[14] *YPF Investor Presentation*, YPF (July 2024), available at https://investors.ypf.com/documents/presentaciones/YPF%20Investor%20Presentation%20Q1%202024.pdf; *see also Las diez marcas más valiosas de Argentina crecieron un 18,33% respecto al año anterior, alcanzando un valor total de 8.624,83 millones de dólares en 2024* (The ten most valuable brands in Argentina grew by 18.33% compared to the previous year, reaching a total value of 8.62483 billion dollars in 2024), BRANDFINANCE (2024), available at https://brandirectory.com/reports/argentina/2024.

dependence on non-renewable energy sources[15], meaning that YPF has a pervasive impact on the economy as a whole. An abrupt change of leadership at YPF, therefore, is a matter of interest for all Argentine businesses, and YPF has explicitly warned that loss of sovereign majority ownership "including as a result of actions taken by judgment creditors of Argentina" could have "material adverse effect[s]" on its financial condition. YPF 2024 Form 20-F; March 28, 2025 YPF Sociedad Anónima, Annual Report.[16] Additionally, YPF has explained that a change in control has the potential to "result in an event of default under agreements governing all of our indebtedness and would have a material adverse effect on our business." March 28, 2025 YPF Sociedad Anónima, Annual Report. Thus, a change of control of YPF triggered by compliance with the Order could adversely affect the health of the entire company, thereby also causing significant repercussions for the Argentine economy as a whole.

---

[15] *See Argentina tuvo un año histórico en la producción de hidrocarburos* (Argentina had a historic year in hydrocarbon production), MINISTRY OF THE ECONOMY OF ARGENTINA (Jan. 24, 2025), available at https://www.argentina.gob.ar/noticias/argentina-tuvo-un-ano-historico-en-la-produccion-de-hidrocarburos#:~:text=En%20particular%2C%20en%20el%20mes,la%20libertad%20y%20la%20prosperidad.

[16] Available at: https://www.sec.gov/Archives/edgar/data/904851/000119312525067155/d866694d20f.htm.

Further, by granting extraordinary relief while the merits appeal is pending, the Order would set in motion events that would most likely be irreversible even if the Republic were to later win on appeal. As stated, due to preexisting obligations, the Order could force YPF into a challenging financial position. Moreover, the transfer of majority ownership almost certainly could not be undone even if the Republic prevails on appeal. Plaintiffs have already stated that they have "no interest in running an oil company" (Petersen 2nd Cir. Docket No. 39.1 at 22), so they presumably do not intend to maintain majority ownership themselves, making it nearly impossible to undo the transfer.[17] Therefore, the Order may be permanently divesting a sovereign nation from its majority interest in a company that is strategically invaluable to the economy through its development and use of one of the country's most important natural resources. This would have a dramatic, detrimental impact on Argentina's economy.

The Order, if upheld, would also serve to undermine the Argentine economy at a particularly sensitive time. Indeed, the Argentine peso declined to a record low last month.[18] In recognition of Argentina's efforts to stabilize its

---

[17] *Petersen*, S.D.N.Y. Dkt. No. 587 at 19 (Plaintiffs ask court to "instruct BNYM to transfer the shares to the U.S. Marshall for the S.D.N.Y. for sale to the public"); *Petersen*, 2d Cir. Dkt. No. 39.1 at 22.

[18] *US support is only a temporary fix for Argentina*, FINANCIAL TIMES, Sept. 24, 2025, available at https://www.ft.com/content/e7a9f837-eb98-4f9e-b050-ccd6ecb38ad4.

economy and its importance as a United States ally, on September 22, 2025, United States Treasury Secretary Bessent pledged to "do what is needed within [the Treasury's] mandate to support Argentina."[19]  Upholding the Order would thus be inconsistent with the expressed interests and efforts of the United States.  As stressed by the Department of Justice, the "court's order implicates significant foreign policy concerns."  *Petersen*, 2d. Cir. Dkt. No. 40.1 at 7; *Bainbridge*, 2d Cir. Dkt. No. 27.1 at 7.  Moreover, the people of Argentina stand to suffer should the economy be detrimentally affected by a foreign court ruling.  Inflation in Argentina has resulted in rising costs for the general population and in an erosion of incomes.[20]  This has aggravated financial vulnerability for millions of Argentinians.  The private sector, including YPF, plays a key role in wealth generation for the nation.[21]  Moreover, the adverse impact to the economy, coupled with the harm done to YPF, could negatively affect US-Argentina business relationships for years to come.

---

[19] Alan Rappeport and Colby Smith, *U.S. Pledges Support for Argentina's Economy and a Trump Ally in Crisis*, N.Y. TIMES, Sept. 22, 2025, available at https://www.nytimes.com/2025/09/22/us/politics/us-argentina-bessent-javier-milei.html.

[20] *See* Josefina Salomon, *Milei tames inflation, but Argentines still struggle to afford basics*, ALJAZEERA (Jul. 25, 2025), available at https://www.aljazeera.com/economy/2025/7/25/milei-tames-inflation-but-argentines-still-struggle-to-afford-basics.

