# No. 25-1687

IN THE
## United States Court of Appeals for the Second Circuit

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA
S.A.U.,
*Plaintiffs-Appellees*,

*v.*

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

YPF S.A.,

*Defendant.*

On Appeal from the United States District
Court for the Southern District of New York
(No. 1:15-cv-2739) (Hon. Loretta A. Preska)

### BRIEF OF *AMICUS CURIAE*

### THE REPUBLIC OF ECUADOR IN SUPPORT OF THE
### DEFENDANT-APPELLANT ARGENTINE REPUBLIC

Steven M. Richman

CLARK HILL PLC
Suite 102
210 Carnegie Center
Princeton, New Jersey 08540
+1 609.785.2911

*Counsel for Amicus Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................ ii

CORPORATE DISCLOSURE STATEMENT ...................................1

IDENTITY AND INTEREST OF *AMICI CURIAE* .........................2

INTRODUCTION AND SUMMARY OF ARGUMENT .....................5

ARGUMENT ...............................................................................7

    I.    The Turnover Order Infringes Upon The Underlying Federal Common Law And Immunity Framework Of The FSIA Concerning Foreign-Sovereign Property Held Outside of United States ...................................................................7

    II.    The District Court's Misapplication Of New York's C.P.L.R. § 5225 To Reach Foreign-Sovereign Property Abroad Is A Violation of Federal Law Rendering FSIA's Territorial Prerequisite Moot ...........................................................14

    III.    The Turnover Order Constitutes An Affront To Sovereign Equality And Violates International Comity And The Act-Of-State Doctrine ................................................................19

CONCLUSION ..........................................................................23

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Austrian German Holocaust Litigation,* 250 F.3d 156, 164-165 (2d
    Cir. 2001) .........................................................................................23

*EM Ltd. V. Republic of Argentina,*
    695 F.3d 201 (2d Cir. 2012) ...........................................................13

*F. Hoffman-La Roche Ltd. v. Empagran S.A.,*
    542 U.S. 155 (2004)..........................................................................11

*Hilton v. Guyot,*
    159 U.S. 113 (1895)..........................................................................22

*Ings v. Ferguson,*
    282 F.2d 149 (2d Cir. 1960) ............................................................12

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,*
    412 F.3d 418 (2d Cir. 2005) ............................................................22

*Motorola Credit Corp. v. Uzan,*
    388 F.3d 39 (2d Cir. 2004) .......................................................19, 22

*Petersen Energia Inversora, S.A.U. v. Argentine Republic et al.,*
    No. 15 Civ. 2739 (LAP), 2016 WL 4735367 (S.D.N.Y., Sept. 9,
    2016), affirmed in part and appeal dismissed in part ........................20

*Petersen Energía Inversora, S.A.U. v. Argentine Republic,*
    Nos. 15 Civ. 02739 (LAP), 16 Civ. 08569 (LAP), 2025 WL
    1796392 (S.D.N.Y. June 30, 2025 at 12).........................................18

*Republic of Argentina v. NML Capital, Ltd.,*
    573 U.S. 144 (2014)..................................................................13, 17

*Republic of Mexico v. Hoffman,*
    324 U.S. 30 [1945]...............................................................................8

*Rubin v. Islamic Republic of Iran,*
    830 F.3d 470 (7th Cir. 2016), aff'd, 583 U.S. 202 (2018) ..................12

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)..................................................................10, 16

*Societe Nationale Industrielle Aerospatiale,* 482 U.S. at 543 n.27 ........................21

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)..........................................................................10

*The Schooner Exchange v. McFaddon*,
    11 U.S. (7 Cranch) 116 [1812] ...................................................8, 21

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 [2023]......................................................................10, 16

*United States v. Texas*,
    507 U.S. 529 (1993)..........................................................................10

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp. Int'l*,
    493 U.S. 400 (1990)..........................................................................20

## Statutes

28 U.S.C. § 1609 ..................................................................9, 11, 14

28 U.S.C. § 1610 ..................................................................9, 11, 14

28 U.S.C. § 1611 ..................................................................9, 11, 14

## Rules

C.P.L.R. § 5225.................................................................*passim*

## Other Authorities

Argentine Law No. 26.741.................................................................22

H.R. Rep. No. 94-1487 (1976).................................................................15

Restatement (Fourth) of Foreign Relations Law § 432 (2018) ................................12

Restatement (Third) of Foreign Relations Law § 441 (1987) ............................19, 22

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The Republic of Ecuador is a sovereign nation and is not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1.

