# 25-1687

## In the United States Court of Appeals for the Second Circuit

PETERSEN ENERGIA INVERSORA, S.A.U.,
PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees*,

— v. —

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

YPF S.A.,

*Defendant*.

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:15-cv-02739) (Hon. Loretta A. Preska)

### PAGE-PROOF BRIEF OF THE BANK POLICY INSTITUTE AND THE AMERICAN BANKERS ASSOCIATION AS AMICI CURIAE IN SUPPORT OF APPELLANT

John B. Goerlich
WILLKIE FARR &
GALLAGHER LLP
1875 K St. NW
Washington, DC 20006
202-303-1000
jgoerlich@willkie.com

Todd G. Cosenza
Zeh S. Ekono
Emily M. Wilson
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
212-728-8000
tcosenza@willkie.com
zekono@willkie.com
ewilson@willkie.com

*Attorneys for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Bank Policy Institute ("BPI") and the American Bankers Association ("ABA") state that they are not subsidiaries of any other corporation. BPI and ABA are nonprofit trade groups and have no shares or securities that are publicly traded.

## **TABLE OF CONTENTS**

Interest of *Amici Curiae* ..................................................................................1

Introduction and Summary of Argument .......................................................2

Argument.........................................................................................................7

     I.     The Turnover Order Impermissibly Binds an Uninvolved, Non-Party Bank. ...............................................................................7

     II.    The Turnover Order Allows Judgment Creditors to Sidestep New York's Well-Established Separate Entity Rule. .........................12

     III.   The Turnover Order Flouts Comity Considerations. ..........................16

     IV.   Affirmance of the Turnover Order Would Present a Serious Threat to New York's Role as the Epicenter of Global Banking. ......19

Conclusion ....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Union Dime Sav. Bank*,
    53 F. Supp. 782 (S.D.N.Y. 1943),
    *aff'd* 144 F.2d 290 (2d Cir. 1944)......................................................................10

*Alemite Mfg. Corp. v. Staff*,
    42 F.2d 832 (2d Cir. 1930) ...................................................................................8

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*,
    757 F.2d 516 (2d Cir. 1985) ...............................................................................19

*In re Chase Manhattan Bank*,
    297 F.2d 611 (2d Cir. 1962) ...............................................................................16

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)............................................................................................16

*Gregory v. Stetson*,
    133 U.S. 579 (1890)..............................................................................................7

*Gucci Am., Inc. v. Bank of China*,
    768 F.3d 122 (2d Cir. 2014) ...............................................................................15

*Havens v. James*,
    76 F.4th 103 (2d Cir. 2023) ..............................................................................5, 8

*Ings v. Ferguson*,
    282 F.2d 149 (2d Cir. 1960) ...............................................................................16

*In re Liquidation of N.Y. Agency & Other Assets of Bank of
    Credit & Commerce Int'l S.A.*,
    587 N.Y.S. 2d 524 (N.Y. Sup. Ct. 1992)............................................................19

*Hilton v. Guyot*,
    159 U.S. 113 (1895)............................................................................................16

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)..............................................................................................8

*Minpeco, S.A. v. Conticommodity Serv., Inc.*,
116 F.R.D. 517 (S.D.N.Y. 1987) ........................................................16

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*,
863 F.3d 96 (2d Cir. 2017) ................................................................22

*Motorola Credit Corp. v. Standard Chartered Bank*,
21 N.E.3d 223 (N.Y. 2014)........................................................*passim*

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004) ....................................................6, 16, 19

*Muhl v. Ardra Ins. Co.*,
666 N.Y.S.2d 920 (1998)..................................................................11

*N. Mariana Islands v. Canadian Imperial Bank of Com.*,
990 N.E. 2d 114 (N.Y. 2013)............................................................12

*Perkins v. Lukens Steel Co.*,
310 U.S. 113 (1940)............................................................................8

*Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*,
816 N.Y.S.2d 470 (1st Dep't 2006) ..................................................16

*Salomon v. N. Brit. & Mercantile Ins. Co. of N.Y.*,
109 N.E. 121 (N.Y. 1915)..................................................................10

*Samsun Logix Corp. v. Bank of China*,
929 N.Y.S.2d 202 (N.Y. Sup. Ct. May 12, 2011) .............................21

*Shaheen Sports, Inc. v. Asia Ins. Co.*,
Nos. 98-cv-5951 (LAP) & 11-cv-920 (LAP), 2012 WL 919664
(S.D.N.Y. Mar. 14, 2012), *appeal dismissed sub nom., Hamid v.
Habib Bank Ltd.*, No. 12-1481, 2012 WL 4017287 (2d Cir. 2012) ..................21

