# 25-1687

## United States Court of Appeals for the Second Circuit

PETERSEN ENERGÍA INVERSORA, S.A.U.,
PETERSEN ENERGÍA S.A.U.,

*Plaintiffs-Appellees,*

v.

ARGENTINA REPUBLIC,

*Defendant-Appellant,*

YPF S.A.,

*Defendant.*

_____

Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR VICTIMS OF TERRORISM AS AMICI CURIAE SUPPORTING PLAINTIFFS-APPELLEES

Tejinder Singh
Jacob R. Loshin
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
202-629-3530
tejinder@sparacinopllc.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF THE AMICI ....................................................................1

ARGUMENT ........................................................................................4

I.     Congress Created a Comprehensive Framework to Enable American
       Victims to Obtain and Enforce Judgments Against State Sponsors of
       Terrorism. ..................................................................................5

II.    Additional Barriers to Enforcement Are Unwarranted. ................10

III.   Additional Barriers to Enforcement Would Undermine Efforts of
       Terrorism Victims to Obtain Justice and Compensation..............14

CONCLUSION ....................................................................................16

i

# TABLE OF AUTHORITIES

## Cases

*Attestor Master Value Fund LP v. Argentina*,
113 F. 4th 220 (2d Cir. 2024)...................................................12

*Conn. Bank of Com. v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002)....................................................11

*Fuld v. Palestinian Liberation Org.*,
606 U.S. 1 (2025).....................................................................13

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010).....................................................................13

*In re 650 Fifth Ave.*, 2014 WL 1284494, at *17 (S.D.N.Y. Mar. 28, 2014),
*vacated on other grounds*, *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107
(2d Cir. 2016) ..........................................................................15

*Koehler v. Bank of Berm. Ltd.*,
544 F.3d 78 (2d Cir. 2008)......................................................10

*Koehler v. Bank of Berm. Ltd.*,
911 N.E. 2d 825 (N.Y. 2009)...................................................12

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
895 F.3d 194 (2d Cir. 2018)......................................................4

## Statutes

18 U.S.C. § 1330(b) ......................................................................10

28 U.S.C. § 1605(a)(2)....................................................................9

28 U.S.C. § 1605A...........................................................................8

28 U.S.C. § 1610(a)(2)....................................................................9

28 U.S.C. § 1610(a)(7)........................................................... 7, 8, 9

Antiterrorism and Effective Death Penalty Act of 1996,
    Pub. L. No. 104-132, § 221, 110 Stat. 1214 ........................................6

National Defense Authorization Act for Fiscal Year 2008,
    Pub. L. No. 110-181, § 1083, 122 Stat. 3 (2008)................................8

Terrorism Risk Insurance Act of 2002,
    Pub. L. No. 107-297, 116 Stat. 2322 ...............................................7

## Other Authorities

H.R. Rep. No. 94-1487 (1976)....................................................................11

## INTEREST OF THE AMICI[1]

*Amici* are twelve American victims of acts of international terrorism who have brought civil actions against a foreign government—namely the Islamic Republic of Iran—that played a role in causing amici's injuries. For years, *amici* have pursued judgments in U.S. courts under the terrorism exception to the Foreign Sovereign Immunities Act. *Amici* have an interest not only in being able to obtain judgments against a foreign government, but also in enforcing them. We respectfully submit this brief in support of Plaintiffs-Appellees' position that foreign sovereign immunity does not prevent courts from attaching property that is lawfully turned over for execution of a judgment in the United States. *Amici* are:

**Frederick Benson**. Mr. Benson's son, Petty Officer 1st Class Darrik C. Benson, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, he was killed in an attack on a helicopter committed by the Taliban's Haqqani Network, a terrorist organization supported by the Islamic Republic of Iran.

**August Wildman** and **Maxwell Cabrera**. Ms. Wildman's husband and Mr. Cabrera's father, Lieutenant Colonel David E. Cabrera, served in Afghanistan as a member of the U.S. Army. On October 29, 2011, he was killed in a suicide bombing

---

[1] This brief is filed with consent from all parties. No party's counsel authored this brief in any part, and no person other than amici's counsel contributed money that was intended to fund preparing or submitting this brief.