[21] *See IDB Approves 2025-2028 Country Strategy for Argentina*, INTER-AMERICAN DEVELOPMENT BANK (July, 16. 2025), available at https://www.iadb.org/en/news/idb-approves-2025-2028-country-strategy-argentina.

## III.   THE ORDER CREATES A NEW AREA OF RISK FOR ARGENTINE-AMERICAN BUSINESS RELATIONS.

By granting unprecedented relief against a foreign sovereign, the Order upends the international framework on which transnational businesses have come to depend.  The District Court engaged in a novel interpretation of the Foreign Sovereign Immunities Act ("FSIA"), which greatly increases the risk that the property of a foreign state will be executed to fulfill judgments of United States courts.  In doing so, the Order threatens to cause significant disruption to cross-border trade and investment, as companies will need to reevaluate the risks of doing business in the United States and abroad.

Under the FSIA, foreign state property can be subject to execution if it is: (1) in the United States, (2) used for a commercial activity in the United States, and (3) used for the commercial activity upon which the claim is based.  *Petersen* Order at 14; *Bainbridge* Order at 14; 28 U.S.C. § 1610(a).  In finding that these circumstances apply to Argentina's YPF shares, the District Court has vastly and unjustifiably expanded the application of the FSIA exponentially and inappropriately.

Regarding the first FSIA prong, the District Court rejected the argument of the Republic, and of the United States itself, that sovereign property outside the U.S. is immune from execution.  *Petersen* Order at 25; *Bainbridge* Order at 23-14; *Petersen*, 2d. Cir. Dkt. No. 40.1 at 2-3; *Bainbridge*, 2d Cir. Dkt.

17

No. 27.1 at 2-3 (stating that FSIA "should be construed consistent with international law as continuing to provide foreign states' property located abroad with absolute immunity against execution.")  This holding ignores well-established federal common law, dictating that the "property of foreign states [is] absolutely immune from execution."  *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011).  Although the FSIA overruled the common law in regard to the "property *in the United States* of a foreign state," 28 U.S.C. § 1609 (emphasis added), it has not changed the law regarding the property of foreign sovereigns located abroad.  Therefore, the Order is misconstruing the protections on which foreign sovereigns rely to protect their assets outside of the United States.  Likewise, by holding that sovereign property located abroad lacks execution immunity, and by compelling its import into New York for turnover, the Order turns the FSIA on its head by interpreting the FSIA's limitations on execution of property located in the United States into a license to execute upon property abroad.  As such, the Order greatly heightens the risk of investment for foreign states, and other entities, in any company—based anywhere in the world— that has a presence in the United States.

Regarding the second FSIA prong, the District Court found that the mere exercise by the Republic of its majority interest in YPF subjects its shares to American execution should YPF—notably *not* the state itself—conduct some

18

alleged commercial activity in the United States. *Petersen* Order at 16-20; *Bainbridge* Order at 17-20. The District Court thereby attributed YPF's alleged activities in the United States to the Republic, mistakenly conflating YPF and the Republic of Argentina in a way that massively expands the exposure of foreign sovereigns and investors to American jurisdiction. The District Court's reasoning would allow execution on a sovereign's ownership interests in a foreign company so long as that company purportedly engages in any commercial activity in the United States—even if the sovereign's own "use" of the shares occurs exclusively abroad. This would discourage participation in U.S. markets by foreign companies and their shareholders because the shareholders' ownership interests may be at risk should the company choose to do business in the United States.

AmCham's membership, and other transnational companies, depend on a bilateral environment where courts respect established norms and international comity. By suddenly and vastly expanding the exposure of foreign property held outside of the United States' borders to the jurisdiction of American courts, the Order creates considerable new risk for foreign entities engaging in business activities in the United States. This will force companies and their investors to significantly reassess their legal and financial risk exposure. Companies will reconsider their participation in American markets, and possibly pull significant wealth out of the United States and into jurisdictions which do not

19

present such risks. The Order, therefore, will have a significant negative impact on investment across America's borders.

## CONCLUSION

For the foregoing reasons, as well as for the reasons set forth in the Argentine Republic's Opening Brief, AmCham respectfully submits that this Court should reverse the order of the District Court requiring the immediate transfer of Argentina's shares in YPF.

Dated:  October 2, 2025
        New York, New York

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By:  ____/s/ Michael S. Vogel_____
        David A. Berger
        Michael S. Vogel

111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

*Attorneys for Amicus Curiae American Chamber of Commerce in Argentina*

20

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) and Local Rule 32.1(a) because it contains 4,376 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

Dated: October 2, 2025
      New York, New York

             Respectfully submitted,

             ALLEGAERT BERGER & VOGEL LLP

             By:    /s/ Michael S. Vogel
                    David A. Berger
                    Michael S. Vogel

             111 Broadway, 20th Floor
             New York, New York 10006
             (212) 571-0550

             *Attorneys for Amicus Curiae American Chamber of Commerce in Argentina*

21