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Ecuador has maintained long-standing friendly political, economic and legal relations with the United States of America. Like the Republic of Argentina and many other nations, Ecuador and its state bodies carry out extensive business with United Sates-based corporations, participate in US capital markets and rely on the consistent application of US and international law to govern such interactions.

Ecuador has a strong sovereign interest in this case because, if upheld, the District Court's Turnover Order would constitute an unprecedented and dangerous deviation from the well-established legal framework that governs foreign sovereign immunity in the U.S. This judgement would interfere with the long-standing assumptions of all sovereign states with regard to the rights and protections afforded to them under U.S. federal law and fundamental principles of international law long accepted in the United States. More specifically, Ecuador is particularly concerned that the Turnover Order: (1) infringes upon the federal common law and the governing immunity framework of the Foreign Sovereign Immunities Act (FSIA) by neglecting the absolute execution immunity that has historically been awarded to

---

[1] All parties have consented to the filing of this brief. *Amicus curiae* states that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

foreign sovereign property situated outside the United States. This constitutes a core common law principle that the FSIA itself did not render invalid and sustained as part of domestic law; (2) this constitutes a significant contravention of federal law by misinterpreting New York's Civil Practice Law & Rules (New York's CPLR) § 5225 to extend to foreign sovereign property situated abroad; and (3) constitutes a clear violation of the principle of sovereign equality, as well as a danger to the principle of international comity and the act-of-state doctrine. This creates a judicial construct that renders moot the FSIA's explicit territorial precondition that property must be "in the United States" before it can be subject to execution.

By ordering or even suggesting that Argentina should violate its own laws within its territory or change them to comply with a United States court's directive, the District Court undermines the fundamental principle that each sovereign nation has exclusive jurisdiction to prescribe and administer its laws within its borders.

Upholding this ruling would cast profound legal uncertainty over Ecuador and every other sovereign nation. It would mean that any United States court exercising personal jurisdiction over a sovereign could apply a state procedural rule to seize sovereign assets situated anywhere in the world, even those within the sovereign's territory designated for public use under its own laws. Such an approach could give rise to a paradoxical situation where property held abroad is afforded less protection

than property located within the United States, thereby negating and rendering ineffective the carefully constructed immunity framework set out in the FSIA.

Such an outcome would not only severely impair the stable and predictable legal environment that is essential for international commerce and diplomacy, but it would also significantly encroach upon the sovereignty of foreign nations. It risks triggering the very sort of international tension whose prevention is the basis for the doctrines of sovereign immunity and comity.

For these reasons, Ecuador has a strong interest in this matter and has submitted this brief to help the Court recognize the wide-reaching ramifications of the District Court's decision that require the Turnover Order be reversed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Never before has a US court delivered an order of this nature that requires a foreign sovereign to surrender property situated within its own borders to the United States for execution. This unprecedented decision threatens the basic principles of sovereignty, comity and statutory and common law interpretation on which Ecuador and numerous other countries rely when dealing with the United States in economic, political and diplomatic matters.

Much like Argentina, Ecuador maintains extensive and vital economic ties with the United States, and its entities participate on a regular basis in United States capital markets. Mutual respect for sovereignty and reliable legal processes lie at the heart of these relationships. The Turnover Order shows a fundamental disregard for the principle of sovereign equality, a cornerstone of international law and a fundamental principle of the Charter of the United Nations, thereby undermining this mutual respect. The Order represents an unreasonable and intrusive extraterritorial application of a state statute by effectively compelling Argentina to either violate its own domestic laws or change them to ensure compliance with a U.S. court's ruling. In doing so, it encroaches upon another sovereign nation's exclusive power to enact and administer its own laws within its own borders. The foundational principles of international comity and the act-of-state doctrine, which forbid a United States court from compelling a sovereign to perform an act in its

own territory that is prohibited by its own laws, appear to have been violated.