*Tiffany (NJ) LLC v. Andrew*,
276 F.R.D. 143 (S.D.N.Y. 2011), *order aff'd*, No. 10 CIV. 9471
WHP, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011)......................21

*Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*,
740 F.3d 108 (2d Cir. 2014) .............................................................20

iv

*Trade Dev. Bank v. Cont'l Ins. Co.*,
    469 F.2d 35 (2d Cir. 1972) ................................................................16

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025).........................................................................7

*United States v. Ross*,
    302 F.2d 831 (2d Cir. 1962) ............................................................16

**Rules**

NY CPLR § 105(i) .................................................................................11, 15

NY CPLR § 5225 .................................................................................3, 9, 11

**Other Authorities**

Genci Bilali, *Know Your Customer—Or Not*, 43 U. Tol. L. Rev. 319
    (2012).............................................................................................10

Restatement (Third) of Foreign Relations Law § 441 (1987) ......................6, 16, 19

Geoffrey Sant, *The Rejection of the Separate Entity Rule Validates the
    Separate Entity Rule*, 65 SMU L. Rev. 813 (Fall 2012)....................13

Diego Zambrano, *A Comity of Errors: The Rise, Fall, and Return of
    International Comity in Transnational Discovery*, 34 Berkeley J.
    Int'l L. 157 (2016) ..........................................................................13

U.S. Bank, *Why Know Your Customer (KYC) – For Organizations*,
    https://www.usbank.com/corporate-and-commercial-
    banking/insights/risk/compliance/why-kyc-for-organizations.html..................10

# INTEREST OF *AMICI CURIAE*[1]

The **Bank Policy Institute** ("BPI") is a nonpartisan public policy, research, and advocacy group, that represents universal banks, regional banks, and the major foreign banks doing business in the United States. BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

Founded in 1875, the **American Bankers Association** ("ABA") is the voice of the nation's $24.1 trillion banking industry, which is composed of small, regional, and large banks that together employ approximately 2.1 million people, safeguard $19.2 trillion in deposits, and extend $12.7 trillion in loans.

BPI and the ABA regularly appear as *amicus curiae* on matters that raise legal issues of significance for their members, and have particularly supported the role of the United States in general and New York in particular as an international financial center. *See, e.g.*, Brief of Sec. & Fin. Mkt. Ass'n. et al. as *Amici Curiae* Supporting Petitioners, *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, No. 20-222 (2021); Brief of the Clearing House Ass'n L.L.C. et al. as *Amici Curiae* Supporting Defendants, *New York v. Citibank, N.A.*, No. 1:24-cv-00659 (S.D.N.Y. 2024); Br. of

---

[1] This brief is filed with consent of the parties. No party's counsel authored the brief in whole or in part, and no one other than *amici* and their members contributed financially to the preparation of this brief.

Am. Bankers Ass'n & Consumer Bankers Ass'n as *Amici Curiae* Supporting Petitioners, *HRB Tax Grp., Inc. v. Snarr*, No. 20-1570 (2021); Br. of N.Y. Bankers Ass'n, et al., as *Amici Curiae* Supporting Defendant-Appellant, *Article 13, LLC v. LaSalle Nat'l Bank Ass'n*, No. CTQ-2025-00001(N.Y. 2025).

BPI and the ABA have a substantial interest in this action because of the adverse effect it could have on their members and on all international banks with branches in New York.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The order at issue in this appeal (the "Turnover Order") imposes an undue burden on a bank that is not a party to this lawsuit. If not reversed, it will provide a roadmap for judgment creditors to improperly conscript banks to take part in the turnover of assets outside of the United States, in violation of the principles underpinning New York's separate entity rule and international comity, and will expose banks to violating other jurisdictions' applicable laws. That will place *amici*'s members and other banks with international operations in an untenable position: Either act as the enforcement arm of a U.S. court regardless of foreign law or violate a U.S. court's order. That would be unjust and impermissible even if the bank in question were a party, but here, the result rankles all the more because the bank that was ordered to take action was not even before the court and is without the ability to make commercial or risk-based decisions about whether to accept the

imposed role. *Amici* urge this Court to reverse and avoid endorsing such an unjust result.

The Turnover Order stems from long-running litigation between the Republic of Argentina (the "Republic") and various former minority shareholders of YPF S.A. ("YPF"). In May 2012, the Republic began the expropriation of 51% of YPF's shares, which were then owned by Spanish energy company Repsol S.A. (Special Appendix ("S.A.") 4, 6.) Those shares (hereinafter, the "YPF Shares") are "held in book-entry form in an account at Caja de Valores, S.A. ('CdV'), the central securities depository of Argentina." (S.A. 6.)