1

committed by al-Qaeda and Taliban terrorists supported by the Islamic Republic of Iran.

**Nicole Kamaleson** and **Cedric Kamaleson**. Ms. Kamaleson's husband and Mr. Kamaleson's father, Monoharan "Paul" Kamaleson, served in Afghanistan as a civilian finance officer with First MicroFinance Bank. On January 14, 2019, he was killed in a suicide bombing attack committed by al-Qaeda and Taliban terrorists supported by the Islamic Republic of Iran.

**David Lau**. Seargeant First Class David Lau served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, he was severely wounded in a suicide bombing attack committed by al-Qaeda and Taliban terrorists supported by the Islamic Republic of Iran.

**Brandon Korona**. Seargeant Brandon Korona served in Afghanistan as a member of the U.S. Army. On June 23, 2013, he was severely injured in an IED attack committed by the Taliban's Haqqani Network, a terrorist organization supported by the Islamic Republic of Iran.

**Barry Welch**. Mr. Welch's son, Specialist Nickolas S. Welch, served in Afghanistan as a member of the U.S. Army. On July 23, 2013, he was mortally wounded (and later died) in an IED attack committed by the Taliban's Haqqani Network, a terrorist organization supported by the Islamic Republic of Iran.

**Nathan Torian**. Mr. Torian's brother, Master Sergeant Aaron C. Torian, served in Afghanistan as a member of the U.S. Marine Corps. On February 15, 2014, he was injured in an IED attack committed by Taliban terrorists supported by the Islamic Republic of Iran.

**Kirk Daehling**. Mr. Daehling's son, Specialist Mitchell Daehling, served in Afghanistan as a member of the U.S. Army. On May 14, 2013, he was killed in an IED attack committed by Taliban terrorists supported by the Islamic Republic of Iran.

**Joseph William Prescott**. Mr. Prescott's son, Specialist Brandon Joseph Prescott, served in Afghanistan as a member of the U.S. Army. On May 4, 2013, he was killed in an IED attack committed by Taliban terrorists supported by the Islamic Republic of Iran.

**Matthias Roldan**. Mr. Roldan's father, Angel Roldan Jr., served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On May 16, 2013, he was killed in a suicide bombing committed by al-Qaeda and Taliban terrorists supported by the Islamic Republic of Iran.

3

## ARGUMENT

This case presents an important question about the ability of U.S. courts to enforce their judgments against foreign governments. While this case involves claims brought under the "commercial activity" exception to the Foreign Sovereign Immunities Act (FSIA), the resolution of this appeal will have implications for claims brought under other FSIA exceptions, including the exception for suits by American victims of state sponsors of terrorism.

In this case, the plaintiffs obtained a $16.1 billion judgment against Defendant-Appellee Argentina after Argentina and its state-owned energy company YPF S.A. breached their obligations to shareholders who purchased YPF's American depository receipts (ADRs) on the New York Stock Exchange. Because the plaintiffs' claims are based on commercial activity with a direct effect in the United States, Argentina is not immune from that suit under the FSIA. *See Petersen Energia Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 209 (2d Cir. 2018). But Argentina failed to satisfy the judgment against it. And so the district court ordered, pursuant to established legal principles, that Argentina transfer its YPF shares to New York and then ordered, pursuant to the FSIA's exception to execution immunity for property in the United States, that ownership of the shares be transferred to the plaintiffs in partial satisfaction of their judgment. The district court's order accords with established legal principles and the plain text of the FSIA.

4

Yet Argentina asks this Court to conjure phantom barriers to execution based on statutory silence, pre-FSIA common law, and notions of "comity."

Such barriers would threaten to render the FSIA a false promise for those injured by foreign governments where Congress has specifically determined that plaintiffs are entitled to recover. And they would diminish the judicial power by indulging foreign governments that defy the valid judgments of U.S. courts. This Court should be mindful that what is true for shareholders injured by Argentina's breach of contract is no less true for Americans injured by a foreign government's support for terrorist attacks: An unenforceable judgment is a hollow recompense. Courts should be fully empowered to enforce their judgments within the bounds of the FSIA. The decision below should be affirmed.

## I. Congress Created a Comprehensive Framework to Enable American Victims to Obtain and Enforce Judgments Against State Sponsors of Terrorism.