Furthermore, the situation created by the District Court's legal construct is paradoxical: properties belonging to foreign sovereigns that are located outside the United States enjoy less protection from execution than properties belonging to foreign sovereigns that are located within the United States. Additionally, relying upon New York's C.P.L.R. 5225 to compel the movement of assets into the United States, the Order renders the explicit territorial prerequisite of the FSIA, namely that property must be 'in the United States' for it to be subject to execution, effectively null and void. The manner this state law is being applied bypasses FSIA's provisions and overlooks the long-established federal common law principle that sovereign property situated abroad is completely protected from execution — a principle that the United States Government, through its *amicus curiae* has consistently upheld in the course of these proceedings.

Should this ruling stand, its consequences would harm international relations. Every sovereign nation, including Ecuador, would find that its property, even when located within its own borders and jurisdiction and dedicated to public purposes, could be seized by virtue of a state statute enforced by a United States court. Such a situation would upset the concept of legal certainty that is vital for international commerce and diplomacy, which could undermine the very purpose of the doctrine

6

of sovereign immunity. This case is of great importance because it has the potential to set a new, dangerous precedent in United States foreign relations law, and because it challenges the concept of national sovereignty. Ecuador respectfully petitions on this Court to give due consideration to these far-reaching implications and to reverse the decision under review.

## ARGUMENT

### I. The Turnover Order Infringes Upon The Underlying Federal Common Law And Immunity Framework Of The FSIA Concerning Foreign-Sovereign Property Held Outside of United States.

The District Court's Turnover Order rests on the flawed premise that the Foreign Sovereign Immunities Act of 1976 (FSIA) silently overturned the long-standing federal common law doctrine that granted absolute immunity from execution to a foreign sovereign's property located outside the United States. Not only is this judicial construction incompatible with the FSIA's explicit text and legislative history, but it also challenges fundamental tenets of statutory interpretation and the logic of sovereignty itself that have been in place for two centuries.

FSIA's carefully balanced immunity framework would be rendered meaningless by such a result. Furthermore, the Court issued the Order despite the explicit and reasoned disagreement of the United States Government—the very

branch of government that is constitutionally tasked with conducting foreign relations—thereby disregarding the principles of comity and separation of powers that have historically guided the Judiciary in matters of such significant international sensitivity. In its Statement of Interest, filed on 6 November 2024, in support of the Argentine Republic, the United States reiterated its longstanding position that foreign sovereign property located abroad is not subject to execution in United States courts. See U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.5].

Before the enactment of the Foreign Sovereign Immunities Act (FSIA), federal common law established absolute immunity for the property of foreign states, regardless of its location or purpose. This principle was rooted in the "perfect equality and absolute independence of sovereigns" and the "common interest impelling them to mutual intercourse." See *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 137 [1812]. The rule was not a mere extension of a courtesy treatment among nations but an accepted tenet of substantive law, grounded in the understanding that the judicial seizure of a friendly state's property could be viewed as a direct "affront to its dignity" that could gravely impair the foreign relations of the United States.  See *Republic of Mexico v. Hoffman,* 324 U.S. 30, 35–36 [1945].

This historical doctrine has provided a stable and predictable legal framework that nations like Ecuador have relied on for decades when structuring their

international financial affairs and engaging with United States markets and institutions. This legal certainty is a prerequisite for the kind of cross-border investment and trade that benefits all nations. Nonetheless, the District Court's decision undermines this foundation, substituting it with radical uncertainty that jeopardizes the mutual cooperation the doctrine of sovereign immunity was intended to promote.

Congress passed the FSIA to codify the doctrine of sovereign immunity and set up a thorough framework for addressing such issues. However, this Act only partially abolished immunity for foreign sovereign property in the United States, leaving absolute foreign immunity intact for property abroad.

In doing so, Congress explicitly chose to amend the common law rule of absolute execution immunity so that it was both limited in substance and circumscribed geographically. The central provision of the FSIA on execution, 28 U.S.C. § 1609, is explicit: "the property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611". The exceptions defined in sections 1610 and 1611 are strictly restricted to property situated "in the United States." According to the plain text of the statute, the waiver of execution immunity applies only to sovereign assets within United States territory. Notably, the statute does not mention sovereign property

9

located abroad. The absence of action by the United States Congress on this issue weighs heavily. A fundamental principle of statutory interpretation is that "to abrogate a common-law principle, the statute must 'speak directly' to the issue addressed by the common law." See *United States v. Texas,* 507 U.S. 529, 534 (1993) (citation omitted).