Appellees sued the Republic, claiming that the Republic had breached YPF's bylaws by failing to make a tender offer for the remaining 49% of the YPF Shares that the Republic did not expropriate. (S.A. 5.) In September 2023, the District Court entered judgment for Appellees on their claims against the Republic for a total of $16.1 billion. (J.A. __ (Dkt.498).)[2]

Appellees, in an effort to enforce the judgment, have sought the turnover of assets under NY CPLR § 5225, which governs the "enforcement of money judgments against property in the possession or custody of the judgment debtor."

---

[2] *Amici* take no position on the validity of that judgment or the District Court's decision to enter it, which is the subject of separate appeals. *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, Nos. 23-7370, 23-7463, 23-7614; *Eton Park Cap. Mgmt., L.P.* v. *Argentine Republic*, Nos. 23-7376, 23-7471, 23-7667.

(S.A. 11.)[3]  Section 5225 provides that "where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money." *Id.* § 5225(a). And to effectuate enforcement, "[t]he court may order any person to execute and deliver any document necessary to effect payment or delivery." *Id.* § 5225(c).

The District Court relied on Section 5225 to order turnover of the Republic's YPF Shares to Appellees.  Given the complicated logistics associated with this cross border transfer, the District Court "reasoned" that non-party The Bank of New York Mellon ("BNY") could identify a "sub-custodian" that is "a member of the central securities depositary in its own market (Argentina)" as the "beneficial owner" of the YPF Shares, and that the Republic could then (through the sub-custodian) "transfer[] [the YPF Shares] into a [to-be-opened] global custody account at BNY[] in New York." (S.A. 26–27.)  This convoluted set of transactions was intended to force the Republic's property rights in the YPF Shares to be brought to the United States so that they could qualify as attachable property under the Foreign Sovereign Immunities Act.  (S.A. 27.)  And to make sure those transactions occurred, the District Court ordered the Republic to (i) "transfer its [YPF Shares] to a global

---

[3]  Appellees' motion for turnover was immediately followed by a copycat motion seeking and obtaining the same relief in a separate proceeding below.  That turnover order is the subject of an appeal proceeding in tandem with this appeal.  *See Bainbridge Fund Ltd. v. Republic of Argentina*, No. 25-1686.

custody account at BNY[] in New York within 14 days from the date of this order" and (ii) "[then] instruct BNY[] to initiate a transfer of the Republic's ownership interests in its [YPF Shares] to [Appellees] or their designees." (S.A. 33.)

As set forth below, that remedy is flawed for at least four independent reasons critical to *amici*'s members.[4] First, BNY was not a party to this case, and yet the Turnover Order presupposes that BNY can and should open such an account. That is the only way in which the Republic *could* "transfer [the YPF Shares] to a global custody account at BNY[]." (*Id.*) Effectively, then, the Turnover Order operates as a command to BNY, even though BNY was and is a non-party to this action. That flies in the face of repeated admonishments from both this Court and the Supreme Court that "entering an injunction against a non-party . . . is forbidden." *Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023) (internal quotation marks omitted). If it is allowed to stand, that portion of the Turnover Order will permit judgment creditors to obtain judgments affecting all banks' (including *amici*'s members') substantial rights, all without those banks being parties or having a right to be heard.

Second, the Turnover Order sidesteps New York's separate entity rule. That rule "provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for

---

[4] *Amici* express no opinion on the additional reasons offered in the Republic's brief and focus here only on those issues most critical to their members.

certain purposes, particularly with respect to . . . article 52 postjudgment restraining notices and turnover orders." *Motorola Credit Corp. v. Standard Chartered Bank*, 21 N.E.3d 223, 226 (N.Y. 2014) [hereinafter "*Motorola*"]. Put another way, "a restraining notice or turnover order served on a New York branch will be effective for assets held in accounts at that branch but will have no impact on assets in other branches." *Id.* But according to the District Court's ruling, a judgment creditor can avoid that well-settled rule by obtaining a turnover order requiring a foreign judgment debtor to use a foreign branch of a U.S. bank to transfer overseas assets to New York. (S.A. 26.) That violation is all the more noxious because the foreign bank here (*i.e.*, the "sub-custodian" of BNY) is *an entirely different bank* than BNY, which is often the case with sub-custodians.

Third, the Turnover Order, which purportedly undertakes a "comity analysis," forces banks into positions where they risk violating foreign law. "[I]t is well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)). That is precisely what the Turnover Order does, as it requires BNY and its sub-custodian to transfer the YPF Shares regardless of whether such transfer is permitted under Argentine law. (S.A. 33). What is more, the District Court concluded that, even if there was a conflict, it would

- 6 -

still set aside Argentine law, and its reasons for doing so would permit courts to regularly ignore comity considerations relevant to international banks.  Again, important policy interests underlie the requirement that the District Court cannot order a party to violate the law of another sovereign, and a failure to respect those policy interests—and the principle of comity in general—could require all banks (including *amici*'s members) to (in certain circumstances) either violate foreign law or violate U.S. law.  That dilemma illustrates the error of the District Court's "comity analysis," which again provides a basis to reverse.