The FSIA establishes a comprehensive framework to provide remedies for American victims of state-sponsored terrorism. This framework reflects Congress's sustained commitment, expressed through multiple legislative enactments over more than two decades, to ensure that Americans who suffer devastating harm at the hands of state sponsors of terrorism have meaningful access to justice and compensation.

Prior to 1996, victims of state-sponsored terrorism generally had no recourse in U.S. courts against the foreign governments responsible for their injuries, as the

5

FSIA's exceptions to foreign sovereign immunity did not encompass terrorism claims. In the Antiterrorism and Effective Death Penalty Act of 1996, however, Congress addressed that problem by enacting an exception to foreign sovereign immunity for cases in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support for such acts, if the foreign state has been designated as a state sponsor of terrorism. Pub. L. 104-132, § 221, 110 Stat. 1214 (1996). The terrorism exception represented a watershed moment for victims of state-sponsored terrorism. Congress recognized that terrorism inflicts unique and catastrophic harms that warrant special legal protections, and that foreign governments can play a major enabling role. American victims were thus given the tools to obtain compensation for those injuries in U.S. courts.

At the same time, Congress recognized that simply providing terrorism victims with a right to sue was insufficient. Even after obtaining judgments against foreign governments, American victims of terrorism would face extraordinary difficulties in collecting those judgments. State sponsors of terrorism are adept at shielding their assets from execution, often by keeping property outside the United States or by structuring holdings to claim immunity from attachment. Without effective enforcement mechanisms, the right to sue risked becoming merely

theoretical. Congress thus enacted an exception to foreign sovereign immunity from execution and attachment, codified at 28 U.S.C. § 1610(a)(7).

In subsequent enactments, Congress substantially strengthened those tools. In the Terrorism Risk Insurance Act of 2002, for example, Congress strengthened terrorism victims' enforcement rights by adding sections 1610(f) and (g). Pub. L. No. 107-297, 116 Stat. 2322. Section 1610(f)(1)(A) provides that certain property subject to regulation under sanctions laws, including frozen assets, shall not be immune from execution to satisfy judgments under the terrorism exception. This provision was designed to make available for execution assets that the United States has frozen pursuant to sanctions against state sponsors of terrorism. Section 1610(f) also requires the Secretary of the Treasury and the Secretary of State to make every effort to fully, promptly, and effectively assist terrorism judgment creditors in identifying, locating, and executing against property of state sponsors of terrorism. Section 1610(g) goes even further, providing that property of a foreign state against which a terrorism judgment is entered, and property of agencies or instrumentalities of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to execution regardless of numerous factors that might otherwise provide a basis for claiming immunity. Specifically, section 1610(g)(1) provides that such property is subject to execution regardless of the level of economic control over the property by the

7

government, whether the profits go to the government, the degree to which officials manage the property or control its daily affairs, whether the government is the sole beneficiary, or whether establishing the property as a separate entity would entitle the foreign state to benefits in U.S. courts while avoiding its obligations.

In the National Defense Authorization Act for Fiscal Year 2008, Congress created the current version of the FSIA's terrorism exception, codified at 28 U.S.C. § 1605A, which broadened the types of covered terrorist acts and eliminated certain procedural barriers that had hindered terrorism victims' ability to obtain relief. Pub. L. 110-181, § 1083, 122 Stat. 3 (2008).

This history reflects Congress's considered determination that immunity does not shield foreign governments when they support terrorist attacks that injure Americans, and that terrorism victims should be able to execute against a broad range of foreign sovereign property to enforce their judgments.

In sum, the FSIA's current exceptions for terrorism claims remove a foreign state sponsor of terrorism's immunity from suit, 28 U.S.C. § 1605A, as well as the immunity of its property from execution and attachment in the United States, 28 U.S.C. § 1610(a)(7). The latter exception provides that "property in the United States of a foreign state . . . used for commercial activity in the United States" shall not be immune from execution to satisfy a judgment relating to a claim under the FSIA's

8

terrorism exception, "regardless of whether the property is or was involved with the act upon which the claim is based." *Id*.