Since the FSIA does not address the immunity of property outside the United States, its provisions cannot be construed as overturning the pre-existing federal common law rule of absolute immunity for such property. The Supreme Court has repeatedly held that the FSIA does not cover all aspects of foreign sovereign immunity. Where the FSIA is silent, a claim "may still be barred by foreign sovereign immunity under the common law." See *Samantar v. Yousuf,* 560 U.S. 305, 324 (2010). See also *Turkiye Halk Bankasi A.S. v. United States,* 598 U.S. 264, 280 [2023]).

In this litigation, the United States has articulated precisely this position: "common law sovereign immunity principles that predate the FSIA continue to preclude execution by judgment creditors against foreign sovereign property outside the United States—including under state law. See *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641 (1981) (federal common law, including in the area of "international disputes implicating the conflicting rights of States or [United

States] relations with foreign nations," supersedes state law). U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.5]

The District Court's line of reasoning not only leads to an unsupported legal conclusion, but also to a fundamentally flawed one. Apart from the law, as a policy matter this results in an inverted, distorted world where foreign sovereign property located "in the United States" is protected under the specific provisions of FSIA §§ 1609-1611, while property located overseas—even within the sovereign's own territory—has no immunity at all.

As the United States government pointed out, "it would not be logical to conclude that Congress, in enacting the FSIA, meticulously delineated the circumstances under which execution on foreign-state-owned assets in the United States would be allowed, but, through its silence, abandoned all such limits for assets located abroad". See *F. Hoffman-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 164 (2004) (courts "ordinarily construe ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations" (parenthesis brackets omitted)). See U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.4]. Such an interpretation would imply that Congress crafted a comprehensive protective framework for assets within its reach, while also allowing assets beyond its traditional enforcement jurisdiction open for seizure, an outcome that contradicts

common sense and principles of international law.

This interpretation directly opposes the international legal order and the deliberate structure of U.S. federal law, which both acknowledge that action against a state's property poses a greater threat to sovereignty than the exercise of adjudicative jurisdiction. United States courts have long understood that "[s]eizing a foreign state's property is a serious affront to its sovereignty—much more so than taking jurisdiction in a lawsuit"—and "carries potentially far-reaching implications for American property abroad". See *Rubin v. Islamic Republic of Iran,* 830 F.3d 470, 480 (7th Cir. 2016), aff'd, 583 U.S. 202 (2018).

Under customary international law, a state may not exercise enforcement jurisdiction in another state's territory without consent. See Restatement (Fourth) of Foreign Relations Law § 432 (2018). This statement reflects the "fundamental principle[]" of international comity that United States courts "dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor." See *Ings v. Ferguson,* 282 F.2d 149, 152 (2d Cir. 1960). The court attempted to sidestep this principle by invoking a state procedural statute, N.Y. C.P.L.R. 5225, to force a sovereign to move its property from its territory to the United States. However, this use of the statute "renders the FSIA's clear statutory prerequisite that foreign sovereign property be located in the United States a nullity."

See U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.8]. The clear consensus of authority within this Circuit and in other jurisdictions is that a foreign sovereign's extraterritorial property remains absolutely immune from execution as a matter of U.S. law. See, *EM Ltd. V. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries"). The District Court's reliance on the vacated *Peterson II* decision, which itself rested on a misreading of the Supreme Court's discovery-related holding in *NML Capital* is improper. The question in *NML Capital* concerned whether the FSIA "limits the scope of discovery available to a judgment creditor in a federal post-judgment execution proceeding against a foreign sovereign," not whether a foreign sovereign's extraterritorial assets are immune from execution. See *Republic of Argentina v. NML Capital, Ltd.,* 573 U.S. 144 (2014), at 136.

This framework created by the Turnover Order would interfere with other countries' ability to operate its state-owned enterprises, and protect its critical infrastructure, since all of these things rely on assets held within their own territories. This would severely hinder other countries' willingness and ability to engage in United States capital markets and broader economic relations with the United States. To avoid such a result, this Court should reverse the District Court judgment.