Fourth, and finally, the Turnover Order jeopardizes the interests of the United States and New York in preserving New York as an international financial powerhouse.  Affirmance of the Turnover Order will create risks and a hostile environment within New York for international banks and international customers which will inevitably make those entities reluctant to bring their business here.

For these reasons, *amici* strongly urge this Court to reverse.

## **ARGUMENT**

## I. THE TURNOVER ORDER IMPERMISSIBLY BINDS AN UNINVOLVED, NON-PARTY BANK.

"It is an elementary principle that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it." *Gregory v. Stetson*, 133 U.S. 579, 586 (1890).  Though this principle often arises in the context of injunction proceedings, the Supreme Court has repeatedly reaffirmed

- 7 -

that a court lacks the power to bind a party not before it. *E.g.*, *Trump v. CASA*, *Inc.*, 606 U.S. 831, 841 (2025) (An injunction binding parties not before the court "can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power."); *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 123 (1940) ("The benefits of [the court's] injunction" improperly extended "to bidders throughout the Nation who were not parties to any proceeding, who were not before the court[,] and who had sought no relief."); *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 487–89 (1923) (concluding that the Court lacked authority to issue "preventive relief" that would apply to people who "suffe[r] in some indefinite way in common with people generally"). This Court has reaffirmed it too. *E.g.*, *Havens*, 76 F.4th at 111 ("We have long recognized that 'no court can make a decree which will bind any one [sic] but a party' because a court's 'jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court.'" (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930) (L. Hand, J.)).

The Turnover Order ignores that fundamental principle. As discussed above, the District Court has directed the Republic to both (i) open a global custody account with BNY and (ii) instruct BNY to transfer its ownership interest in the YPF Shares to Appellees. (*Supra* at 4–5.) The only way that those actions can take place is if BNY, an uninvolved, non-party bank, participates—that is, BNY must enter into a

commercial relationship with the Republic that establishes a global custody account at BNY, BNY must enter into an agreement with a sub-custodian in Argentina that is "a member of the [Argentine] central securities depositary" that would be willing to engage in this transaction, and BNY must subsequently comply with the Republic's instructions to accept the deposit of the YPF Shares at its sub-custodian and transfer the property rights in those YPF Shares from Argentina to the United States. (S.A. 26.) As a functional matter, then, non-party BNY has been ordered to facilitate the transactions designed to force the Republic's YPF Shares to be brought to the United States. The clear message underlying the Turnover Order is that BNY must open such an account—whether or not that engagement is consistent with its commercial or risk appetite—or risk being at odds with the District Court. That is not a tenable position for any bank to be in, particularly when that bank is not a party to this Action, is being forced to enter into a new business relationship with the Republic, and has not been given any opportunity to be heard on this issue.

The District Court swept this difficulty aside with little reasoning, apparently concluding that, because "BNY[] historically had contractual relationships with both the Republic (for which it serves as trustee and paying agent on sovereign debt issuances) and YPF" and "NY CPLR § 5225(c) requires that the Republic will execute and deliver any documents necessary to set up such an account," the global custody account could be created. (S.A. 26 n.19.) But that reasoning, which

assumes that financial services engagements are interchangeable from a commercial and risk perspective, fails to account for the rights of *amici*'s members.

With regard to its first justification, by ordering the opening of an account for the Republic *at a specific bank*, the District Court ignored a bank's right and need to control its commercial relationships. *See Adams v. Union Dime Sav. Bank*, 53 F. Supp. 782, 784 (S.D.N.Y. 1943) (internal citation omitted) (a party cannot be compelled "to enter into or be bound by a contract which it never made"); *see also, e.g.*, *Salomon v. N. Brit. & Mercantile Ins. Co. of N.Y.*, 109 N.E. 121, 122 (N.Y. 1915) (same). Banks have broad rights and responsibilities associated with opening and maintaining accounts for customers, including regulatory requirements, an extensive, ongoing Know Your Customer (KYC) process,[5] internal underwriting standards, and risk tolerance determinations. Any of these factors can lead to a legitimate reason for a bank to decline a particular commercial relationship. Consequently, the fact that a bank had a relationship with a given customer *at some point* does not mean that the bank will or even can form a new and different