Those exceptions parallel the FSIA's exceptions to immunity from suit, 28 U.S.C. § 1605(a)(2), and attachment and execution, 28 U.S.C. § 1610(a)(2), for commercial activity, which are at issue in this appeal. With respect to both exceptions, Congress acted to ensure that the right to sue a foreign government would not be rendered hollow by immunity barring execution. Unlike plaintiffs enforcing a commercial judgment, however, Congress permitted terrorism victims to attach property of a foreign government regardless of whether that property was involved with the act upon which the claim is based. This dispensed with a nexus requirement that would otherwise be a significant barrier to enforcement, and it reflects Congress's recognition that terrorism victims need broader enforcement tools than are available under other exceptions to immunity. Congress intended terrorism victims to have these broad enforcement rights to ensure that terrorism victims can not only obtain judgments but also collect on them.

Accordingly, to attach property under the FSIA's terrorism exception, there are no special restrictions—and that is by congressional design. The only restrictions are the threshold requirements common to all of the FSIA's exceptions to execution immunity, namely that the property of the foreign state be "in the United States" and be "used for commercial activity in the United States." No more, and no less.

9

## II.    Additional Barriers to Enforcement Are Unwarranted.

The decision below observed the FSIA's threshold requirements by ordering Argentina to bring assets into New York before executing upon them. The legal basis for that turnover procedure was straightforward. Under the FSIA, the court had personal jurisdiction over Argentina as to the plaintiffs' claims, 18 U.S.C. § 1330(b); and under long-settled law, such a court that "has personal jurisdiction over a judgment debtor . . . may order the judgment debtor himself to deliver the property into New York" to satisfy the judgment, *Koehler v. Bank of Berm. Ltd.*, 544 F.3d 78, 85 (2d Cir. 2008). Once in New York, Argentina's property enjoys no immunity from attachment or execution under the FSIA where it is used for commercial activity in the United States and was used for the commercial activity upon which the plaintiffs' claims were based. Appellees' Br. 43-50.

Argentina resists that conclusion by conjuring barriers where none exist. Argentina argues that the FSIA forecloses the district court's turnover procedure because the FSIA "does not mention property outside the United States." Appellant's Br. 25. But such statutory silence hardly rescinds the FSIA's express provision for personal jurisdiction over defendants like Argentina. Nor does it override the established rule that courts exercising such jurisdiction to enforce a judgment may order a defendant to bring property into the court's jurisdiction to satisfy the judgment.

10

The FSIA's immunity exceptions simply correspond to the different types of jurisdiction a court may exercise with respect to a foreign government, with *in personam* jurisdiction over a foreign government conferred by the exceptions to immunity from suit and *in rem* jurisdiction over a foreign government's property conferred by the exceptions to immunity from attachment and execution. The FSIA does not mention property outside the United States because courts generally lack *in rem* jurisdiction over property abroad. But where courts have jurisdiction, encompassing the power to order a defendant to move assets to satisfy a judgment, the FSIA exceptions to sovereign immunity work together to cover the waterfront. *See* H.R. Rep. No. 94-1487, at 27 (1976) (exceptions to execution immunity "are intended to . . . partially lower[] the barrier of immunity from execution, so as to make this immunity *conform more closely* with the provisions on jurisdictional immunity") (emphasis added).

Tellingly, Argentina seems eager to return to the days before the FSIA's enactment, when Argentina claims immunity from suit was "absolute" as "a matter of federal common law," Appellant's Br. 22-23, and when execution against a foreign government's property was purportedly an even "greater affront," Appellant's Br. 28 (quoting *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 255-56 (5th Cir. 2002)). But those days are over. While the FSIA preserves a wide range of immunity from claims that do not fall within the FSIA's exceptions,

11

the exceptions—including for commercial activity and terrorism—represent Congress's firm determination in these contexts to place the rights of injured plaintiffs ahead of any "affront" a foreign government may feel.