**II.    The District Court's Misapplication Of New York's C.P.L.R. §
5225 To Reach Foreign-Sovereign Property Abroad Is A
Violation of Federal Law Rendering FSIA's Territorial
Prerequisite Moot**.

The District Court's Turnover Order relies on an inherently circular logic that
cannot be reconciled with the territorial framework of the FSIA. fulfilled. This
reasoning is an improper self-justifying argument that manufactures its own
jurisdictional basis. The initial order to transfer the property was not based on valid
legal authority because, when it was issued, the property was located abroad.
Therefore, it was absolutely immune from the court's enforcement jurisdiction under
federal common law, which the FSIA left undisturbed. As the United States
government rightly pointed out, this judicial manipulation "renders the FSIA's clear
statutory prerequisite that foreign sovereign property be located in the United States
a nullity". See U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.8]

The FSIA's execution framework is territorial only and renders the court's
initial order invalid, as it establishes a strict and unequivocal territorial limit on the
enforcement of judgments against foreign sovereigns. The Act's general rule, set
forth in 28 U.S.C. § 1609, is explicit: "the property in the United States of a foreign
state shall be immune from attachment arrest and execution except as provided in
sections 1610 and 1611". Each of the narrow exceptions in § 1610 follows this rule

and is limited to property located "in the United States." This precise wording is a fundamental jurisdictional prerequisite deliberately chosen by Congress.

This strict territorial rule ensures the legal certainty that sovereign nations rely on to manage their assets and engage in the global economy. When structuring its international financial arrangements, sovereign nations count on the clear principle that assets within its territory fall outside the enforcement jurisdiction of United States courts. However, the District Court's decision to consider the FSIA's territorial prerequisite a procedural obstacle that can be overcome by its own order erodes this certainty. This exposes Ecuador's most critical sovereign assets, including those of its strategic state enterprises, to an uncertain and boundless jurisdictional reach.

Consequently, because of this federal statutory framework, a state procedural statute cannot override substantive federal common law immunity for property abroad. The court lacked the legal authority to mandate the transfer of Argentina's YPF shares because, at that time, the shares were located in Argentina and were thus absolutely immune from execution under federal common law. As previously mentioned, the FSIA did not alter this fundamental common-law rule for property held abroad. In enacting the FSIA, Congress only "partially lower[ed] the barrier of immunity from execution" for property located in the United States, see H.R. Rep. No. 94-1487, at 27 (1976). The statute says "not a word on the subject" of property

15

abroad. Where a statute does not "speak directly" to the question addressed by the common law, the common law principle stays intact. The Supreme Court has repeatedly confirmed this principle, holding that, where the FSIA is silent, a claim "may still be barred by foreign sovereign immunity under the common law." See *Samantar v. Yousuf,* 560 U.S. 305, 324 (2010). See also *Turkiye Halk Bankasi A.S. v. United States,* 598 U.S. 264, 280 (2023).

This is such a fundamental point that it bears repeating: the FSIA did not abrogate absolute immunity for foreign-sovereign property outside of the U.S. Thus, the misapplication of Section 5225 is based upon the understanding that foreign sovereign immunity under federal common law has remained intact after the enactment of the FSIA and consequently cannot be superseded by a state procedural rule such as section 5225.

If a New York procedural rule could authorize a United States court to seize sovereign assets situated in other sovereign nations, then the management of their strategic state-owned enterprises and their capacities to finance public services would be at the mercy of any potential United States judgment creditors. This precedent would pose a direct threat to any sovereign nation's economic self-governance by transforming a domestic United States court into an adjudicator of

16

other countries' sovereign property within its own borders—a result that is both unsustainable and a grave violation of sovereign equality.

Furthermore, the Court's "two-step" logic contradicts accepted principles of international law that United States courts have recognized because instead of being a sequential application of law it is a circular construct designed to confer jurisdiction. This move not only runs afoul of United States law, but also of a basic international law principle of enforcement jurisdiction that every country must adhere to.