---

[5] Genci Bilali, *Know Your Customer—Or Not*, 43 U. Tol. L. Rev. 319, 319 (2012) ("'Know Your Customer'. . . refers to the requirement for banks and other financial institutions to monitor, audit, collect, and analyze relevant information about their customers (or potential customers) before engaging in financial business with them."); U.S. Bank, *Why Know Your Customer (KYC) – For Organizations*, ("Gathering KYC information and discovering potential money laundering risk can help limit exposure to financial risk for banks and their business clients").

relationship with that customer.[6]  And rote obedience to an order issued to a non-party bank could subject the bank to regulatory or legal risks abroad, or indeed to an action by an accountholder challenging an unasked-for transfer.  Courts should not be able to set aside a bank's rights and statutory responsibilities associated with opening and maintaining client accounts and relationships.

As to the District Court's reading of Section 5225(c), its emphasis on "the Republic" executing and delivering the necessary documents cannot be fairly read to require a non-party bank to do the same, which means it could not justify issuing an implicit order to a non-party bank as has been done here.  And any argument that a non-party bank is "any person" that can be "order[ed] . . . to execute and deliver any document necessary to effect payment or delivery," NY CPLR § 5225(c), would be wrong.  Reading Section 5225(c) that way would permit a court to issue orders to entities not before it in order "to effect payment or delivery," which would contravene the well-settled law discussed *supra* at 7–8.  In any event, it is also well-settled that "[a]n order for execution or delivery of documents under CPLR 5225(c) may only be issued against a party whose debt liability has been established, or

---

[6]  Here, the only previous relationship that BNY had with the Republic began decades ago, as a "trustee and paying agent on sovereign debt issuances," (J.A. __ (Dkt.556.at.19–20))—a completely different service than a global custody account, which "indirectly holds foreign securities on behalf of an investor," (S.A. 26).

against that party's garnishee or transferee." *Muhl v. Ardra Ins. Co.*, 666 N.Y.S.2d 920, 920–21 (1998). Non-party banks like BNY are neither.[7]

## II. THE TURNOVER ORDER ALLOWS JUDGMENT CREDITORS TO SIDESTEP NEW YORK'S WELL-ESTABLISHED SEPARATE ENTITY RULE.

There is another flaw in the Turnover Order that again demonstrates the District Court erred: The Turnover Order provides a blueprint for judgment creditors to sidestep New York's separate entity rule. Again, that cannot be correct, and a failure to reverse would render yet another injury to *amici*'s members and other banks.

Under the separate entity rule, "when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to . . . article 52 postjudgment restraining notices and turnover orders." *Motorola*, 21 N.E.3d at 226; *see also N. Mariana Islands v. Canadian Imperial Bank of Com.*, 990 N.E. 2d 114, 115 (N.Y. 2013) (holding that section 5225(b) is unavailable if the property is in the custody of a foreign subsidiary of the New York bank garnishee). Put another way, "a restraining notice or turnover order served on a New York branch [of a bank] will

---

[7] A garnishee is "a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest." NY CPLR § 105(i). BNY does not fit either category.

be effective for assets held in accounts at that branch but will have no impact on assets in other branches." *Motorola*, 21 N.E.3d at 226. A judgment creditor in New York cannot use the New York courts to reach assets held by a foreign branch of a New York bank:

> [T]he [separate entity] doctrine has been a part of the common law of New York for nearly a century. Courts have repeatedly used it to prevent the postjudgment restraint of assets situated in foreign branch accounts based solely on the service of a foreign bank's New York branch. Undoubtedly, international banks have considered the doctrine's benefits when deciding to open branches in New York, which in turn has played a role in shaping New York's status as the preeminent commercial and financial nerve center of the Nation and the world.

*Id.* at 229 (internal quotation marks omitted).

There are myriad reasons for the separate entity rule's continued vitality in New York. "The separate entity rule is the embodiment of international comity; it exists to avoid forcing foreign bank branches to comply with U.S. orders and as recognition of foreign sovereign power over banks located in their countries." Diego Zambrano, *A Comity of Errors: The Rise, Fall, and Return of International Comity in Transnational Discovery*, 34 Berkeley J. Int'l L. 157, 188–89 (2016); *see also* Geoffrey Sant, *The Rejection of the Separate Entity Rule Validates the Separate Entity Rule*, 65 SMU L. Rev. 813, 815–25 (Fall 2012) (listing comity, inconvenience, and avoidance of competing claims to the same asset as justifications for the rule). Indeed, the *Motorola* court recognized exactly those concerns when it

- 13 -

reaffirmed the separate entity rule's vitality in New York. 21 N.E.3d at 229 (noting the rule prevents "competing claims and the possibility of double liability in separate jurisdictions," relieves banks of the burden of understanding and monitoring "a multitude of legal and regulatory regimes" and "conflicts among competing legal systems," and "promotes international comity").