Argentina's search for immunity fares no better under New York law (made applicable by Federal Rule of Civil Procedure 69(a)(1)), which reaffirms the principle that a court "with personal jurisdiction over a defendant may order him to turn over out-of-state property" by ordering him to bring "money or property into New York from another state or country." *Koehler v. Bank of Berm. Ltd.*, 911 N.E. 2d 825, 829-31 (N.Y. 2009). Unable to dispute that principle, Argentina simply argues that it cannot apply to foreign governments because New York law does not expressly single them out. But a general rule is a general rule, as this Court has recognized. It "would make little sense" to read New York law to exclude foreign governments when doing so "would cut them out of a normal part of civil litigation—judgment enforcement"—to which the FSIA plainly subjects them. *Attestor Master Value Fund LP v. Argentina*, 113 F. 4th 220, 234 (2d Cir. 2024).

Argentina's state-law arguments are ultimately an attempt to smuggle absolute immunity in through New York law after the FSIA has rejected it. Where a federal statute speaks directly to the scope of immunities a foreign government may enjoy, it is implausible to assume that New York law's "silence" as to foreign

12

governments creates an absolute-immunity regime that the FSIA rejected. Appellant's Br. 37.

Finally, Argentina invokes "principles of international comity," but this is yet one more attempt to institute the absolute-immunity regime Congress decided against. Appellant's Br. 52. Comity is the reason for the sovereign immunity the FSIA broadly confers; it is no reason to close a targeted exception the FSIA plainly maintains. Such exceptions represent Congress's determination in certain contexts, including a foreign government's support for acts of terrorism injuring Americans, that the interests of injured plaintiffs in obtaining and enforcing their judgments take precedence over comity. As the district court recognized here, the "United States has a strong interest in enforcing its judgments, and this interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to execution under the FSIA." S.A. 30-31. The U.S. interest is further underscored in the terrorism context, where "combating terrorism is . . . 'an urgent objective of the highest order'" and the "Federal Government . . . has a strong interest in permitting American victims of international terror to pursue justice in domestic courts." *Fuld v. Palestinian Liberation Org.*, 606 U.S. 1, 20 (2025) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010)).

As the district court recognized, "[c]omity is not a one-way street." S.A. 32. Foreign governments that injure plaintiffs and "refuse[] to make any effort to honor" the valid judgments of U.S. courts deserve no more comity than they afford. *Id*.

## III. Additional Barriers to Enforcement Would Undermine Efforts of Terrorism Victims to Obtain Justice and Compensation.

Despite the comprehensive statutory framework Congress has created, terrorism victims continue to face extraordinary obstacles in enforcing their judgments against state sponsors of terrorism. State sponsors have proven adept at shielding their assets from execution, employing sophisticated strategies to keep property beyond the reach of U.S. courts.

The enforcement challenges terrorism victims face are not merely frustrating; they threaten to render hollow the remedies Congress created for these American victims. Terrorism victims may achieve symbolic victories in obtaining judgments, but will remain largely uncompensated for the devastating harms they have suffered if they cannot enforce them.

Although hardly a panacea, the turnover procedure employed by the district court here is one important tool to ensure that a valid judgment against a foreign sovereign may be meaningfully enforced. While state sponsors of terrorism may not often have property that is used for commercial activity in the United States, as the FSIA's predicate to attachment or execution requires, some state sponsors like Iran

14

and North Korea maintain sprawling commercial enterprises that have been known to reach into the United States from abroad. *See, e.g.*, *In re 650 Fifth Ave.*, 2014 WL 1284494, at *17 (S.D.N.Y. Mar. 28, 2014) (shares used by Iran, though various entities, to direct a partnership to lease and maintain a Manhattan office building), *vacated on other grounds*, *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016). Others like Sudan and Iraq have had their designations removed in the past, paving the way for commercial activity in the U.S., and still others like Cuba and Syria have been considered for removal and normalization.

There is no telling what lengths a current or former state sponsor of terrorism may go to enjoy the benefits of access to U.S. markets while avoiding compensation to the American victims they injure. Where the FSIA empowers courts to enforce their judgments, this Court should refrain from erecting additional barriers.

## CONCLUSION

The decision below should be affirmed.

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Jacob R. Loshin
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
Tel: 202-629-3530
tejinder.singh@sparacinopllc.com

November 21, 2025

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the length limitation in Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c) because, excluding the portions permitted to be excluded by rule from the word count, it contains 3,300 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


/s/ Tejinder Singh
Tejinder Singh

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2025, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the ACMS system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.

/s/ Tejinder Singh
Tejinder Singh