Although the Turnover Order addresses the Argentine Republic directly, its practical effect is to exercise enforcement jurisdiction over property within Argentina's sovereign territory. What no United States court could lawfully compel in a direct manner is being attempted through the use of this strategy: the forced seizure of sovereign assets from Argentine territory to satisfy a judgment rendered by a United States court. This customary international law principle is so fundamental that the Supreme Court acknowledged it in *NML Capital*. While permitting discovery of extraterritorial assets, the Court observed that U.S. courts "generally lack authority in the first place to execute against property in other countries". See *Republic of Argentina v. NML Capital, Ltd.,* 573 U.S. 144 (2014). The District Court's effort to use its personal jurisdiction over Argentina to force the

17

turnover of property from Argentine territory is clearly an attempt to get around this well-known limit on a court's power to enforce its decisions. Indeed, in its Order the District Court reasoned that :"[t]urnover orders pursuant to NY CPLR § 5225 are effective against assets regardless of their location if the Court has personal jurisdiction over the judgment debtor or the third-party garnishee." See *Petersen Energía Inversora, S.A.U. v. Argentine Republic,* Nos. 15 Civ. 02739 (LAP), 16 Civ. 08569 (LAP), 2025 WL 1796392 (S.D.N.Y. June 30, 2025 at 12).

Furthermore, the District Court's order disregards the mandatory procedural framework governing the enforcement of foreign judgments in civil law jurisdictions such as Argentina and Ecuador. A foreign judgment is not automatically enforceable. First, it must undergo a domestic judicial proceeding known as exequatur to be recognized. This is not just a formality. Rather, it is a meaningful judicial review. During this review, the domestic court checks that the foreign judgment was given regularly, and that it follows the basic rules of the country's public policy. Argentina's expert explained that for the YPF shares to be transferred, an Argentine court would have to issue an order. This order would be sent to the central securities depository, *Caja de Valores*. The order would only be issued after a successful exequatur proceeding. By the transfer being commanded directly, an attempt is made by the District Court's order to bypass and render null the sovereign judicial function of Argentina's own courts.

18

The stability of the international order, on which all nations rely to structure peaceful and predictable relations, rests on mutual respect for territorial sovereignty. As the Circuit has emphasized, it is "well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state.'" See *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)). This statement reflects a fundamental limit on the authority of one state to prescribe or enforce conduct within the territory of another. That limit stems directly from the principle of territorial sovereignty that is recognized at the international level in Article 1 of the United Nations Charter, which affirms the sovereign equality of all its Members. However, the District Court's order dismisses this fundamental principle as an inconvenience to be circumvented. It suggests that any nation's courts, should they obtain personal jurisdiction over another sovereign, are empowered to issue orders that reach into the heart of that sovereign's territory and command the disposition of its public property. This would undermine the perfect equality and absolute independence of sovereigns and give rise to a system in which judicial power serves as a means of international coercion. Accordingly, Ecuador urges the Court to consider the potential impact of the District Court's decision and to reverse the decision.

## III. The Turnover Order Constitutes An Affront To Sovereign Equality And Violates International Comity And The Act-Of-State Doctrin.

The District Court's Turnover Order contravenes foundational principles of

international law and comity that have long shaped interactions among the United States' legal system and other sovereign nations. By ordering the Argentine Republic to act within its own territory in ways expressly forbidden by its domestic law, the Order disregards Argentina's sovereignty and establishes a dangerous precedent that threatens the stable, predictable legal framework on which international commerce and diplomacy depend. The United States Executive Branch explicitly and carefully objected to this judicial command. See U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.5]. The Executive Branch has been constitutionally entrusted with responsibility for the nation's foreign relations. Thus, the Order causes a dangerous split between the judiciary's actions and the nation's declared foreign policy interests.

The act-of-state doctrine was created to prevent precisely this sort of judicial encroachment. The doctrine prevents United States courts from declaring invalid the official act of a foreign sovereign performed within its territory. See *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp. Int'l,* 493 U.S. 400, 405 (1990). Although the District Court claimed to respect Argentina's initial expropriation act (*Petersen Energia Inversora, S.A.U. v. Argentine Republic et al.,* No. 15 Civ. 2739 (LAP), 2016 WL 4735367, at *8 (S.D.N.Y., Sept. 9, 2016), affirmed in part and appeal dismissed in part), it failed to recognize that the prohibition on subsequent transfer in the YPF Expropriation Law is an integral and ongoing part of that same

sovereign act. The court's Order is not just enforcing a judgment; it's essentially making a key part of Argentine law invalid, which is strictly forbidden by the act-of-state doctrine, as discussed earlier.