The Turnover Order, however, threatens to subvert the separate entity rule and all of its critical benefits for banks sitting in New York. The District Court envisioned that BNY would identify a "sub-custodian" in Argentina that is "a member of the central securities depositary" there, CdV would "identify [the sub-custodian that BNY designated] as the beneficial owner," and then the YPF Shares would be "transferred into a global custody account in New York." (S.A. 26–27.)

There are several problems with that Order. First, the District Court incorrectly treated BNY (a New York bank) as one and the same as its Argentine sub-custodian. It was improper for the District Court to order BNY to reach into Argentina to do anything via an Argentine sub-custodian—whether obtaining custody of the YPF Shares or transferring those Shares to New York—irrespective of whether Argentine law permits the same. More concerning, the sub-custodian of BNY has been, per Appellees, "[t]he Branch of Citibank, N.A. in the Republic of Argentina," (J.A. __ (Dkt.559-16.at.2)), *i.e.*, *an entirely different bank than BNY* that also was not before the District Court. So the District Court did not just fail to treat

- 14 -

different branches of the same bank separately, which is the situation where the separate entity rule is most frequently applied; it also failed to treat *entirely different banks* as separate entities.

*Amici* are concerned that, if upheld, the Turnover Order would provide a court-approved shortcut for bypassing the separate entity rule and undermining New York law in other cases going forward: Under the Turnover Order, if the District Court has personal jurisdiction over a judgment debtor, then the judgment debtor can simply be ordered to deposit its foreign assets with a foreign bank that has a commercial relationship with a New York bank, or is a foreign affiliate of a New York bank, which will then involve that foreign bank in transferring the assets to a bank sitting in New York.

Another way to conceptualize the District Court's error is this: Under New York law, a garnishee is "a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest." NY CPLR § 105(i). As discussed, the Turnover Order (if upheld) would permit a district court to treat a domestic bank and a foreign bank as the same for Section 5225 purposes (*supra* at 14–15; S.A. 27), and in so doing it would force both the domestic and foreign banks to become garnishees without their consent. But a foreign bank—whether an entirely different bank or a foreign branch of a domestic branch—must be dealt with separately and cannot

simply be assumed to be the same entity. *Motorola*, 21 N.E.3d at 226. The District Court erred in making that assumption.

## III.  THE TURNOVER ORDER FLOUTS COMITY CONSIDERATIONS.

"Comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation.'" *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 139 (2d Cir. 2014) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)). It has long been the rule in U.S. courts—embodied in the concept of comity—to avoid applying U.S. laws in a way that interferes with the laws of other nations. *See, e.g.*, *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) ("[T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with other nations' sovereign authority."); Restatement (Third) of Foreign Relations Law § 441 (1987) ("[A] state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national."). "That rule is 'a fundamental principle[] of international comity.'" *Uzan*, 388 F.3d at 60 (quoting *Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960)); *accord United States v. Ross*, 302 F.2d 831, 834 (2d Cir. 1962).

Consistent with that precept, this Court and others have refused to enforce orders that require international banks to act in violation of the law of a foreign jurisdiction. *See, e.g.*, *Trade Dev. Bank v. Cont'l Ins. Co.*, 469 F.2d 35, 41 (2d Cir. 1972) (refusing to require bank to disclose customer names in violation of Swiss

law); *In re Chase Manhattan Bank*, 297 F.2d 611, 613 (2d Cir. 1962) (declining to order production of documents in violation of Panamanian law); *Ings*, 282 F.2d at 151–152 (same, with regard to Quebec law); *see also Minpeco, S.A. v. Conticommodity Serv., Inc.*, 116 F.R.D. 517, 529–30 (S.D.N.Y. 1987) (refusing to compel disclosure of bank customer names in violation of Swiss law); *cf. Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*, 816 N.Y.S.2d 470, 475–77 (1st Dep't 2006) (declining to force entrepreneur to answer questions about his employment when doing so would cause him to violate Malaysian law).

The District Court rejected the Republic's comity argument in the Turnover Order. As the District Court acknowledged, Article 10 of the law expropriating the YPF Shares "forbids any transfer of the [YPF Shares] without permission of the [Argentine] National Congress by two-thirds vote of its members." (S.A. 29.) But the District Court reasoned that there was no conflict between that law and the Turnover Order because the Republic could, among other things, "receive the permission of the National Congress by two-thirds vote" or "take action to change the law." (S.A. 30.)

Those are perplexing reasons for refusing to extend comity. In particular, the District Court's notion that there is no conflict between Argentine law and the Turnover Order because Argentina could change its law eviscerates the requirement

that there be a comity analysis when the judgment debtor is a foreign sovereign. A foreign sovereign can always change its laws to avoid a conflict with U.S. law.