Furthermore, the separation of powers and United States foreign policy are undermined by the Order's disregard of the executive branch's stated position. Indeed, the District Court's ruling directly contravenes the United States Government's long-standing and consistent position, which was asserted in this very litigation: "foreign sovereign property located abroad is not subject to execution in U.S. courts." See U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679 at.1].

This is not just a difference of opinion among lawyers; it is a decision made by the Court that undermines the deference that should be granted to other sovereign nations' legislation, and it does so against the advice of the president's advisors. The principles of international comity are disregarded by such a ruling, which require courts to give "due regard to... international duty and convenience". See *Societe Nationale Industrielle Aerospatiale,* 482 U.S. at 543 n.27.

International comity is not merely a matter of courtesy but a doctrine of mutual respect rooted in the perfect equality and absolute independence of sovereigns. See *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 137 (1812). It is "the recognition which one nation allows within its territory to the

legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience". See *JP Morgan Chase Bank v. Altos Hornos de Mexico*, *S.A. de C.V.,* 412 F.3d 418, 423 (2d Cir. 2005) (quoting *Hilton v. Guyot,* 159 U.S. 113, 164 (1895)). A core tenet of this doctrine, establishes that "'a state may not require a person to do an act in another state that is prohibited by the law of that state.'" See *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)). This principle is not just a suggestion, but rather a fundamental rule of judicial restraint. This rule prevents courts from one nation from effectively extending their jurisdiction to compel illegal acts within another sovereign nation's territory.

In this matter, Argentine Law No. 26.741 expressly asserts that the Republic's shares in YPF are of "public interest" and prohibits their transfer without the National Congress' permission by a two-thirds vote of its members. This is an official act of a sovereign legislature concerning property within its own borders. The District Court's order compelling the shares' transfer contradicts this binding domestic law.

The District Court ignores this clear basis for Argentina's law by suggesting that the Republic could (1) receive permission from the National Congress by a two-thirds vote, (2) change the law, or (3) satisfy the judgment with a separate agreement

22

with the plaintiffs. However, the "options" stated in the Order are not avenues for compliance, but rather, directives for surrendering sovereignty. Such a conflict is resolved by subordinating one sovereign's legislative authority to another's judicial power, which is beyond the authority of the federal courts. As this Circuit correctly held in another case, United States courts cannot require "the legislature of a foreign sovereign" to "enact or change a law." See *Austrian German Holocaust Litigation,* 250 F.3d 156, 164–165 (2d Cir. 2001).

If the Turnover Order is upheld, it would mean that a United States court could override any nation's constitutional and statutory framework by forcing them to alter its laws or contravene its constitution to comply with a civil judgment. For example, a United States court could order the executive branch of any country to bypass the National Congress' authority regarding the disposition of shares in a strategic, state-owned enterprises. This is not a hypothetical concern; rather, it poses a direct threat to the principle of sovereign equality and a nation's sole jurisdiction to prescribe and administer its own laws. A precedent like this would cause major instability in international legal and business relations.

## CONCLUSION

The Republic of Ecuador and other sovereign nations conduct diplomatic and commercial relations with the United States under the assumption that the nation has

a coherent foreign policy. The judiciary's attempted incursion into foreign policy, especially when it conflicts with the executive branch, introduces an additional layer of legal and political risk that could dissuade foreign governments from engaging in United States capital markets or relying on U.S. law to govern their business transactions. This ultimately harms the mutual respect that is fundamental to the global economy. If the District Court's decision is upheld, it would further erode this important principle of mutual respect. The District Court decision is wrong and must be reversed.

Dated: 2 October 2025                                    Respectfully submitted,

                                                         */s/ Steven M. Richman*
                                                         Steven M. Richman

                                                         *Counsel for Amicus Curiae*
                                                         *Republic of Ecuador*

## <u>CERTIFICATE OF COMPLIANCE</u>

This amicus brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 4993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Steven M. Richman*
Steven M. Richman

*Counsel for Amicus Curiae*
*Republic of Ecuador*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2025, I caused to be electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Steven M. Richman*
Steven M. Richman

*Counsel for Amicus Curiae*
*Republic of Ecuador*

26