In any event, the District Court's reasoning is not applicable to a non-sovereign bank. No such bank could reasonably be asked to change a sovereign's laws, or to force a required legislative vote. Yet the Turnover Order mandates that BNY and its sub-custodian (both non-sovereign entities) facilitate the turnover from the Republic to Appellees by participating in multiple transactions that, on their face, violate Argentine law (both as it existed at the time of the Turnover Order and now). (S.A. 33; J.A. __ (Dkt.577.at.7–8.).) Indeed, the Turnover Order contains no exceptions or conditions to allow BNY and its sub-custodian to consider whether the role dictated by the District Court is even *permitted by Argentine law*. (S.A. 33.) Moreover, even if a bank were to comply with an order like the Turnover Order, the bank could be forced to violate its own internal underwriting standards or underwriting procedures or even bank regulatory requirements. Banking is a highly regulated industry, and a failure to consider how those regulations might affect what a bank is being ordered to do is (again) a failure to conduct a proper comity analysis.

Just as troubling, the District Court concluded that, even if there was a conflict between Argentine law and the Turnover Order, "comity considerations [would still] counsel in favor of granting Plaintiffs' requested relief" because "[t]he United States has a strong interest in enforcing its judgments" and the Republic had (in the District

Court's view) "refuse[d] to make any effort to honor the Court's unstayed judgment." (S.A. 30–32.) But the United States always has an interest in enforcing its judgments; if that were enough to overcome comity considerations, then banks could regularly be ordered (tacitly or explicitly) to violate foreign law. And the supposed refusal to honor a judgment by the judgment debtor, again, cannot be laid at the feet of the bank ordered to facilitate payment. As discussed above, "it is well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national.'" *Uzan*, 388 F.3d at 60 (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)). The District Court's failure to fully consider what it was ordering BNY to do makes the Turnover Order a blueprint for entirely ignoring comity considerations with regard to banks. That cannot be correct.

## IV. AFFIRMANCE OF THE TURNOVER ORDER WOULD PRESENT A SERIOUS THREAT TO NEW YORK'S ROLE AS THE EPICENTER OF GLOBAL BANKING.

"For New York City and New York State, it is important, perhaps vital, that foreign banking prosper and flourish here." *In re Liquidation of N.Y. Agency & Other Assets of Bank of Credit & Commerce Int'l S.A.*, 587 N.Y.S. 2d 524, 526 (N.Y. Sup. Ct. 1992). So too for the United States, which "has an interest in maintaining New York's status as one of the foremost commercial centers in the world." *Allied*

*Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 (2d Cir. 1985). If affirmed, the Turnover Order would jeopardize those interests.

The District Court's issuance of an order that not only purports to require a bank to act contrary to foreign law, but that purports to bind a non-party to the litigation, *see supra* at 7–12, is deeply troubling to *amici* and their members. Even setting aside the procedural and legal flaws of the Turnover Order discussed above, *amici* expect stark consequences will flow from the Turnover Order if it is allowed to stand.

First, the Turnover Order greenlights courts to conscript banks with New York operations to obtain foreign assets of a judgment debtor and bring them to the United States—no matter the identity of the judgment debtor or the relationship the bank may previously have had with it. *Amici* know of no similar case in which a court has ordered a bank to act in this way without its consent (and especially without even being heard) simply because it once had a relationship with a customer. The logical response to such an impingement would be for banks to either remove themselves from New York to avoid Section 5225, or (if such a thing were even possible) shut down (or never open) branches in countries where potential judgment debtors reside.

Second, if affirmed, the Turnover Order would sanction other parties to flout the well-settled separate entity rule in a broad variety of situations, effectively stripping New York banks of hard-fought protections critical to their operations. As

this Court has acknowledged, "[a] decision that branches of a bank anywhere in the world are subject to post-judgment enforcement orders if that bank maintains a New York branch could potentially affect decisions of international banks to maintain New York branches" at all. *Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*, 740 F.3d 108, 117 (2d Cir. 2014). The logic of the Turnover Order could be seen by other courts to apply not just to the turnover of the YPF Shares but to any attempt by a judgment creditor to reach foreign assets. Affirmance of the Turnover Order thus could subject banks with New York branches and foreign branches or other operations to "competing claims" (that is, a bank could be forced to break the law of one jurisdiction to obey the law of another), and it would detract from, rather than "promote[,] international comity." *Motorola*, 21 N.E.3d at 229. *Amici*'s members could find it significantly more difficult to maintain branches in New York if the mere presence of a branch in New York sufficed to subject any other branch worldwide (or, as here, another bank in a foreign jurisdiction with a commercial relationship with a New York bank, *see supra* at 14–15) to a turnover order. Foreign clients, too, would have to consider seriously whether to contract with a bank with a New York branch if the mere act of doing so could put their non-U.S. assets at risk or force them into commercial relationships with other entities. The result, again, could be a migration of international business to other commercial centers.

And, finally, the Turnover Order offers judgment creditors a game plan for dodging the comity concerns that usually feature in litigation concerning international banks. This is no idle concern: Litigation implicating conflicts between foreign and New York or federal law is common in this Circuit and in New York State,[8] and (as discussed *supra* at 16–17) courts in this Circuit have often refused to order banks to violate foreign law. But under the Turnover Order, a judgment creditor could skip such an analysis with regard to the bank that must facilitate the transfer by instead purporting to target only the judgment debtor.

What is more, if U.S. courts compel U.S. banks to transfer assets held overseas, there is nothing to prevent similar orders by foreign courts against the property of the United States or of its citizens. Enforcing a foreign judgment in the United States requires the plaintiff to file suit in a court of competent jurisdiction and obtain a judgment from a U.S. court. *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*, 863 F.3d 96 (2d Cir. 2017) (tracing various bases for enforcing foreign judgments). But under the Turnover Order, enforcing a U.S. judgment implicating foreign assets merely requires that the foreign judgment debtor has done

---

[8] *See, e.g.*, *Tiffany (NJ) LLC v. Andrew*, 276 F.R.D. 143, 158 (S.D.N.Y. 2011) (potential conflict between U.S. and Chinese law); *Samsun Logix Corp. v. Bank of China*, 929 N.Y.S.2d 202, 208 (N.Y. Sup. Ct. May 12, 2011) (same); *Shaheen Sports, Inc. v. Asia Ins. Co.*, Nos. 98-cv-5951 (LAP) & 11-cv-920 (LAP), 2012 WL 919664, at *7 (S.D.N.Y. Mar. 14, 2012) (potential conflict between Pakistani and U.S. law).

business with some bank that has a branch in New York and a commercial relationship with another bank (perhaps an entirely different one) in a foreign jurisdiction. That unequal treatment will not go unnoticed by foreign countries, and could well result in a race to the bottom where countries rush to make judgments targeting foreign-held assets more easily enforceable domestically. One undoubted loser in such a race would be international banks.

To state the obvious, placing financial institutions in the United States at risk of violating foreign law has serious policy implications. That is especially the case where, as here, a bank could be subject to regulatory, civil, or other legal sanctions abroad, as well as an action by its accountholder against it for transferring funds without permission, even though the bank was not a party to the case exposing it to such sanctions. Again, the practical effect of such a ruling would be to discourage banks from having branches in New York. Given the strong federal and New York policy interests in having New York remain a center of banking and commerce (*see supra* at 19–20), that is another reason to reverse the District Court.

* * *

Enforcement of a judgment—even a supposedly valid judgment—cannot come at any cost. Here, the flaws in the Turnover Order would create a difficult situation for international banks: Without even being a party to a court proceeding, a bank could be forced to assist in the transfer of foreign assets from a foreign

- 23 -

jurisdiction to the United States in violation of that foreign jurisdiction's law. Inevitably, international banks would become reluctant to operate in New York and international customers would become reluctant to bank with entities with a presence in New York. The requirement that a court can only bind the parties before it, the rule that separate entities must be treated separately, and the principles of comity are meant to preclude such an unjust result. Because the Turnover Order ignores those principles or errs in their application, this Court should reverse.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse.

Dated:      October 2, 2025

                        Respectfully submitted,

                        WILLKIE FARR & GALLAGHER LLP

                        By: */s/ Todd G. Cosenza*
                        Todd G. Cosenza
                        Zeh S. Ekono
                        Emily M. Wilson
                        WILLKIE FARR & GALLAGHER LLP
                        787 Seventh Avenue
                        New York, NY 10019
                        212-728-8000
                        tcosenza@willkie.com
                        zekono@willkie.com
                        ewilson@willkie.com

                        John B. Goerlich
                        WILLKIE FARR & GALLAGHER LLP
                        1875 K St. NW
                        Washington, DC 20006
                        202-303-1000
                        jgoerlich@willkie.com

                        *Attorneys for* Amici Curiae

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 6,074 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). In preparing this certificate, I relied on the word count function in Microsoft Word.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 29(a)(4), 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

Dated: October 2, 2025
                                        */s/ Todd G. Cosenza*
                                        Todd G. Cosenza

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2025, I filed the foregoing Brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: October 2, 2025            */s/ Todd G. Cosenza*
                                     Todd G. Cosenza